Jodie Berger (SBN 124144)
jberger@wclp.org
Richard Rothschild (SBN 67356)
rrothschild@wclp.org
Robert Newman (SBN 86534)
rnewman@wclp.org
Antionette Dozier (SBN 244437)
adozier@wclp.org
**WESTERN CENTER ON LAW & POVERTY**
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010
T: (213) 235-2617
F: (213) 487-0242

Lindsay Nako (SBN 239090)
lnako@impactfund.org
Fawn Rajbhandari-Korr (SBN 315888)
fkorr@impactfund.org
Meredith Dixon (SBN 346864)
mdixon@impactfund.org
**IMPACT FUND**
2080 Addison St., Suite 5
Berkeley, CA 94704
T: (510) 845-3473
F: (510) 845-3654

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIKA OKJE ERDMANN-BROWNING and JACQUELINE BENITEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS J. VILSACK, Secretary of the United States Department of Agriculture, in his official capacity; SHALANDA YOUNG, Director of the United States Office of Management and Budget, in her official capacity.<br><br>Defendants. | Case No. 4:23-cv-04678-JST<br><br>CLASS ACTION<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing date: January 25, 2024<br>Time: 2:00 p.m.<br><br><br>Action filed: September 12, 2023 |

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that, on December 11, 2023, or as soon thereafter as counsel may be heard by the Court, Plaintiffs Anike Okje Erdmann-Browning and Jacqueline Benitez will move, under Rule 65 of the Federal Rules of Civil Procedure and Rules 7-2 and 65-2 of the Local Civil Rules of the Court, for a preliminary injunction. The parties have stipulated to a shortened briefing schedule, subject to Court approval, for this Motion for Preliminary Injunction and the accompanying Motion for Class Certification.

The motion seeks a preliminary injunction to maintain the timely issuance of benefits from the Supplemental Nutrition Assistance Program (SNAP) in the event that Congress is unable to approve an appropriations act or further continuing resolution before November 17, 2023, and the federal government shuts down. Plaintiffs seek a preliminary injunction on behalf of themselves and all others similarly situated. The motion is filed concurrently with a Motion for Class Certification that seeks certification of a proposed class of SNAP recipients.

This motion is made on the grounds that Defendants' inaction will lead to an interruption or delay of SNAP benefits, which will violate the Administrative Procedure Act for failure to adhere to the Food and Nutrition Act. Defendants' inaction will also cause irreparable harm. The equities and public interest weigh in Plaintiffs' favor. The Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities; the previously filed declarations of Plaintiff Anika Okje Erdmann-Browning, Plaintiff Jacqueline Benitez, Gina Plato-Nino, Rebecca Silva, Erica Padilla Chavez, Shimica Gaskins, Louise Hayes, and Plaintiffs' counsel Jodie Berger and all exhibits thereto; the declarations of Hilary Williamson Hoynes, Theresa Havelka, and Plaintiffs' counsel Jodie Berger filed in support of Plaintiffs' Motion for Preliminary Injunction and all exhibits thereto; and all of the records in the action.

The parties request a hearing date of December 11, 2023.

Dated: November 13, 2023                    Respectfully submitted:

                                            Jodie Berger
                                            *Attorney for Plaintiffs*

1
2

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ........................ 2

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 7

    I. INTRODUCTION ....................................................................................................... 7

    II. FACTUAL BACKGROUND ...................................................................................... 8

        A. Low-Income Households Rely on SNAP Benefits to Alleviate Hunger. .......... 8

        B. USDA and OMB inaction will cause a delay in SNAP benefits issuance. ....... 9

        C. Plaintiffs Erdmann-Browning and Benitez will go hungry if January SNAP
           benefits are not timely issued. ................................................................... 11

    III. PROCEDURAL BACKGROUND ........................................................................... 12

    IV. LEGAL STANDARD ............................................................................................. 13

    V. ARGUMENT ........................................................................................................... 13

        A. Plaintiffs are likely to succeed on the merits because Defendants' obligation
           to pay monthly SNAP benefits is not conditioned on an appropriation. .......... 14

           1. *Maine Community Health Options* held that mandatory statutory
              language creates an enforceable federal obligation. .................... 14

           2. The Food and Nutrition Act uses obligation-creating language
              regarding the issuance of monthly SNAP benefits. ..................... 15

           3. Budget legislation categorizes SNAP as a mandatory obligation. ........ 17

           4. Congress has required appropriations only for establishment of a
              supplemental nutrition assistance program, while mandating
              continuous operation of the program in unconditional language. 19

           5. The Food and Nutrition Act's provision on "Appropriations and
              allotments" does not permit USDA to suspend SNAP benefits
              during a government shutdown. ................................................... 20

        B. Plaintiffs and the proposed class will suffer irreparable harm if an injunction
           is denied. .................................................................................................... 21

        C. The proposed injunction will preserve the status quo. .................................. 23

        D. The balance of equities and the public interest both favor plaintiffs. ............. 24

    VI. PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND. ...................... 26

    VII. CONCLUSION ..................................................................................................... 26

Notice of Motion and Motion for Preliminary Injunction
4:23-CV-04678-JST.

3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Futures LLC v. Boyd Street Distro, LLC*,
 35 F. 4th 682 (2022) ............................................................................................ 16

*All. for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (2011) ........................................................................................... 13

*Arizona Dream Act Coal. v. Brewer*,
 757 F.3d 1053 (2014) ........................................................................................... 23

*Booth v. McManaman*,
 830 F. Supp. 2d 1037 (2011) ............................................................................... 23

*Brantley v. Maxwell-Jolly*,
 656 F. Supp. 2d 1161 (2009) ............................................................................... 26

*Cont'l Oil Co. v. Frontier Ref. Co.*,
 338 F.2d 780 (1964) ............................................................................................. 26

*Digital Realty Trust, Inc. v. Somers*,
 583 U.S. ——, 138 S. Ct. 767 (2018) .................................................................. 19

*Dominguez v. Schwarzenegger*,
 No. C 09-02306 CW, 2010 WL 2673715 (2010) ................................................. 26

*Drakes Bay Oyster Co. v. Jewell*,
 747 F.3d 1073 (2014) ........................................................................................... 24

*Haskins v. Stanton*,
 621 F. Supp. 622 (1985) ....................................................................................... 23

*Hernandez v. Sessions*,
 872 F.3d 976 (2017) ............................................................................................. 24

*Johnson v. Couturier*,
 572 F.3d 1067 (2009) ........................................................................................... 26

*Jorgensen v. Cassiday*,
 320 F.3d 906 (2003) ............................................................................................. 26

*Lambright v. Ryan*,
 698 F.3d 808 (2012) ............................................................................................. 16

Notice of Motion and Motion for Preliminary Injunction
4:23-CV-04678-JST.

4

*Levesque v. Block*,
723 F.2d 175 (1983) ............................................................................................ 19

*Lopez v. Brewer*,
680 F.3d 1068 (2012) .......................................................................................... 13

*Lopez v. Heckler*,
713 F.2d 1432 (1983) .......................................................................................... 25

*Maine Community Health Options v. United States*,
590 U.S. __, 140 S. Ct. 1308 (2020) ........................................................... passim

*Newman v. Chater*,
87 F.3d 358 (1996) .............................................................................................. 16

*Paxton v. Sec'y of Health and Human Servs.*,
856 F. 3d 1352 (1988) ........................................................................................ 23

*Republic of Sudan v. Harrison*,
587 U.S. ——, 139 S. Ct. 1048 (2019) ............................................................. 19

*S.A. v. Trump*,
No. 18-CV-03539-LB, 2019 WL 990680 (2019) ............................................... 23

*Sacks v. Office of Foreign Assets Control*,
466 F.3d 764 (2006) ............................................................................................ 16

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (2005) .......................................................................................... 26

*Walker v. Pierce*,
665 F. Supp. 831 (1987) ...................................................................................... 26

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................... 13, 25

*Withrow v. Concannon*,
942 F.2d 1385 (1991) .......................................................................................... 24

**Statutes**

2 U.S.C. § 641(a)(1)(C) ............................................................................................. 18
2 U.S.C. § 651 ...................................................................................................... 7, 18
2 U.S.C. § 900(b)(8) ............................................................................................. 7, 18
2 U.S.C. §§ 622(9) ................................................................................................ 8, 19
7 U.S.C. § 2013 .......................................................................................................... 21
7 U.S.C. § 2013(c) ..................................................................................................... 21
7 U.S.C. § 2013(b)(6)(A) ........................................................................................... 22
7 U.S.C. § 2014 .......................................................................................................... 10

7 U.S.C. § 2014(a) ................................................................................................................ passim
7 U.S.C. § 2014(b) .................................................................................................................... 16
7 U.S.C. § 2016(g)(2)(ii) ........................................................................................................... 17
7 U.S.C. § 2020(c)(9) ................................................................................................................ 17
7 U.S.C. §§ 2011, 2014(a) ................................................................................................... passim
7 U.S.C. §§ 2013(a), 2020 ........................................................................................................... 9
7 U.S.C. §§ 2027(b), (c) ............................................................................................................. 20
7 U.S.C. §§ 2027(b), (c), (d) ...................................................................................................... 21
31 U.S.C. § 1341 .................................................................................................................. 7, 15
31 U.S.C. § 1341(a) ................................................................................................................... 24
31 U.S.C. § 1341(a)(1) ............................................................................................................... 25
31 U.S.C. § 1512(b)(2) ................................................................................................................ 9
42 U.S.C. § 18062 ..................................................................................................................... 14
U.S. Const. art. I ...................................................................................................................... 15
U.S. Const. art. I, § 9, cl. 7 .................................................................................................. 15, 24

**Rules**

Federal Rule of Civil Procedure 65(c) ......................................................................................... 25
Local Civil Rules of the Court 7-2 and 65-2 .................................................................................. 2

**Regulations**

7 C.F.R. § 273.10 ........................................................................................................................ 9
7 C.F.R. § 273.2(a), (g)(1) and (g)(3) ................................................................................... 16, 17
7 C.F.R. § 274.1(h) ..................................................................................................................... 9
7 C.F.R. § 274.8(a)(3) .................................................................................................................. 8
7 C.F.R. § 274.8(c)(1)(iii) ...................................................................................................... 8, 25
7 C.F.R. §§ 273.2(a)(2), (i)(l) .................................................................................................... 17

**Other Authorities**

H. Rep. No. 99-271 ................................................................................................................... 20
Annual Update of the HHS Poverty Guidelines,
88 Fed. Reg. 3424 (Jan. 19, 2023) ............................................................................................... 9

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

More than 40 million Americans who rely on Supplemental Nutrition Assistance Program (SNAP) benefits may be unable to feed themselves beginning January 1, 2024, unless this Court issues a timely preliminary injunction.  If Congress does not pass a continuing resolution or appropriations bill by November 17, the federal government will begin shutting down.  SNAP recipients will not get their benefits on time in the new year unless USDA instructs states by mid-December to process the benefits for January.  Plaintiffs Anika Okje Erdmann-Browning and Jacqueline Benitez, on behalf of themselves and millions of Americans, seek to prevent an unlawful delay or suspension of SNAP benefits.

Thomas J. Vilsack, Secretary of the United States Department of Agriculture (USDA) has a continuing statutory obligation to provide benefits to eligible households that have completed the application process, regardless of lapses in annual appropriations.  The Food and Nutrition Act contains mandatory language directing the issuance of SNAP benefits to qualifying households.  7 U.S.C. §§ 2011, 2014(a).  Section 2014(a), for example, expressly provides that: "Assistance under this program shall be furnished to all eligible households who make application for such participation." *Id.* § 2014(a).  In addition, legislation governing the congressional budget procedure confirms that the expenditure of funds necessary to deliver SNAP benefits is not dependent on an annual appropriation.  2 U.S.C. §§ 622(9), 651, 900(b)(8).  The entitlement language in these statutes is an explicit congressional instruction to spend money, satisfying the requirements of the Appropriations Clause and the Anti-Deficiency Act.  U.S. Const. art. I, § 9, cl.7; 7 U.S.C. § 2014(a); 31 U.S.C. § 1341.

Plaintiffs meet all the requirements for issuance of a preliminary injunction.  Defendants' failure to adhere to the provisions of the Food and Nutrition Act violates the Administrative Procedure Act.  Whereas tens of millions of Americans will suffer irreparable harm caused by the denial or delay of January and future benefits, Defendants will not suffer much, if any, hardship from granting provisional relief.  Plaintiffs accordingly ask this Court to

issue a preliminary injunction prohibiting Secretary Vilsack and Shalanda Young, Director of

the Office of Management and Budget (OMB), from causing an interruption of the normal

issuance of SNAP benefits from January 1 onward.  Specifically, the Court should (1) order

Secretary Vilsack and USDA to inform states that they can and should continue to take all

actions on the normal schedule to ensure timely issuance of SNAP benefits for January 2024

and any subsequent months, and (2) order Director Young to instruct USDA to obligate January

and future benefits and provide any necessary apportionments regardless of whether Congress

has a passed a continuing resolution or appropriations bill.

## II.     FACTUAL BACKGROUND

### A.     Low-Income Households Rely on SNAP Benefits to Alleviate Hunger.

SNAP is the nation's most important and effective anti-hunger program.  Recognizing

that "the limited food purchasing power of low-income households contributes to hunger and

malnutrition among members of such households," Congress enacted SNAP to "safeguard the

health and well-being of the Nation's population" and "alleviate . . . hunger and malnutrition"

by "permit[ing] low income households to obtain a more nutritious diet through normal

channels of trade."  7 U.S.C. § 2011.  SNAP currently provides over 40 million participants[1] in

over 21 million[2] low-income households with food assistance.

SNAP participants receive benefits via Electronic Benefit Transfer (EBT) debit cards

that they can use to purchase food each month.  *Id.* § 2013.  They can only redeem these

benefits at retailers authorized to accept EBT cards.  *Id.* § 2016.  At the end of each day, the

state's EBT system totals all EBT transactions and transfers the cash value of the transactions

into the bank accounts of participating retailers.[3]  "Concentrator banks" then request

reimbursement of those transactions from the appropriate U.S. Treasury accounts.  7 C.F.R.

---

[1] USDA, Supplemental Nutrition Assistance Program: Number Of Persons Participating, available at https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-persons-9.pdf (last visited Nov. 8, 2023).

[2] USDA, Supplemental Nutrition Assistance Program: Number Of Households Participating, available at https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-households-9.pdf (last visited Nov. 8, 2023).

[3] 7 C.F.R. § 274.8(a)(3); USDA, SNAP: The USDA Supplemental Nutrition Assistance Program, Training Guide for Retailers, January 2019, p. 13, available at https://www.fns.usda.gov/snap/retailer-training-guide (last visited Nov. 9, 2023).

§ 274.8(c)(1)(iii).

USDA has determined that SNAP benefits are critical for relieving food insecurity[4] and decreasing poverty, particularly child poverty.[5]  USDA has also documented the strong correlation between food insecurity and chronic health conditions among low-income working-age adults.[6]

The Food and Nutrition Act and USDA regulations determine SNAP eligibility nationwide.  7 U.S.C. § 2014; 7 C.F.R. § 273.10.  SNAP households are extremely poor—their net income after deductions for certain exceptional basic needs other than food generally is under 100% of the Federal Poverty Level, which is currently $1,215 per month for an individual or $2,500 per month for a family of four.  Office of the Secretary, Dept. of Health & Human Services, Annual Update of the HHS Poverty Guidelines, 88 Fed. Reg. 3424 (Jan. 19, 2023).

**B.        USDA and OMB inaction will cause a delay in SNAP benefits issuance.**

SNAP is a federal-state partnership; USDA pays the full cost of SNAP benefits, which are administered by state SNAP agencies.  7 U.S.C. §§ 2013(a), 2020.  Every month, state SNAP agencies begin the benefits issuance process for the next month by submitting electronic data files detailing the SNAP eligibility of individual households to a third-party EBT vendor.  7 C.F.R. § 274.1(h) (state EBT issuance files); *Id.* § 274.12 (state agency responsibility for coordination and management of EBT system).  USDA is also responsible for ensuring that state agencies comply with the Act, including by ensuring state agencies provide timely service for SNAP recipients.  *Id.* §§ 2020(e)(2)(B)(i), 2020(g).  OMB is responsible for apportioning funds necessary for USDA to obligate the funds related to the benefits issuance.  31 U.S.C. § 1512(b)(2).

---

[4] Food and Nutrition Service, Office of Policy Support August 2013, "Measuring the Effect of Supplemental Nutrition Assistance Program (SNAP) Participation on Food Security," available at https://fns-prod.azureedge.us/sites/default/files/Measuring2013Sum.pdf (last visited Nov. 8, 2023).

[5] USDA, Economic Research Service, SNAP Benefits Alleviate the Intensity and Incidence of Poverty, June 5, 2012, available at https://www.ers.usda.gov/amber-waves/2012/june/snap-benefits/ https://www.ers.usda.gov/amber-waves/2012/june/snap-benefits/ (last visited Nov. 8, 2023).

[6] Christian A. Gregory and Alisha Coleman-Jensen, "Food Insecurity, Chronic Disease, and Health Among Working-Age Adults," ERR-235, U.S. Department of Agriculture, Economic Research Service, July 2017, https://www.ers.usda.gov/webdocs/publications/84467/err-235.pdf?v=42942 (last visited Nov. 8, 2023).

On the evening of September 30, 2023, a government shutdown was averted when Congress passed and President Biden signed into law the Continuing Appropriations Act, 2024 and Other Extensions Act.  Pub. No. 118-15 (Sept. 30, 2023).  Among other things, the continuing resolution allowed SNAP and other entitlements and mandatory payments to continue operating at existing levels through December 17, 2023.  *Id.* § 111(b).  USDA subsequently confirmed that the continuing resolution allows USDA to fund SNAP benefits for existing and newly certified households for both November and December 2023.[7]

If Congress has not passed a continuing resolution or annual appropriations bill before the middle of December, an interruption or delay to January 2024 benefits is likely to occur.

According to Cary Jeffers, Director of Product for Fidelity Information Services (FIS) (the EBT vendor serving a majority of the states)[8], the final date for state SNAP agencies to send benefit issuance files to them for timely distribution of January SNAP benefits is approximately a week before December 22, 2023.  Decl. of Jodie Berger in Support of Plaintiffs' Motion for Preliminary Injunction, ¶ 5, Ex. A.  This is a week earlier than the deadline in other months because of the Christmas holiday.  *Id.*  In addition, at least California requires an additional day to make the decision about sending the files.  *Id.* ¶ 4.

USDA has taken the position that, without an annual appropriations bill or continuing resolution temporarily funding the government, SNAP benefits issuances must cease.  The current USDA contingency plan provides that "[i]f multi-year and directly appropriated funding is insufficient to fund these programs during the period of the lapse, then program operations for the above programs would cease."[9]  In late September of this year, when SNAP was only protected through October, Secretary Vilsack stated that "if the shutdown were to extend longer

---

[7] USDA, "Supplemental Nutrition Assistance Program (SNAP) Benefit Issuance," October 16, 2023, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-benefit-issuance-cont-app-act24.pdf.

[8] Fidelity Information Services (FIS) is the EBT vendor for many states.  USDA, "EBT: Electronic Benefits Transfer (EBT) Status Report by State," May 16, 2023, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-ebt-status-report-state-052423.pdf.

[9] Food, Nutrition & Consumer Servs. Contingency Plan (January 2018), https://www.usda.gov/sites/default/files/documents/fns-2024-contingency-plan.pdf.

---

than that, there would be some serious consequences to SNAP."[10]

Although USDA has faced impending government shutdowns several times, it has never committed to an advance strategy to continue benefits if there is a lapse in funding. In 2013, USDA's only response to the states about issuing benefits after annual appropriations were depleted was that "USDA would evaluate available options, seek legal determinations, and make a final decision about a course of action closer to that time." ECF No. 12-9, ¶ 7, Ex. 4. At the same time, USDA warned the states that if they used state funds to pay food benefits during a lapse in appropriations, they would have no assurance of federal reimbursement, and that if they issued cash payments for food, there would be no reimbursement absent a specific congressional vehicle. *Id.* ¶ 8, Ex. 5. USDA has not given any public assurance regarding the issuance of SNAP benefits after December if the shutdown continues. The recent USDA discussion of SNAP availability pursuant to the Continuing Resolution Act, although addressing funding for administration of the program through the first quarter of the new year, is silent on benefit issuance in 2024.[11]

### C.     Plaintiffs Erdmann-Browning and Benitez will go hungry if January SNAP benefits are not timely issued.

Plaintiffs Erdmann-Browning and Benitez are currently eligible to receive SNAP benefits through California's SNAP program, known as CalFresh. ECF No. 12-4, Declaration of Anika Okje Erdmann-Browning (Erdmann-Browning Decl.), ¶ 4; ECF No. 12-8, Declaration of Jacqueline Benitez (Benitez Decl.), ¶ 5. Plaintiffs face ongoing challenges purchasing sufficient food, even with assistance from SNAP. Erdmann-Browning Decl. ¶¶ 10-12; Benitez Decl. ¶¶ 10-13. Both Plaintiffs will go hungry if their SNAP benefits are delayed. Erdmann-Browning Decl. ¶ 16; Benitez Decl. ¶¶ 11-13.

Plaintiff Erdmann-Browning is currently unhoused and uses her limited income for motel rooms and basic needs. Erdmann-Browning Decl. ¶ 12. She meets most of her family's

---

[10] https://www.whitehouse.gov/briefing-room/press-briefings/2023/09/25/press-briefing-by-press-secretary-karine-jean-pierre-and-secretary-of-agriculture-tom-vilsack.

[11] USDA, "Supplemental Nutrition Assistance Program (SNAP) Benefit Issuance," October 16, 2023, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-benefit-issuance-cont-app-act24.pdf.

food needs through SNAP benefits. *Id.* Food banks would also require her to use her limited funds to buy gas for travel to the food bank site, rather than putting those funds toward motel rooms. *Id.* ¶ 14.

Plaintiff Benitez has a total food budget of $100 per month, more than half of which comes from her SNAP benefits. Benitez Decl. ¶ 14. Even with her benefits, she usually eats only a bowl of cereal and one meal each day, sometimes supplemented by snacks from her worksite. *Id.* If her SNAP benefits are delayed or suspended, she will lose a significant portion of her already limited food buying capacity. *Id.*

Plaintiff Erdmann-Browning has experienced previous interruptions of her SNAP benefits, and they created significant hardships. Erdmann-Browning Decl. ¶ 13. Income that she would have used to stay in a motel had to be used for food, so she had to shelter in her car more often. *Id.* She also had to divert income normally used for motels to purchase ice to keep her multiple sclerosis medications cool. *Id.* Receiving retroactive benefits as a lump sum, after the fact, did not make up for her lost income. *Id.*

## III.    PROCEDURAL BACKGROUND

Plaintiffs filed this action on September 12, 2023, seeking timely issuance of October SNAP benefits. ECF No. 1. They simultaneously filed an ex parte application for provisional class certification and an ex parte motion for a temporary restraining order. ECF Nos. 11, 12. The Court held a hearing on September 14. ECF No. 24. It denied Plaintiffs' motion for a temporary restraining order without prejudice and set a subsequent hearing for September 27. ECF No. 26. On September 19, USDA submitted a statement to the Court describing the informed Plaintiffs of the change to its accounting policy that would make federal funds from available for benefits issued to ongoing and newly certified households in October. ECF No. 31-1. The parties then stipulated to the withdrawal of Plaintiffs' remaining motions and removal of the September 27 hearing from the Court calendar. ECF No. 33.

SNAP benefits for January and the duration of the government shutdown are now in question, as December 17, the end of the September 30 continuing resolution, draws near. Plaintiffs' counsel attempted to avoid the need for court intervention by writing to both

Notice of Motion and Motion for Preliminary Injunction
4:23-cv-04678-JST.

12

1    Defendants on November 7, 2023, requesting confirmation that SNAP benefits will issue for

2    January and ongoing, but received no response.  Berger Decl. in Supp. of Pls.' Mot. Prelim.

3    Injunction, ¶¶ 2-3.

4    **IV.    LEGAL STANDARD**

5          Plaintiffs are entitled to obtain a preliminary injunction if they can show (1) they are

6    likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence

7    of preliminary relief; (3) that the balance of equities tips in their favor; and (4) an injunction is

8    in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)

9    (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  These

10   elements "must be balanced, so that a stronger showing of one element may offset a weaker

11   showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  For example, a

12   stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of

13   success on the merits.  *Cottrell*, 632 F.3d at 1131.  Therefore, "serious questions going to the

14   merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of

15   a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

16   irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

17   **V.    ARGUMENT**

18         A preliminary injunction is warranted, as the Food and Nutrition Act requires that SNAP

19   assistance "shall be furnished" to all qualifying households without requiring an accompanying

20   appropriation.  7 U.S.C. § 2014(a).  This mandatory language creates a legal obligation on the

21   part of the federal government and demonstrates that Plaintiffs are likely to succeed on the

22   merits of their claims.  A preliminary injunction is also necessary to prevent immediate and

23   irreparable harm to Plaintiffs and other households throughout the United States certified to

24   receive SNAP benefits, who will imminently experience hunger or forego other necessary

25   expenses to purchase food.  The equities tip strongly in Plaintiffs' favor because Defendants

26   will incur no harm from performing their statutory duty to continue operating this

27   Congressionally mandated program that prevents hunger and other suffering.  Finally,

28   continuing SNAP benefits without interruption is in the public interest, as the stated purpose of

SNAP is to prevent hunger and malnutrition and to "safeguard the health and well-being of the Nation's population." *Id.* § 2011.

A.    **Plaintiffs are likely to succeed on the merits because Defendants' obligation to pay monthly SNAP benefits is not conditioned on an appropriation.**

Plaintiffs are likely to succeed on their claim that Defendants are required to continue obligating the federal government for issuance of SNAP benefits for January 2024 and future months. The Food and Nutrition Act provides, "Assistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). This language requires USDA to provide SNAP benefits to all eligible households who have applied, regardless of whether Congress has separately appropriated funds. The Supreme Court recently described similar statutory language as "obligation-creating language" that requires government payment, even without direction as to the manner in which the obligation is to be satisfied. *Maine Community Health Options v. United States*, 590 U.S. __, __, 140 S. Ct. 1308, 1322 (2020).

1.    *Maine Community Health Options* **held that mandatory statutory language creates an enforceable federal obligation.**

In *Maine Community Health Options*, the Supreme Court was called upon to determine whether specific language from the Affordable Care Act created an enforceable government obligation, when it lacked any formal appropriation or direction on how the obligation would be paid. Section 1342 of that Act required the government to compensate insurers participating in the "Risk Corridors" program, which was created to encourage insurers to enter online insurance marketplaces by defraying their costs and limiting their risk. *Maine Community Health Options*, 140 S. Ct. at 1315 (analyzing section 1342, 42 U.S.C. § 18062). Section 1342 provided that "the Secretary shall pay" participating plans with financial losses that exceeded a certain predicted threshold. *Id.* at 1316. As the Court noted, "When it enacted the Affordable Care Act in 2010, Congress did not simultaneously appropriate funds for the yearly payments the Secretary could potentially owe under the Risk Corridors program. Neither did Congress limit the amounts that the Government might pay under § 1342." *Id.*

The lack of appropriation did not prevent the Court from enforcing the government's mandatory legal obligation. Starting from the premise that "[t]he Government may incur an obligation by contract or by statute," *id.* at 1319, the Court acknowledged that government obligations are "typically" created by the passage of a statute *and* appropriated funds separately enacted by Congress. *Id.* "But," it continued, "Congress can deviate from this pattern." *Id.* "Congress can also create an obligation directly by statute, without also providing details about how it must be satisfied." *Id.* The Court determined that the language of section 1342 created a legal obligation. "The first sign that the statute imposed an obligation is its mandatory language: 'shall.' 'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement.'" *Id.* at 1320. In addition, adjacent provisions differentiated between when the Secretary of Health and Human Services "shall" act and when she "may" exercise discretion, demonstrating that Congress specifically chose mandatory terms for section 1342. *Id.*

In opposition, the government argued that the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Anti-Deficiency Act, 31 U.S.C. § 1341, made appropriated funds a necessary prerequisite to any payments. *Maine Community Health Options*, 140 S. Ct. at 1321. The Court rejected these arguments, concluding that both the Constitution and the Anti-Deficiency Act limit financial commitments by federal employees, not by Congress itself. *Id.* at 1321-22. Ultimately, the Court held that:

> [Section] 1342's obligation-creating language does not turn on whether Congress expressly provided "budget authority" before appropriating funds. . . . Congress usually gives budget authority through an appropriations Act or by expressly granting an agency authority to contract for the Government. But budget authority is not necessary for Congress itself to create an obligation by statute.

*Id.* Thus, Congress can—and, in the case of section 1342, did—create mandatory obligations for the federal government, even without an associated appropriation to fund the obligation. *Id.*

### 2.    The Food and Nutrition Act uses obligation-creating language regarding the issuance of monthly SNAP benefits.

Like section 1342 of the Affordable Care Act, the Food and Nutrition Act uses obligation-creating language to direct the issuance of critical food assistance benefits to low-income households across the country. Section 2014, "Eligible households," provides:

"Assistance under this program *shall be furnished* to all eligible households who make application for such participation."  7 U.S.C. § 2014(a).[12]  Like the Supreme Court in *Maine Community Health Options*, the Ninth Circuit has "made clear that Congress's or an agency's use of the word 'shall' indicates a mandatory duty that is not subject to discretion."  *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 778 (9th Cir. 2006).  While the courts "will depart from the interpretation of 'shall' as mandatory where a convincing argument to the contrary is made, . . .  such occasions are rare."  *Id.* (citing *Newman v. Chater*, 87 F.3d 358, 361 (9th Cir. 1996)).  There is no evidence that this is one of those rare occasions.

Besides the word "shall," section 2014(a) also uses the word "all," specifying that assistance shall be provided to "all" eligible households.  "The use of 'all' indicates a sweeping statutory reach."  *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F. 4th 682, 690-691 (9th Cir. 2022) (construing a provision of the Farm Act); *see also Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012) ("The common meaning of the word 'all' is 'the whole amount, quantity, or extent of; as much as possible' ...." (quoting *All and Any Definition*, Merriam-Webster (online ed., visited Oct. 4, 2012)).

In favorable distinction from section 1342 of the Affordable Care Act, the surrounding provisions of the Food and Nutrition Act use mandatory language to ensure uniform and reliable provision of SNAP benefits.  These sections are also not conditioned on annual appropriations.  The "Congressional declaration of policy" provides: "To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized *which will permit* low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."  7 U.S.C. § 2011.  Another statute specifies that "the Secretary *shall* establish uniform national standards of eligibility."  *Id.* § 2014(b).  The "State agency *shall* properly restore any improperly denied benefits . . . and *shall* take other steps to prevent a recurrence of such errors[.]"  *Id.* § 2020(b).  And "the specific standards to be used in determining the eligibility of applicant households which *shall* be in accordance with sections 2014 and 2015 of this title and *shall* include no

---

[12] Unless otherwise stated, italics within a citation will indicate that emphasis has been added.

additional requirements imposed by the State agency[.]" *Id.* § 2020(e)(5).

In general, SNAP applications "shall" be processed, and benefits issued to those eligible, no later than 30 days after the date of application. *Id.* § 2020(e)(3); *see also* 7 C.F.R. § 273.2(a), (g)(1) and (g)(3). States "shall . . . ensure that no household experiences an interval between issuances of more than 40 days" if changing staggered issuance dates. 7 U.S.C. § 2016(g)(2)(ii). Having received complaints that the earlier Food Stamp Program was not responding quickly enough to requests from persons in immediate need, Congress introduced the concept of "expedited service" benefits in the Food and Agriculture Act of 1977. Pub. L. No. 95-113, § 1301, 91 Stat. 913, 958-72 (1977). Federal law currently requires that benefits "shall" be issued within seven days of the date of application to households in immediate need. 7 U.S.C. § 2020(c)(9); *see also* 7 C.F.R. §§ 273.2(a)(2), (i)(l).

The use of mandatory language throughout the Food and Nutrition Act to describe the entitlement of participating household to SNAP benefits shows that Congress intended for USDA to provide those benefits to all eligible households that apply, regardless of whether Congress separately appropriates funds. In fact, the evidence of congressional intent is stronger in this case than it was in *Maine Community Health Options*. In that case, not only did Congress fail to appropriate money for the Risk Corridors program, but two successive lump sum appropriations included riders specifying that "[n]one of the funds made available by this Act . . . may be used for payments . . . relating to risk corridors." *Maine Community Health Options*, 140 S. Ct. at 1317. Nonetheless, the Supreme Court discounted the riders, concluding that "Congress merely appropriated a less amount than that required to satisfy the Government's obligation, without expressly or by clear implication modif[ying] it." *Id.* at 1324. Other funds could be used to satisfy the government's obligation. *Id.* Here, Congress has never expressed any intent to deny or delay funding to SNAP, much less to modify the funding obligation. Indeed, as discussed below, Congress has elsewhere categorized SNAP funding as a mandatory government obligation with or without an annual appropriation.

### 3. Budget legislation categorizes SNAP as a mandatory obligation.

At least two pieces of congressional budget legislation explicitly define or categorize

SNAP as an obligation of the United States government or an entitlement that exists independent of appropriated funds.

First, a statutory provision governing congressional budget procedure includes the food stamp program (as SNAP was formerly known) within the definition of "entitlement authority," along with authority to make payments outside of appropriated funds. 2 U.S.C. § 622(9). The statute provides:

> (9) The term "entitlement authority" means—
>   (A) the authority to make payments . . . , the budget authority for which is not provided for in advance by appropriation Acts, . . . if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law; and
>
>   (B) the food stamp program.

Second, Congress explicitly named SNAP in its definition of "direct spending," which is spending authorized without appropriated funds. 2 U.S.C. § 900(b)(8). The statute provides:

> (8) The term "direct spending" means
>   (A) budget authority provided by law other than appropriation Acts;
>   (B) entitlement authority; and
>   (C) the Supplemental Nutrition Assistance Program.

*Id.* Congress differentiated "direct spending" from "discretionary appropriations," the immediately previous definition, which references "budgetary resources (*except to fund direct spending programs*) provided in appropriation Acts." *Id.* § 900(b)(7).

Rather than being limited by an appropriation, SNAP's entitlement status places it under the provisions of the Congressional Budget Act (2 U.S.C. § 651) that govern "[b]udget-related legislation not subject to appropriations." USDA's spending is controlled through the budget reconciliation process of the Congressional Budget Act (2 U.S.C. § 641(a)(1)(C)).

Thus, the statutory language, surrounding legislative provisions, and treatment of the program in congressional budget legislation demonstrate that SNAP benefits are an obligation of the federal government, independent of annual appropriations.

//

//

**4.    Congress has required appropriations only for establishment of a supplemental nutrition assistance program, while mandating continuous operation of the program in unconditional language.**

Unlike section 2014 and the other sections of the Food and Nutrition Act referenced above, there is one provision of the Act that is subject to appropriations.  Section 2013(a), "Establishment of supplemental nutrition assistance program," states:

> Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer a supplemental nutrition assistance program under which, at the request of the State agency, eligible households within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment[.]

7 U.S.C. § 2013(a).  This section serves to impose fiscal constraints on program creation and administration.  The provision to "formulate and administer" the program is necessary because "[t]he Food Stamp Program has never been self-executing." *Levesque v. Block*, 723 F.2d 175, 183 (1st Cir. 1983).  The SNAP program requires further agency actions to take effect.  Accompanying section 2013(c) again refers to program administration, directing the Secretary to issue regulations "necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program."  7 U.S.C. § 2013(c).  Thus, the structure of section 2013 demonstrates that its purpose is to impose fiscal limits on program administration, not individual benefits.

Canons of statutory interpretation dictate that each word and clause of a statute must be given operative effect, if possible, and read to avoid an interpretation that would render a word or a part of a statute inoperative or redundant.  *Republic of Sudan v. Harrison*, 587 U.S. ——, 139 S. Ct. 1048, 1058 (2019); *see also Digital Realty Trust, Inc. v. Somers* , 583 U.S. ——, ——–, 138 S. Ct. 767, 777 (2018) (noting that when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning).  While section 2013(a) requires appropriations "to formulate and administer" SNAP, section 2014 requires issuance of benefits to all qualifying households without reference to appropriations.  7 U.S.C. §§ 2013(a), 2014.  The only way to give each section full operative effect is to read section 2013 as requiring appropriations for program development and administration *only*, while section 2014 and other sections cited above create a legal duty for USDA to ensure

1    regular issuance of SNAP benefits to qualifying households.

2    Similarly, section 2011 authorizes the SNAP program to "permit low-income

3    households to obtain a more nutritious diet through normal channels of trade by increasing food

4    purchasing power *for all eligible households who apply for participation*."  7 U.S.C. § 2011.

5    This authorization is not conditioned on appropriations and would be undermined by

6    section 2013(a) if household benefits, the core of the program, can actually issue only when

7    Congress appropriates funds to "formulate and administer" the program.

8    Lastly, the Supreme Court in *Maine Community Health Options* looked at language in

9    surrounding provisions to determine whether the statute was obligation-creating, noting other

10   provisions utilized "may" language.  140 S. Ct. at 120.  Here, Congress also used conditional

11   language elsewhere in the Food and Nutrition Act, such as "subject to the availability of

12   appropriations" (7 U.S.C. § 2013(b)(6)(A)) or "subject to the availability of appropriations to

13   carry out this paragraph" (*id*. § (b)(5)), when it did not intend to create an obligation.  The use

14   of mandatory language in section 2014(a) demonstrates that funding for SNAP benefits is not

15   dependent on an annual appropriation.

5.    **The Food and Nutrition Act's provision on "Appropriations and allotments" does not permit USDA to suspend SNAP benefits during a government shutdown.**

18   The Food and Nutrition Act identifies both the conditions under which the Secretary of

19   Agriculture may reduce SNAP benefits and the manner in which such reductions may occur.  7

20   U.S.C. §§ 2027(b), (c).  The Act contemplates a benefit reduction in only one scenario:  when

21   the total value of benefit allotments will exceed the appropriation for the fiscal year.  *Id.*

22   § 2027(b) ("In any fiscal year, the Secretary shall limit the value of those allotments issued to an

23   amount not in excess of the appropriation for such fiscal year.").  The Act does not contemplate

24   the forthcoming scenario, where there is a delayed appropriation or none at all.  The Act does

25   not permit or direct USDA to shut SNAP down altogether when Congress fails to pass an

26   appropriation.

27   To the contrary, the Act's legislative history demonstrates that Congress implemented

28   section 2027 to prevent the sudden interruption of SNAP benefits when appropriated funds were

1    not available.  During deliberations over the Food Security Act of 1985, the precursor to today's

2    Food and Nutrition Act, the House Agriculture Committee sought "to leave leeway for

3    inaccurate economic forecasts so that Congress need not adjust the spending ceilings every

4    year."[13]  The resulting provisions identified the circumstances under which allotments could be

5    reduced, set the "[m]anner of reducing allotments," and required the Secretary prepare a report

6    to Congress on the need for benefit reductions at least 60 days before any action is taken.  7

7    U.S.C. §§ 2027(b), (c), (d).

8         The House Agriculture Committee, which proposed the amendment to section 2027's

9    spending limits, declared that it would no longer accept

10        the unfortunate situation of the past few years where . . . the continuation of full
          food stamp benefits has been uncertain [and r]ecipients nationwide have been
11        threatened with delays and reductions pending Congressional approval of
          supplemental appropriations legislation late in the fiscal year.  This has led to
12        confusion and unnecessary fear at the local level, as well as additional
          administrative cost and burden.[14]
13

14   The Committee declared that benefit reductions should result only from "an explicit decision to

15   do so," not the mere failure to pass legislation.  *Id.*

16        In short, Congress has demonstrated, both in the Food and Nutrition Act and in statutes

17   governing budget procedure, that SNAP benefits must be reliable and continue under all

18   circumstances, even in the rare absence of an annual appropriation.  Defendants' failure to

19   comply with their statutory obligations violates the Administrative Procedure Act, and

20   Plaintiffs are likely to prevail on the merits of their claims.

21        **B.    Plaintiffs and the proposed class will suffer irreparable harm if an
              injunction is denied.**
22

23        Plaintiffs and proposed class members are likely to suffer irreparable harm unless this

24   Court grants a preliminary injunction requiring Defendants to fulfill their statutory obligation to

25   continue the normal issuance of SNAP benefits during any government shutdown.  As one

26   community service provider in the Bronx reports, "[o]ur clients depend on SNAP. . . benefits to

27   feed themselves and their families.  If SNAP benefits are suspended or delayed beginning

28

---

[13] H. Rep. No. 99-271 (pt. 1) at 165, *reprinted in* 1985 U.S. Code Cong. & Admin. News 1265.
[14] *Id.* at 166, *reprinted in* 1985 U.S. Code Cong. & Admin. News 1270.

January 1 of next year, our clients will have to choose between paying for food or the other necessities of life."  Declaration of Theresa Havelka (Havelka Decl.), filed herewith, ¶¶ 1-3.

An interruption in SNAP benefits will cause millions of recipients to go hungry, as food banks are already stretched to capacity and will struggle to meet the tremendous increase in demand.  These free food sources have already experienced a huge increase in demand following the March 2023 end of Emergency Allotments, which had significantly increased household benefits.  ECF No. 12-3, Declaration of Rebecca Silva (Silva Decl.), ¶ 5; ECF 12-7, Declaration of Shimica Gaskins (Gaskins Decl.), ¶¶ 7-8.  Food banks will not be able to meet the extraordinary need caused by an interruption in SNAP benefits.  Gaskins Decl. ¶¶ 8, 10 "(Disrupting [SNAP] benefits would cause immense harm to the households who rely on the program to eat," and "overwhelm our partner food assistance agencies"); ECF No. 12-6, Declaration of Erica Padilla Chavez (Padilla Chavez Decl.), ¶¶ 8-9 ("If the largest program feeding our community were to stop, our food bank would simply not be able to meet the needs"); *See also* Silva Decl. ¶ 6; Havelka Decl., 9.  Nor can food banks meet all the same needs as SNAP.  For example, many food banks do not provide infant formula, which is available to purchase with SNAP benefits.  Silva Decl., ¶ 6.

Food insecurity has been connected with an array of negative outcomes, including poor health among children, lower academic achievement, and depression.[15]  In the opinion of a nationwide expert on food security programs, "delays in providing SNAP benefits cause low-income households either to suffer or be at risk of suffering hardships," including going hungry; paying for food at the expense of other necessities of life, or, alternatively, paying for other necessities of life at the expense of having enough to eat.  Declaration of Hilary Hoynes (Hoynes Decl.), filed herewith, ¶¶ 1, 3-12.

These harms cannot be remedied by retroactive benefits.  Retroactive allotments will not resolve the daily hunger or related repercussions experienced by millions of families dependent

---

[15] Caroline Ratcliffe, Signe-Mary McKernan, and Sisi Zhang, "How Much Does the Supplemental Nutrition Assistance Program Reduce Food Insecurity?, American Journal of Agricultural Economics, July 12, 2011, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4154696/ (last visited Nov. 8, 2023).

on SNAP benefits.  The Ninth Circuit has recognized that "back payments cannot erase either the experience or the negative effect of delays in the prompt provision of benefits."  *Paxton v. Sec'y of Health and Human Servs.*, 856 F. 3d 1352, 1354 (9th Cir. 1988).  With regard to food assistance, multiple courts have concluded that the potential harm is particularly acute:

> [I]t is reasonable to conclude that, unless a preliminary injunction issues to prevent delays and interruptions in food stamp benefits, the plaintiffs may be deprived of food.  The deprivation of this basic human need is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients.

*Haskins v. Stanton*, 621 F. Supp. 622, 627 (N.D. Ind. 1985) (citation omitted); *accord*, *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043-44 (D. Haw. 2011).

Nor can retroactive food benefits issued on an EBT card remedy the serious financial disruptions caused by a delay in SNAP benefits.  Because nutrition is a basic survival need, many SNAP recipients will forego other necessary expenditures such as housing, utilities, or transportation to places of employment.  Funds loaded onto an EBT card weeks or months later are only available for purchasing food and cannot be re-allocated to pay past due rents or other bills.  For example, Plaintiff Erdmann-Browning uses all of her income to meet her subsistence needs and uses whatever she has left over to pay for motel rooms. *See* ECF No. 12-4, Erdmann-Browning Decl. ¶ 10.  When Plaintiff Erdmann-Browning must use her available income to purchase food, she cannot afford to pay for shelter and must sleep in her car, which complicates her serious health condition and her use of necessary medications.  *Id.* ¶ 13.  This harm cannot be remedied by retroactive SNAP benefits.

### C.    The proposed injunction will preserve the status quo.

Plaintiffs seek an injunction to prohibit Defendants from interrupting the issuance of SNAP benefits.  The requested injunction will maintain the status quo pending a determination of the case on the merits.  *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (the relevant "status quo" for purposes of an injunction "refers to the legally relevant relationship between the parties before the controversy arose."); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *13 (N.D. Cal. Mar. 1, 2019) (granting a prohibitory injunction ordering the Department of Homeland Security to continue processing 2,714 existing

1    applications for parole after DHS terminated the program, reasoning that the last uncontested

2    status was when DHS was continuing to process the applications as usual).  *Id.* at 15.

3          Here, the status quo is for USDA to ensure that states meet their obligation to timely

4    issue benefits to all participating and newly certified households that are eligible for SNAP

5    assistance.  Thus, Plaintiffs are seeking a prohibitory injunction.

6          Even if the Court were to consider Plaintiffs' request to be for a mandatory injunction, it

7    would still be permissible.  *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017)

8    ("Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are

9    permissible when extreme or very serious damage will result that is not capable of

10   compensation in damages, and the merits of the case are not doubtful.").  Such is the case here,

11   where millions of people will be unable to feed themselves, and retroactive lump sum food

12   benefits cannot compensate for the diversion of cash income from subsistence needs that cause

13   other harms, such as failure to pay for rent, utilities, or purchase medication.

14          **D.    The balance of equities and the public interest both favor plaintiffs.**

15          "When the government is a party to a lawsuit, the balance of the equities and public

16   interest prongs of the preliminary injunction test merge."  *Drakes Bay Oyster Co. v. Jewell*, 747

17   F.3d 1073, 1092 (9th Cir. 2014).  Here, the balance of equities and the public interest both tip

18   sharply towards Plaintiffs.

19          The balance of equities favors Plaintiffs, who will suffer serious irreparable harm absent

20   an injunction.  Plaintiffs risk imminent hunger with the loss or interruption of their benefits.

21   Defendants, on the other hand, will not be harmed by an order directing them to comply with

22   their statutory obligations.  A preliminary injunction requiring agencies to comply with the

23   Food and Nutrition Act should not be considered a burden when balancing the equities, because

24   "[t]he Act itself imposes the burden; th[e] injunction merely seeks to prevent the defendants

25   from shirking their responsibilities under it."  *Withrow v. Concannon*, 942 F.2d 1385, 1388

26   (1991).

27          Defendants may argue that they stand to suffer harm if they violate the Appropriations

28   Clause and the Antideficiency Act, which prohibits agencies from incurring obligations in

excess of legally available amounts.  31 U.S.C. § 1341(a).  The Supreme Court in *Maine Community Health Options* rejected both arguments.

While the Appropriations clause requires "Appropriatio[n] made by Law" before money may "be drawn" to satisfy a payment obligation, U. S. Const., art. I, § 9, cl. 7, the Court differentiated between the obligation and payment, noting that statutory obligations without appropriation can be enforced through lawsuits.  *Maine Community Health Options,* 140 S. Ct. at 1320.  Plaintiffs are seeking enforcement of the government's obligation to timely issue SNAP benefit, not payment of federal funds.  Federal payment for SNAP benefits does not occur until the "concentrator banks" seek payment from a U.S. Treasury account.  7 C.F.R. § 274.8(c)(1)(iii).

Nor would an order directing timely issuance of SNAP benefits run afoul of the Anti-Deficiency Act.  That Act's prohibitions give way "as specified" or "authorized" by "any other provision of law."  31 U.S.C. § 1341(a)(1).  As discussed above, SNAP is an "other provision of law" that authorizes obligating federal funds for SNAP benefits without an annual appropriation.  The Court noted that although the agency itself cannot disburse funds beyond those appropriated to it, the Government's "valid obligations will remain enforceable in the courts."  140 S. Ct. at 1320.

The public interest also favors Plaintiffs.  An order directing continuation of SNAP will further the purpose of the Food and Nutrition Act to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  7 U.S.C. § 2011.  Indeed, in weighing the public interest factor, the Ninth Circuit has stated that it "would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time."  *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

The public interest, as well as the balance of equities and the other *Winter* factors, overwhelmingly favors the relief sought here.

//

//

1

## VI.    PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND

2        Federal Rule of Civil Procedure 65(c) "invests the district court 'with discretion as to the

3   amount of security required, *if any*.'"  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)

4   (emphasis in original); *accord Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  A

5   district court can waive the posting of a bond where important federal rights are involved, *see,

6   e.g., Cont'l Oil Co. v. Frontier Ref. Co*., 338 F.2d 780, 782 (10th Cir. 1964), or where giving

7   security would effectively deny access to judicial review.  *See, e.g., Save Our Sonoran, Inc. v.

8   Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

9        Exercise of that discretion is particularly appropriate in an action brought by a class of

10  indigent plaintiffs.  *See, e.g., Walker v. Pierce*, 665 F. Supp. 831, 843-44 (N.D. Cal. 1987)

11  ("Because this case is brought by indigent class representatives on behalf of mostly indigent

12  tenants, the court in its discretion waives the requirement of security[.]"); *Dominguez v.

13  Schwarzenegger*, No. C 09-02306 CW, 2010 WL 2673715 at *6 (N.D. Cal. July 2, 2010)

14  ("Court waives the bond requirement for Plaintiffs because many of them are indigent and to

15  ensure their ability to access the courts on behalf of themselves and other class members[.]");

16  *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1178 (N.D. Cal. 2009) (court waived the bond

17  requirement for issuance of preliminary injunction as the plaintiffs and proposed class were

18  Medicaid recipients).

19       By definition, SNAP recipients have extremely limited income and resources.  *See* 7

20  U.S.C. § 2014(a).  Given that Plaintiffs and members of the proposed class rely upon SNAP

21  benefits to purchase food, they also cannot afford to post a bond.  *See* Erdmann-Browning Decl.

22  ¶¶ 14-16; Benitez Decl. ¶¶ 12-14.  The Court should waive the bond requirement in issuing a

23  preliminary injunction in this case.

24  ## VII.    CONCLUSION

25       Plaintiffs have shown a high likelihood of success on the merits of their claims and an

26  imminent threat of irreparable injury.  Moreover, the balance of harms and public interest weigh

27  in favor of immediate injunctive relief.  Based on the foregoing, Plaintiffs respectfully request

28  that the Court grant their motion for a preliminary injunction without requiring posting of a

1    bond.

2        Dated: November 13, 2023                    Respectfully submitted:

3

4                                                    Jodie Berger
                                                     *Attorney for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28