BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
JULIE STRAUS HARRIS
Assistant Branch Director
KYLA M. SNOW
Ohio Bar No. 96662
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 514-3259
Facsimile: (202) 616-8202
E-mail: kyla.snow@usdoj.gov

Attorneys for DEFENDANTS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| ANIKA OKJE ERDMANN-BROWNING and JACQUELINE BENITEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS J. VILSACK, Secretary of the United States Department of Agriculture, in his official capacity, and SHALANDA YOUNG, Director of the United States Office of Management and Budget, in her official capacity,<br><br>Defendants. | Case No. 4:23-cv-04678<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEROF**<br><br>Hearing: March 7, 2024 |

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2

**PLEASE TAKE NOTICE** that on January 23, 2023, Defendants Thomas J. Vilsack, in his

3

official capacity as Secretary of the United States Department of Agriculture, and Shalanda Young,

4

in her official capacity as the Director of the United States Office of Management and Budget, will

5

and hereby do move this Court for an order dismissing this action.  This motion is based upon this

6

Notice of Motion and Motion to Dismiss, the Memorandum of Points and Authorities in Support

7

of Motion to Dismiss, and all other papers and pleadings on file in this action, and such oral

8

argument as may be presented at hearing of this motion.

9

10

Dated:  January 23, 2024                         Respectfully submitted,

11

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

12

JULIE STRAUS HARRIS
Assistant Branch Director

13

14

/s/ *Kyla M. Snow*
KYLA M. SNOW

15

OH Bar No. 96662
United States Department of Justice
Civil Division, Federal Programs Branch

16

1100 L Street, NW
Washington, D.C. 20005

17

(202) 514-3259
kyla.snow@usdoj.gov

18

*Counsel for Defendants*

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.      The Supplemental Nutrition Assistance Program ................................................. 2

        A.      State and Federal Administration of SNAP ............................................. 2

        B.      Appropriations for SNAP Benefits ........................................................... 3

        C.      SNAP Benefits Historically Have Never Been Reduced or Interrupted
                Because of a Lapse in Annual Appropriations .......................................... 4

        D.      SNAP Benefits Have Not Been Reduced or Suspended Since the Close of
                FFY 2023 ................................................................................................... 5

II.     Procedural and Factual Background ..................................................................... 7

LEGAL STANDARDS ............................................................................................... 10

ARGUMENT .............................................................................................................. 11

I.      Plaintiffs' Alleged Injuries Are Too Speculative to Satisfy Article III. ............. 11

        A.      Plaintiffs' speculations about a lapse in SNAP funding during a possible
                shutdown do not satisfy Article III. ........................................................ 12

        B.      Plaintiffs' speculations that non-party states will delay the issuance of
                benefits because of fears about a possible shutdown do not satisfy
                Article III. ............................................................................................... 17

II.     Plaintiffs do not Challenge a Final Agency Action. ........................................... 20

CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

**CASES**

*Alcoa, Inc. v. Bonneville Power Admin.*,
    698 F.3d 774 (9th Cir. 2012) ............................................................................. 11

*Allen v. Wright*,
    468 U.S. 737 (1984) ........................................................................................... 18

*Am. Cas. Co. of Reading, Pa. v. Baker*,
    22 F.3d 880 (9th Cir. 1994) ............................................................................... 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 19

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................... 21

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) ...................................................................... 11, 12

*Cho v. Hyundai Motor Co., Ltd.*,
    636 F. Supp. 3d 1149 (C.D. Cal. 2022) ............................................................. 19

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................. 11, 13, 14

*Clark v. City of Lakewood*,
    259 F.3d 996 (9th Cir. 2001) ........................................................................ 12, 14

*Env't Info. Ctr. v. Stone-Manning*,
    766 F.3d 1184 (9th Cir. 2014) .............................................................. 11, 12, 14

*I.C. v. Zynga, Inc.*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) ............................................................. 10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................. 11, 12, 18, 20

*McCarthy v. United States*,
    850 F.2d 558 (9th Cir. 1988) ............................................................................. 10

*Norton v. S. Utah Wilderness*,
    *All.* ("*SUWA*"), 542 U.S. 55 (2004) .......................................................... 21, 22

*Nova Stylings, Inc. v. Ladd*,
    695 F.2d 1179 (9th Cir. 1983) ........................................................................... 22

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ...................................................................................... 10, 18

*Robinson v. United States*,
586 F.3d 683 (9th Cir. 2009) ..................................................................................... 11

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ..................................................................................................... 10

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ................................................................................................... 11

*Texas v. United States*,
523 U.S. 296 (1998) ................................................................................................... 12

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2020) ................................................................................... 12

*Vietnam Veterans of Am. v. Cent. Intel. Agency*,
811 F.3d 1068 (9th Cir. 2016) ................................................................................... 22

*Winnemucca Indian Colony v. Dep't of Interior*,
819 Fed. App'x 480 (9th Cir. 2020) ........................................................................... 20

**STATUTES**

5 U.S.C. § 706(1) ............................................................................................................ 22

7 U.S.C. § 2012(r) ............................................................................................................ 2

7 U.S.C. § 2013(a) ........................................................................................................... 3

7 U.S.C. § 2016(g) .............................................................................................. 3, 16, 17

7 U.S.C. § 2020 ................................................................................................................ 3

28 U.S.C. § 1361 ............................................................................................................ 21

Agriculture, Rural Development, FDA and Related Agencies Appropriations Act, 1996,
Pub. L. No. 104-37, 109 Stat. 299 (Oct. 21, 1995) ..................................................... 5

American Recovery and Reinvestment Act of 2009,
Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009) .................................................... 4, 5

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, 136 Stat. 78 (Mar. 15, 2022) .................................................. 3, 7

Consolidated Appropriations Act, 2023,
Pub. L. 118-15, 136 Stat. 4459 (Dec. 29, 2022) ............................................... *passim*

Consolidated Appropriations Act, 2023,
Pub. L. No. 117-328, Div. A, Title IV, 136 Stat. 4488 (Dec. 29, 2022) .................. 3, 7

Department of Defense and Labor, Health and Human Services, and
    Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019,
    Pub. L. 115-245, 132 Stat. 3123 (Sept. 28, 2018)..................................................... 5

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, Div. A, Title I, 134 Stat. 178 (Mar. 18, 2020)........................... 4

Food, Conservation, and Energy Act of 2008,
    Pub. L. 110-246, 122 Stat. 1651 (June 18, 2008) ...................................................... 2

Further Additional Continuing Appropriations and Other Extensions Act, 2024
    118-35 (Jan. 19, 2024) ........................................................................................ 6, 15

Further Continuing Appropriations and Other Extensions Act, 2024,
    Pub. L. 118-22,  (Nov. 16, 2023) .................................................................. 6, 14, 15

Healthy, Hunger-Free Kids Act,
    Pub. L. No. 111-296 (Dec. 13, 2010)......................................................................... 4

**RULES**

Fed. R. Civ. P. 12(b)(1)............................................................................................... 10

**REGULATIONS**

7 C.F.R. § 273.10 (2017) ....................................................................................... 3, 16

7 C.F.R. § 274.2(d) (2020)......................................................................................... 3

7 C.F.R § 273.2 (2019) .............................................................................................. 3

**OTHER AUTHORITIES**

Circular No. A-11, Preparation, Submission, and Execution of the Budget,
    OMB (Aug. 2023),
    https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf...................................... 4, 6

# INTRODUCTION

The Supplemental Nutrition Assistance Program (SNAP) (originally called "Food Stamps") is a federal benefits program that has provided monthly nutrition assistance to impoverished households for over 40 years. For the entirety of its existence, SNAP has never been interrupted by a lapse in federal appropriations, commonly referred to as a government shutdown. Even during the longest shutdown in history, lasting 35 days, SNAP was unaffected. Nonetheless, Plaintiffs here—two California residents who allege they are SNAP beneficiaries—speculated that on October 1, 2023, that would change. Predicting that a government shutdown by that date was "likely, if not inevitable," Compl. ¶ 2, ECF No. 1, and that the shutdown would, for the first time in history, cause an immediate interruption to SNAP benefits, Plaintiffs initiated this action on behalf of themselves and a putative class of SNAP beneficiaries nationwide. They sought preliminary injunctive relief against the U.S. Department of Agriculture (USDA) and the Office of Management and Budget (OMB) to ensure the continued distribution of SNAP benefits without delay or interruption in the event of a shutdown. Four months later, the government has not shut down, and SNAP has continued operating as normal.

The Court should dismiss this case for lack of subject-matter jurisdiction. First, Plaintiffs' allegations of possible future harm, based on contingencies that may not occur (and, indeed, have not occurred), do not satisfy Article III's overlapping standing and ripeness requirements. Plaintiffs allege two theories of injury, both of which are equally speculative. Initially, Plaintiffs assert that they will be injured if the government shuts down and SNAP benefits are suspended as a result. But that theory depends on the occurrence of various hypothetical factors: the government shutting down after September 30, 2023 (it has not yet), for such an extended period that there are no longer funds available for SNAP (which has never happened), at a time when Plaintiffs are eligible for and scheduled to receive SNAP benefits imminently. Such possibilities do not show a certainly impending injury. Alternatively, Plaintiffs allege a more convoluted theory that turns on the speculative actions of California, a third party not before the Court. According to Plaintiffs, they will be injured by the mere *possibility* of a shutdown—but only if, two weeks or so before a potential lapse in federal funds, the State of California declines to take necessary steps to prepare

residents' benefits cards for the coming month because the State fears there will be no federal funds available for SNAP for that month.  That theory layers speculation upon speculation, guessing at what the State may do in a hypothetical scenario, without any factual allegation that the State has ever before acted as Plaintiffs hypothesize.  Neither theory comes close to satisfying Article III's requirements that an injury be ripe and certainly impending to invoke the federal court's jurisdiction.

Second, Plaintiffs do not challenge any final agency action, a jurisdictional requirement of the Administrative Procedure Act (APA) under Ninth Circuit jurisprudence.  Instead, Plaintiffs challenge future actions USDA *might* take, depending on the circumstances, that would allegedly interrupt the issuance of SNAP benefits.  But possible future agency actions are not final agency actions and do not establish subject-matter jurisdiction under the APA.  And Plaintiffs' allegations that Defendants have failed to act, in support of their claim for mandamus relief, do not satisfy the narrow exception to the APA requirement for final agency action and therefore do not provide an alternate path to jurisdiction.  In any event, the failure-to-act allegations are moot.  Plaintiffs seek an order compelling OMB to apportion all available funds for October 2023 SNAP benefits, and for USDA to direct states to issue those benefits.  But OMB has already apportioned those funds, which USDA has obligated, and states have already issued them.

Thus, whether for failure to allege injury-in-fact or final agency action, Plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction.

## **BACKGROUND**

### I.    The Supplemental Nutrition Assistance Program

#### A.  State and Federal Administration of SNAP

SNAP, formerly known as the Food Stamp Program,[1] is a federal nutrition assistance program administered by USDA at the federal level and implemented by state SNAP agencies[2] at

---

[1] The name of the Food Stamp Program was changed to the Supplemental Nutrition Assistance Program pursuant to the Food, Conservation, and Energy Act of 2008, Pub. L. 110-246, 122 Stat. 1651 (June 18, 2008).  Additionally, the 2008 Farm Bill changed the name of the Food Stamp Act of 1977 to the Food and Nutrition Act of 2008.  For ease of reference, use of the acronym "SNAP" throughout this brief refers to SNAP and its predecessor the Food Stamp Program.

[2] SNAP operates in the 50 states, the District of Columbia, Guam, and the U.S. Virgin Islands. *See* 7 U.S.C. § 2012(r).

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
2

the local level.  *See* 7 U.S.C. § 2020.  Since 1964, SNAP (or its predecessor) has provided monthly

benefits to low-income households to purchase nutritious food.  *Id.* § 2011.  Eligible households

receive their SNAP benefits on electronic benefit transfer (EBT) cards, *id.* § 2020, which may be

used to purchase food from authorized retailers, *id.* § 2013(a).  States are responsible for

determining household eligibility and benefit amount, based on federal standards, and loading

benefits to EBT cards.  *Id.* § 2020.

The State of California's SNAP program is known as "CalFresh."  Compl. ¶ 32.[3]  Like all

states, California determines whether a household is eligible to receive SNAP benefits and sets the

monthly benefit amount by assessing household size and income through a written application and

interview process.  *See* 7 C.F.R §§ 273.2, 273.10.  Households deemed eligible to receive benefits

are certified for a set period of time—anywhere from one to twenty-four months, depending on the

circumstances—after which the household must apply for recertification from the state.  *See id.*

§ 273.10(f), (g)(2).  State SNAP agencies allocate federal funds to participating households' SNAP

benefit cards on a set, staggered schedule each month; some SNAP households may receive benefits

on the first of each month, others on the fifth of each month, others on the tenth, and so on.  Decl.

of David Burr ("USDA Decl.") ¶ 4, ECF No. 23-2; *see also* 7 U.S.C. § 2016(g); 7 C.F.R. § 274.2(d)

(2020) (requiring each state to allocate benefits to each eligible household "on an issuance schedule

so that they receive their benefits on or about the same date each month").

## B.  Appropriations for SNAP Benefits

Congress appropriates federal funds for SNAP benefits during the annual appropriations

process.  *See* 7 U.S.C. § 2013(a) ("Subject to the availability of funds appropriated under section

2027 of this title, the Secretary is authorized to formulate and administer [SNAP]"); *see also, e.g.*,

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. A, Title IV, 136 Stat. 4488,

(Dec. 29, 2022).  The money appropriated annually for SNAP typically includes a contingency fund

for use beyond that specific federal fiscal year ("FFY").  *See, e.g.*, *id.*  Current available contingency

funds total $6 billion. *See id.*; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136

Stat. 78 (Mar. 15, 2022); *see also* Decl. of Melissa Bomberger, ("OMB Decl.") ¶¶ 10-11, ECF No.

---

[3] *See also CalFresh*, CDSS, https://perma.cc/4QE6-KYBM.

23-1.  In addition to annual appropriations, including any contingency funds, Congress may provide for other appropriations for SNAP benefits; it has done so on various occasions.  *See, e.g.*, American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009), as amended by the Healthy, Hunger-Free Kids Act, Pub. L. No. 111-296, 124 Stat. 3183, 3265 (Dec. 13, 2010) (providing an increase in SNAP benefits through October 31, 2013); Families First Coronavirus Response Act, Pub. L. No. 116-127, Div. A, Title I, 134 Stat. 178, 179 (Mar. 18, 2020) (allowing USDA to provide emergency allotments to all SNAP households to help them navigate hardships caused by the COVID-19 pandemic).

Once SNAP funds are appropriated, OMB "apportions" them for USDA's administration of SNAP.  *See* OMB Decl. ¶¶ 7-8; Circular No. A-11, Preparation, Submission, and Execution of the Budget ("OMB Circular A-11"), OMB (Aug. 2023) § 10.5, available at https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf (explaining that through apportionment, OMB "specifies the amount of funds that an agency may use by time period, program, project, or activity").  The apportionment provides USDA "the necessary authority to obligate and expend funds" for SNAP.[4]  OMB Decl. ¶ 12.  USDA obligates SNAP funds "in advance of the benefit month during which benefits are loaded onto household cards."  Sept. 19, 2023 Decl. of David Burr ("2d USDA Decl.") ¶¶ 2-3, ECF No. 29-1.  The obligation covers the full amount of SNAP benefits due nationwide to households certified prior to and during the months covered by the obligation.  *See id.* ¶¶ 3-4.

### C.  SNAP Benefits Historically Have Never Been Reduced or Interrupted Because of a Lapse in Annual Appropriations

The annual appropriations process at times involves political negotiations among members of Congress that extend right up to the expiration date for the prior year's appropriations act.  And yet a lapse in appropriations is a rare event.  Congress often passes full-year appropriations or short-term "continuing appropriation" acts on the eve of funding deadlines.  Even when a shutdown has

---

[4] An obligation is defined as a "binding agreement that will result in outlays, immediately or in the future."  OMB Circular A-11 § 20.6.  In other words, it is a commitment to pay funds.

occurred, however, SNAP benefits (including their predecessor, Food Stamps) have never been reduced or interrupted.

The two partial shutdowns in November and December 1995, lasting seven and 21 days respectively,[5] did not affect SNAP benefits; Congress had already passed annual legislation funding SNAP.  *See* Agriculture, Rural Development, FDA and Related Agencies Appropriations Act, 1996, Pub. L. No. 104-37, 109 Stat. 299, 323-24 (Oct. 21, 1995).  During the next government shutdown nearly 20 years later, which lasted 16 days in October 2013,[6] SNAP again was unaffected; it had sufficient funding to continue operating due in part to the American Recovery and Reinvestment Act of 2009.  *See* Pub. L. 111-5, 123 Stat. 115 (2009) (later amended); *see also* Reauthorization of SNAP and Other Nutrition Programs in the Next Farm Bill at 7, Cong. Rsch. Serv. (Dec. 10, 2013), https://sgp.fas.org/crs/misc/R43332.pdf.  And in the most recent—and by far the longest—government shutdown, beginning in December 2018 and lasting 35 days,[7] SNAP was again unaffected due to the availability of other funding sources.  *See Press Release*, USDA, https://perma.cc/AK4B-CHQ2; *see also* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 3123, 3124 (Sept. 28, 2018).[8]

**D.  SNAP Benefits Have Not Been Reduced or Suspended Since the Close of FFY 2023**

The annual appropriation for FFY 2023 expired on September 30, 2023.  *See* Consolidated Appropriations Act, 2023, Pub. L. 118-15, 136 Stat. 4459 (Dec. 29, 2022).  Since then, the government has not shut down, and SNAP benefits have not been interrupted.  Congress has passed three continuing resolutions ("CRs") that have temporarily extended funds for government programs, including SNAP, while it negotiates full-year appropriations legislation for FFY 2024.  On September 30, 2023, the President signed into law the first CR, which extended funding for federal government operations until November 17, 2023.  *See* Continuing Appropriations Act, 2024

---

[5] Carten Cordell, *5 Longest Government Shutdowns in U.S. History*, Gov't Exec. (Sept. 26, 2023), https://perma.cc/HX9Y-L9M2.
[6] Cordell, *supra* note 5.
[7] Cordell, *supra* note 5.
[8] Relying on provisions in the then-existing continuing resolution, USDA also permitted states to issue February benefits early, during the month of January, *see Press Release*, USDA, https://perma.cc/AK4B-CHQ2, but a full appropriations bill was adopted by January 25, 2018.

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
5

and Other Extension Act §§ 101, 106, Pub. L. 118-15, 137 Stat. 71 (Sept. 30, 2023)[9] (extending federal funding through November 17, 2023).  Although the CR was originally set to expire on November 17, it provided funding for certain programs, including SNAP, well beyond that date. Specifically, Section 111(b)—a provision typically included in short-term CRs[10]—makes funds available for "obligations for mandatory payments due . . . 30 days after" the CR expiration date. Because USDA obligates the full amount of SNAP benefits due nationwide in advance of the month during which the benefits are loaded onto household cards, *supra*, Bckgd. § I.B., the CR sufficed to fund SNAP through at least the end of December 2023.

Before November 17, Congress passed, and the President signed, another CR that modified the dates set by the September CR.  *See* Further Continuing Appropriations and Other Extensions Act, 2024 § 101(4), Pub. L. 118-22, 137 Stat. 112 (Nov. 16, 2023).[11]  Adopting a "laddered" approach, the new CR extended federal funding for some agencies—including USDA—through January 19, 2024, and others through February 2, 2024.  *Id.* § 101(2) (as to certain programs, including programs maintained by USDA as listed in § 101(1) of the September CR, changing the date from November 17, 2023, to January 19, 2024); *id.* § 101(1) (as to other programs, changing the date to February 2, 2024).  The November CR did not modify Section 111(b), which made funds available for certain programs, such as SNAP, for 30 days beyond the relevant CR expiration date.  *See* Pub. L. 118-15 § 111(b).  And because USDA obligates the full amount of SNAP benefits due nationwide in advance of the month during which the benefits are loaded onto household cards, *supra*, Bckgd. § I.B., the September CR, as amended by the November CR, provided sufficient funding for USDA to operate SNAP as normal through at least the end of February 2024.

By January 19, 2024, Congress had enacted another CR that further modified the applicable dates.  *See* Further Additional Continuing Appropriations and Other Extensions Act, 2024, Pub. L.

---

[9] https://www.congress.gov/bill/118th-congress/house-bill/5860.
[10] *See* OMB Circular A-11 § 123.11 (explaining that the typical § 111 provision in short-term CRs allows certain "mandatory payments and activities under the Food and Nutrition Act of 2008" to "operate as normal" and provides "an additional 30 days of obligational authority and funding beyond the end date of the short-term CR, including any government shutdowns").
[11] https://www.congress.gov/bill/118th-congress/house-bill/6363?s=1&r=1.

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
6

118-35 (Jan. 19, 2024).[12]  Like the November CR, the January CR takes a laddered approach to funding, extending federal funds for some agencies—including USDA—through March 1, 2024, and others through March 8, 2024.  *Id.* § 101(1)-(2).  And also like the November CR, the January CR does not modify Section 111(b).  Accordingly, the latest CR amendments provide sufficient funding for USDA to operate SNAP as normal through at least the end of March 2024.

The CRs are not the only source of SNAP funds that are available beyond the close of FFY 2023, as Contingency Reserves also remain available until their expiration at the end of September 2024 and September 2025.  Pub. L. No. 117-103, 136 Stat. 78 (making $3 billion available through September 30, 2024); Pub. L. No. 117-328, 136 Stat. 4488 (making $3 billion available through September 30, 2025).

## II.    Procedural and Factual Background

Plaintiffs are two California residents who allege that they receive SNAP benefits through California's CalFresh program.  Compl. ¶¶ 12-13.  They initiated this action on September 12, 2023, bringing claims against USDA and OMB on behalf of themselves and a putative class of 40 million individuals nationwide who "have been or will be certified to receive SNAP benefits in October 2023 and thereafter."  *Id.* ¶ 1.  The Complaint alleges that, "[a]s of [September 12, 2023], Congress has failed to pass the agriculture appropriations bill for Federal Fiscal Year 2024, which begins on October 1, 2023," and that "a federal government shutdown [is] likely, if not inevitable."  *Id.* ¶ 2.  Plaintiffs further contend that "[i]f Congress does not pass either full-year appropriations bills or a continuing resolution, the federal government will shut down," and "USDA will interrupt SNAP benefits this year" (*i.e.*, in 2023).  *Id.* ¶¶ 18-19.  According to Plaintiffs, a future "disruption of SNAP benefits will cause immediate irreparable harm to low income recipients" and may eventually impact retailers.  *Id.* ¶ 29.  Plaintiff Ms. Erdmann-Browning alleges that she receives SNAP benefits "each month," *id.* ¶ 32, but does not allege what day of the month she is scheduled to receive them.  Plaintiff Jacqueline Benitez also alleges that she receives SNAP benefits "each

---

[12] https://www.congress.gov/bill/118th-congress/house-bill/2872/actions.

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
7

month" and is "authorized to receive $88 in SNAP benefits as of October 1, 2023," *id.* ¶ 42, but does not specify on what day in October, or any month, she is scheduled to receive such benefits.

Plaintiffs' claims against USDA allege that the Food and Nutrition Act of 2008 requires the agency to ensure that States timely issue SNAP benefits, *id.* ¶ 4, "regardless of whether annual appropriations bills have been enacted," *id.* ¶ 7, and that USDA has either "failed to take the necessary steps to ensure that SNAP benefits will be issued in October and subsequent months," *id.* ¶ 2, or has "induced states" not to "pay benefits timely to eligible households" by failing to instruct states to take steps to process the issuance of benefits, *id.* ¶¶ 4, 68. Plaintiffs allege that "sufficient funds remain in the Fiscal Year 2023 appropriations to fund October benefits obligated in September 2023." *Id.* ¶ 20. Plaintiffs' claims against OMB allege that the agency is statutorily required to "instruct USDA to obligate October 2023 benefits from the fiscal year 2023 appropriation." *Id.* ¶ 73.

By way of relief, Plaintiffs ask the Court to declare that Defendants have violated the Administrative Procedure Act (APA) and the Food and Nutrition Act by "disrupting Plaintiffs' ability to receive and redeem SNAP benefits in the absence of an appropriation, by de-authorizing retailers or through other means," and to "enjoin Defendants from interfering with Plaintiffs' ability to timely receive and redeem SNAP benefits to which they are entitled." *Id.* Plaintiffs also seek a writ of mandamus compelling OMB "to apportion the necessary funds from the Fiscal Year 2023 annual appropriation to fund October 2023 SNAP benefits" and USDA "to direct state SNAP agencies to issue such benefits." *Id.*

On the same day they filed their Complaint, Plaintiffs filed an *ex parte* motion for a temporary restraining order (TRO), *see* Pls.' *Ex Parte* Motion for TRO ("TRO Mot."), ECF No. 12, and an application for provisional class certification, *see* Pls.' *Ex Parte* App. for Provisional Class Cert. ("Provisional Class Cert. Mot."), ECF No. 11. Plaintiffs asserted that immediate injunctive relief—by no later than September 15—was necessary to ensure "the regular issuance" of SNAP benefits in October 2023, in advance of a purportedly "impending shutdown of the federal government on October 1, 2023." TRO Mot. 2, 5. They sought provisional class certification on behalf of "[a]ll households that are or will be certified to receive [SNAP] benefits for October 2023

in the 50 states, the District of Columbia, Guam, and the Virgin Islands" "for purpose of the motion for expedited relief through the TRO." Provisional Class Cert. Mot. 2. The Court held a hearing on the morning of September 14. *See* Order Setting Hr'g, ECF No. 21. Later that same day, the Court denied the TRO motion without prejudice and deferred ruling on the motion for provisional class certification. Order, ECF No. 26. The Court set an expedited briefing schedule, a case management conference on September 19, and a hearing on both motions on September 27. *Id.*

Even before Defendants' response deadline, however, intervening events mooted Plaintiffs' motions for emergency relief and provisional class certification. Specifically, USDA finalized a change to its accounting process that it had been working toward implementing since before Plaintiffs' motions were filed, which allows it to obligate the full amount of SNAP benefits due nationwide in advance of the benefit month during which the benefits are loaded onto household cards. *See* Defs.' Notice of Mootness 3-5, ECF No. 29. That change made it clear that October 2023 benefits would issue as normal to households certified prior to and during the month of October, regardless of whether a lapse in appropriations began on October 1, 2023, as there were "sufficient funds from the FFY 2023 USDA appropriation to cover" that benefit month. *Id.* Plaintiffs therefore withdrew their motions. *See* Stipulation to Withdraw Motions, ECF No. 32. Separately, shortly thereafter, Congress passed, and the President signed into law, a CR extending federal funding through November 17, and providing additional funding for SNAP. *See* Pub. L. 118-15; *supra* Bckgd. § I.D.

Several days before the CR's November 17 expiration, Plaintiffs again moved for emergency relief. Mot. for PI ("Nov. PI Mot."), ECF No. 38; Mot. for Class Cert. ("Nov. Class Cert. Mot."), ECF No. 39. Plaintiffs asserted that they would be harmed by a loss or suspension of SNAP benefits beginning in January 2024 "in the event that Congress is unable to approve an appropriations act or further continuing resolution before November 17, 2023, and the federal government shuts down." Nov. PI Mot. at 2. They sought class certification of "[a]ll households who are or will be certified to receive [SNAP] benefits for January 2024 and subsequent months in

the 50 states, the District of Columbia, Guam, and the Virgin Islands." Nov. Class Cert. Mot. at 6. Plaintiffs sought an expedited hearing on the motions by no later than December 13. ECF No. 40.

Yet again, Congress adopted a CR that mooted Plaintiffs' request for emergency relief. In fact, Plaintiffs filed their emergency motions after the press widely reported that the House would be voting on a proposed CR extending government funding into 2024, and mere hours before that vote was held.[13] The House passed the bill, as did the Senate,[14] and the President signed the bill into law on November 16.[15] The November 16 legislation provided funding authority for SNAP benefits through at least the end of February 2024. *Supra* Bckgd. § I.D. Because there was no shutdown on November 17, Plaintiffs withdrew their motions for preliminary injunction and class certification seeking to ensure the issuance of benefits in January. Stipulation to Withdraw November Motions, ECF No. 42.

## **LEGAL STANDARDS**

Defendants move to dismiss this case for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Plaintiffs bear the burden to show subject-matter jurisdiction, and the Court must determine that it has jurisdiction before addressing the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). To satisfy Article III, Plaintiffs must show injury to themselves and cannot rely on alleged injuries to members of the putative class alleged in their Complaint: "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class." *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1046-47 (N.D. Cal. 2022) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). In evaluating its jurisdiction, "the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Furthermore, "[n]o presumptive truthfulness attaches to plaintiff's allegations. Once challenged, the party asserting subject matter jurisdiction has the

---

[13] *See, e.g.*, Emily Brooks, *GOP Leaders Aim to Pass Funding Bill with Help from Democrats Amid Conservative Opposition*, The Hill (Nov. 13, 2023), https://perma.cc/7RES-6KPN.
[14] Jacob Bogage, *Senate Passes Bill to Avert Government Shutdown, Sending It to Biden to Sign*, Washington Post (Nov. 15, 2023), https://perma.cc/5FUL-5WVX.
[15] *Press Release: Bill Signed: H.R. 6363*, The White House, https://perma.cc/P7E9-T4JB.

1  burden of proving its existence." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)

2  (citations omitted).

3  ## ARGUMENT

4      Plaintiffs fail to carry their burden to show subject-matter jurisdiction.  First, their

5  allegations do not satisfy the overlapping Article III requirements of standing and ripeness.

6  Plaintiffs allege harms arising from hypothetical events that had not occurred when they filed their

7  Complaint and that, four months later, have yet to occur—and may never occur.  This case thus

8  hinges on uncertain future events, and Plaintiffs cannot show an actual or certainly impending

9  injury as required for standing; for the same reason, their claims are not ripe.  Second, Plaintiffs do

10  not challenge any final agency action, but instead seek to enjoin actions that they speculate

11  Defendants may or may not take in hypothetical factual scenarios.  Plaintiffs therefore fail to satisfy

12  the APA's jurisdictional requirements, and their allegations supporting their request for mandamus

13  relief do not support an exception to those requirements.

14  **I.     Plaintiffs' Alleged Injuries Are Too Speculative to Satisfy Article III.**

15      Whether considered under a ripeness or standing framework, the outcome here is the same:

16  Plaintiffs' alleged injuries are "too speculative to give rise to a case or controversy as required by

17  Article III."  *See Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012).  The

18  standing and ripeness requirements are "closely related" and in many cases, such as this one,

19  overlap entirely.  *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (citation omitted);

20  *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014) ("Ripeness and

21  standing are closely related because they 'originate from the same Article III limitation.'" (quoting

22  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014))).

23      To show that they have standing, Plaintiffs must allege "an injury in fact, that is, 'an

24  invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

25  imminent, not conjectural or hypothetical.'"  *Alcoa*, 698 F.3d at 793 (quoting *Lujan v. Defs. of

26  Wildlife*, 504 U.S. 555, 560 (1992)).  Imminence is "a somewhat elastic concept," but "it cannot be

27  stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for

28  Article III purposes."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

To that end, the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks and citations omitted).  The presence of an actual or impending injury "is determined by the facts that exist at the time the complaint is filed." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001), *as amended* (Aug. 15, 2001) (citing *Defs. of Wildlife*, 504 U.S. at 569 n.4).

The related doctrine of ripeness is often "characterized as standing on a timeline." *Bova*, 564 F.3d at 1093 (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2020) (en banc)).  For instance, a claim that "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," is not yet ripe; nor is it sufficiently concrete and particularized to establish an injury-in-fact. *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  In other words, if "the supposed injury has not materialized and may never materialize," the "dispute is more of an abstraction than an actual case" and cannot "survive the standing/ripeness inquiry." *Stone-Manning*, 766 F.3d at 1190 (internal quotation marks and citations omitted).

Here, Plaintiffs assert two overlapping theories of injury.  The first theory is based on the possibility of the complete suspension of SNAP benefits during a lapse in appropriations in the event Congress fails to adopt a new appropriations measure, whether through a short-term CR or full-year appropriations bill.  The second theory is based on the possibility of a delay in receiving SNAP benefits in the event the State of California fail to timely prepare SNAP benefit cards for use by eligible households because the State fears a shutdown is imminent.  Both theories of injury lie in the realm of future possibilities, not imminent certainties, and therefore fail to satisfy the core Article III requirements of injury-in-fact and ripeness.

### A. Plaintiffs' speculations about a lapse in SNAP funding during a possible shutdown do not satisfy Article III.

First, according to Plaintiffs, they and millions of others will be harmed by a delay or interruption in SNAP benefits *if*, and only if, at some unknown future date—and for the first time in history—there is a lapse in appropriations *and* SNAP benefits are suspended because of such a

lapse.  Compl. ¶¶ 16-19 (alleging that, "*[i]f* Congress does not pass either full-year appropriations bills or a continuing resolution, the federal government will shut down" and "USDA will interrupt SNAP benefits" (emphases added)).  But a "highly attenuated chain of possibilities" must occur for SNAP benefits to possibly be suspended, *Clapper*, 568 U.S. at 410: the government would have to shut down; the shutdown would have to last long enough to approach a month for which federal funding for SNAP (including funds provided by any CRs and contingency reserves) is unavailable; the shutdown would have to further extend to the date during that month that Plaintiffs' are scheduled to receive SNAP benefits[16]; and all of this assumes that the State of California would not step in to provide alternative assistance with its own funds on that date.  This series of contingencies has never occurred, and its occurrence is not certainly imminent.

The very first link in this chain of contingencies—a government shutdown—is itself a rare event.  No shutdown had occurred when Plaintiffs brought this action and, four months later, none has occurred yet.  And predicting when or if a government shutdown will occur is an inherently speculative task.  It is not unusual for federal lawmakers to engage in heated and protracted negotiations over appropriations legislation until the eve of funding expiration deadlines or to provide short-term funding in the event negotiations over full-year funding require more time.  Therefore, any injury premised on a future shutdown is, likewise, inherently speculative.  The proceedings in this action are a case in point.   Throughout the litigation, Plaintiffs have made shifting predictions about when the government might shut down.  Those predictions, which were the basis for two unnecessary—and, accordingly, withdrawn—requests for preliminary relief, were proven false soon after they were made.  In their September 12, 2023 Complaint and accompanying TRO motion, Plaintiffs asserted that a government shutdown was "likely, if not inevitable" on October 1.  Compl. ¶ 2.  But on September 30, Congress passed a new CR, avoiding a shutdown. *See* Pub. L. 118-15.  Later, in their November 14, 2023 PI motion, Plaintiffs assumed the government would shut down by November 17. *See* Nov. PI Mot. at 2 (seeking relief "in the event that Congress is unable to approve an appropriations act or further continuing resolution before

16

November 17, 2023, and the government shuts down").   But two days later, Congress passed another CR, again avoiding a shutdown.  *See* Pub. L. 118-22.  And as long as a shutdown remains a future contingency, Plaintiffs cannot show an actual or certainly impending injury.  *See Stone-Manning*, 766 F.3d at 1190; *cf. Clapper*, 568 U.S. at 410 (rejecting a theory of injury that relied on an "objectively reasonable likelihood" that an event would occur in the future as incompatible with the "certainly impending" requirement).

That is so even if Plaintiffs make some future prediction during the pendency of this litigation that turns out to be correct.  Standing must be shown by the facts in existence when the Complaint is filed, not new facts that come into existence later.  *Clark*, 259 F.3d at 1006.  Although the factual circumstances have changed significantly since Plaintiffs filed their Complaint in September predicting a shutdown on October 1, Plaintiffs have not sought to amend their Complaint to include allegations concerning the new CRs or any other relevant facts that could possibly show an impending shutdown at any future date.  Any finding that Plaintiffs may establish standing based on a shutdown that did not occur at the time predicted in the Complaint based on then-extant facts, but eventually did occur more than four months later based on new facts, would deprive of any meaning the "certainly impending" requirement, which Plaintiffs bear the burden of satisfying.  In any event, there has been no shutdown.  For that reason alone, neither at the time Plaintiffs filed their Complaint nor during the months following have the factual circumstances shown any certainly impending injury.  Thus, even had Plaintiffs amended their Complaint, it would have required dismissal for lack of standing.

And yet, the mere occurrence of a shutdown—while necessary—would not suffice to show an actual or certainly impending injury.  None of the handful of shutdowns that have occurred throughout history have resulted in a delay or suspension of any SNAP benefits, *supra* Bckgd. § I.C., let alone Plaintiffs' SNAP benefits.  To show a certainly impending interruption to their SNAP benefits, Plaintiffs would have to allege that a shutdown has lasted so long that it is approaching a date at which Plaintiffs are eligible to receive SNAP benefits for which no federal funds will be available. Making that showing depends on various factors, including the specifics of the legislation in effect at the time of the hypothetical shutdown and facts about Plaintiffs' eligibility

and issuance schedule that they fail to allege. However, facts existing at the time the Complaint was filed and still today demonstrate that that the convergence of these factors would require a shutdown extending nearly as long as, and likely longer than, the record-breaking shutdown of 35 days--a highly speculative possibility.

To start, all throughout the litigation, relevant appropriations legislation has provided SNAP funds for a period lasting well beyond the start of the government shutdowns Plaintiffs predicted. For instance, when Plaintiffs brought this action in September, they alleged that "sufficient funds remain[ed] in the Fiscal Year 2023 appropriations to fund October 2023 benefits," and that billions of dollars in contingency reserves were also available for SNAP. Compl. ¶¶ 20-21. In other words, by Plaintiffs' own allegations, funds were available for at least 31 days beyond the date they assumed a shutdown would occur. Since then, three CRs have been enacted, each of which makes SNAP funds available well beyond the CR's own expiration date. *See* Pub. L. 118-15, § 111(b) (providing for "obligations for mandatory payments due," which include the SNAP program, for an additional 30-day period beyond the expiration of the CR); Publ. L. 118-22 § 101 (modifying the September CR's funding deadlines while preserving the extension provision at Section 111(b)); H.R. 2872 (further modifying the September CR's funding deadlines while preserving the extension provision at Section 111(b)). The CR expiring on November 17 ensured SNAP benefits would be funded through at least the end of December; the CR expiring on January 19 (as to USDA) ensured SNAP benefits would be funded through at least the end of February; and the CR expiring March 1 (as to USDA) ensures SNAP benefits will be funded through at least the end of March. Pub. L. 118-15, §§ 106, 111(b); Pub. L. 118-22, § 101(2); H.R. 2872 § 101(2).[17] On these facts alone, the shutdown Plaintiffs fear would have to last at least a month before there could even *potentially* be no available funds to cover SNAP benefits.

But for Plaintiffs to show that a shutdown of such length might have any effect on their benefits, they would have to allege that the SNAP funding insufficiency will occur during a month that they are actually eligible to receive benefits. As it stands, the Complaint alleges no facts tending

---

[17] Congress has included an identical provision in short-term CRs for the last 16 years, starting in 2007. *See* Continuing Appropriations, 2008, Publ. L. 110-92, 121 Stat. 989 (Sept. 29, 2007).

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
15

1    to show that will be the case. Plaintiffs allege only that Ms. Benitez is eligible for SNAP benefits

2    in October 2023, Compl. ¶ 42, and that Ms. Erdmann-Browning receives SNAP benefits "each

3    month," *id.* ¶ 32. But states certify households for specific monthly periods, not in perpetuity, and

4    therefore eligibility in October says nothing of eligibility in November, December, or any month

5    following. *see* 7 C.F.R. § 273.10(f) (2017); *see also infra* Bckgd. § I.A. Thus, Plaintiffs necessarily

6    fail to allege facts showing imminent harm because of a hypothetical shutdown, of any length, in

7    any month following October 2023.

8        Yet merely alleging eligibility during a particular month would not suffice to show certainly

9    impending harm, even assuming a lapse in SNAP funds at the beginning of that month. Plaintiffs

10   would also have to allege that the funding insufficiency is approaching the specific date during that

11   month that they are scheduled to receive SNAP benefits. That is because states generally issue

12   benefits on a staggered schedule, such that beneficiaries may receive benefits anywhere from the

13   first to the 15th to the 30th of the month. *See* 7 U.S.C. § 2016(g); *see also infra* Bckgd. § I.A. If

14   Plaintiff Benitez is scheduled to receive benefits from California on the 15th of the month, she

15   would not be imminently harmed by an absence of SNAP funds occurring on the first of the month.

16   At a minimum, she could only show an imminent injury if the funding insufficiency continued

17   nearer to the time at which her benefits would issue, on the 15th. But at that point, the hypothetical

18   shutdown already would have had to have lasted for *well over a month*—surpassing the longest in

19   history—and there would have to be no available funds left to cover SNAP benefits. It would be

20   extremely difficult to show a certainly impending injury from the possibility of that occurrence

21   *during* a shutdown, even one that has lasted a few weeks. It is impossible to show such harm before

22   any shutdown has occurred at all.

23       Still other contingencies are at play, as Plaintiffs' own allegations illustrate. For instance,

24   Plaintiffs allege that California's State SNAP agency informed them, prior to September 12, 2023,

25   that it was "working with state and federal partners to mitigate risks resulting from a governmental

26   shutdown." Compl. ¶ 24.[18]  Plaintiffs may not suffer any harm from a hypothetical lapse in federal

27   ─────────────────────

28   [18]  Additionally, a document referenced in the Complaint and submitted with Plaintiffs' TRO
     Motion generally illustrates states' interest during prior years in potentially using their own funds
     (Footnote continues on next page.)

funds that might otherwise affect their SNAP benefits if the state of California steps in to provide alternate benefits during such lapse.

In sum, Plaintiffs cannot meet Article III's injury-in-fact or ripeness requirements because their injury is premised on a speculative chain of contingencies—namely, that, for the first time in history, the government will shut down for so long (possibly breaking the record for the longest-ever shutdown) that all sources of SNAP funding will be completely depleted, at a time when Plaintiffs are otherwise certified and scheduled to receive SNAP benefits imminently, and that California will decline to provide any alternate food benefits.  Never before has this series of events occurred.  The possibility that it might occur now is, to say the least, remote.  And that remote possibility does not satisfy Article III.

### B. Plaintiffs' speculations that non-party states will delay the issuance of benefits because of fears about a possible shutdown do not satisfy Article III.

Plaintiffs advance another theory of injury that turns on even more unsupported speculations, this time about the conduct of non-party states in the weeks leading up to the expiration dates for federal appropriations.  Specifically, Plaintiffs allege that the mere possibility of a future shutdown may cause injury *if* that possibility exists roughly two weeks before the start of a new benefits month and *if* that possibility leads the State of California to refrain from initiating the process for preparing SNAP benefits cards at that time.  Compl. ¶¶ 23-24, 27-28.

These allegations stem from the process by which states work with privately contracted EBT vendors to prepare SNAP benefits for use by households.  As an initial step in the largely automated process, each state submits to its vendor so-called "issuance files," which specify the monthly "amount of [SNAP] benefits due" and "when those benefits must become available" to households in that state.  USDA Decl. ¶ 6; *see also* Compl. ¶ 22.  The EBT vendors then use the issuance files to draw the specified amounts from the Treasury and deliver them to the specified

---

to provide food benefits to certain residents in the hypothetical absence of federal funds.  *See* Compl. ¶ 26 (referring to USDA informing states that they may not be guaranteed federal reimbursement if they used their own funds to provide food benefits); Ex. 5 to Berger Decl., at 22, ECF No. 12-9 ("Lapse in Funding Questions from States, Oct. 11, 2013") (the referenced document, in which USDA answers states' questions about options for using their own funds to provide benefits to their residents in November 2013 if a shutdown occurs); *id.* ("Vermont is considering using state funds to pay . . . benefits . . . .").

EBT cards on the applicable dates.  USDA Decl. ¶ 8.  Plaintiffs allege that "California and other states must submit" these files "to the EBT vendor by a specific deadline" each month to ensure the benefits will timely issue, Compl. ¶¶ 22, 24, and that California was required to submit its files for October benefits by September 15, 2023, *id.* ¶ 24.[19]  Plaintiffs further allege that, "[o]nce states miss their contractual deadline to send the electronic files to their EBT vendor," Plaintiffs will suffer irreparable harm, because—according to Plaintiffs—missing the deadline would delay issuance of benefits during the next month even in the absence of a shutdown.  *Id.* ¶¶ 23-24.  To remedy this alleged injury, Plaintiffs assert that the Court must order USDA to instruct states to send issuance files to their vendors.  *See* Compl. at 15, Proposed Order on Nov. PI Mot. 2 (seeking an injunction mandating USDA to issue an instruction to states by January 15, 2023, and "the 15th of any month thereafter").  Absent such an order, Plaintiffs contend that "SNAP benefits will be delayed or interrupted entirely."  Compl. ¶ 27.

Such allegations that turn on the behavior of states and their vendors—third parties not before the Court—make standing "'substantially more difficult' to establish."  *Defs. of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  It is even more difficult here, where the alleged injury hinges on predictions about a state's *future* conduct and assume that the state will decline to follow provisions set by private contract—matters of significant "speculation and conjecture."  *O'Shea*, 414 U.S. at 497.  Nor is there any historical precedent that could provide any basis whatsoever for Plaintiffs' conjecture about future state behavior.  During the Court's TRO hearing on September 14, Plaintiff's counsel represented that she was "not aware" of any state declining to submit its issuance files "in a timely way because it had concerns" about the absence of federal funds.  TRO Hr'g Trans. 14:16-20, ECF No. 35.

Equally important, the Complaint does not offer any support for the conclusory assertion that, if California were to miss its contractual deadline, SNAP benefits would inevitably be delayed.  An attachment to Plaintiffs' TRO motion suggests otherwise.  *See* Ex. 5 to Berger Decl. at 23, ECF No. 12-9 (question from a state to USDA in October 2013, in which the state says that "not knowing

---

[19] As explained in a declaration from USDA attached to Defendants' truncated TRO response, a state may transmit issuance files to its vendor the month before or the month during which they must be available for use by SNAP households.  USDA Decl. ¶ 9.

how to proceed for November monthly benefits is not the bigger issue as we can make that call very late and not affect timely issuance (October 30)").  Additionally, a declaration from USDA, submitted during the TRO proceedings, explains that many states do not submit their issuance files to vendors until the date that benefits are actually due.  USDA Decl. ¶¶ 8-10.  The USDA declaration also provides an example of the State of Florida expediting the issuance of benefits in response to an environmental disaster and completing the EBT processing changes required to make the expedited issuance within only two days.  *Id.* ¶ 13.  This testimony refutes Plaintiffs' conclusory allegations that any changes to the EBT processing schedule would inevitably delay or disrupt SNAP benefits.

Moreover, historically, annual appropriations legislation is often only enacted in the eleventh hour before funding expires.  If California is truly unlikely to send its issuance files to its vendor absent explicit instruction from USDA roughly two weeks before any potential shutdown, and if the failure to send issuance files by that pre-determined date would inevitably interrupt the timely issuance of SNAP benefits, then Plaintiffs should be able to support their allegations with a real-world example.[20]  They have not, and their conclusory speculations fail to support standing.  *See Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp. 3d 1149, 1159 (C.D. Cal. 2022) ("[I]n terms of Article III standing, the complaint must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

The proceedings in this case also contradict this creative theory of injury.  September 15 came and went, without a Court injunction, without a CR or full-year appropriations act having yet been passed by Congress, and without an instruction from USDA to states regarding the submission of their issuance files.  Meanwhile, Plaintiffs have not alleged that their benefits were interrupted as a result.  Either California submitted its issuance files by September 15, or it missed the deadline with no effect on the timely delivery of Plaintiffs' SNAP benefits.  Either way, the proceedings

---

[20] Plaintiffs may assert that they need discovery to determine the deadlines set by state contracts and how quickly states and their private contractors can load the issuance files to SNAP benefit cards if they choose not to follow their pre-determined deadlines.  But such discovery of information in the possession of third parties would be futile.  It would not answer whether states will in fact choose not to comply with their contractual deadlines.  Nor would it resolve the redressability problem, discussed below.

Defs.' Motion to Dismiss, *Erdmann-Browning, et al. v. Vilsack, et al.*, No. 4:23-cv-04678
19

1  here undercut the Complaint's allegations that Plaintiffs certainly will be injured by California's

2  failure to transmit its issuance files by a certain date absent instruction from USDA.

3        Besides, this theory of injury suffers another fatal flaw: because it stems from the

4  "unfettered choices made by independent actors not before the court," there is no relief this Court

5  may enter that would remedy the purported injury. *Defs. of Wildlife*, 504 U.S. at 562. USDA is

6  not a party to the states' contracts governing issuance files. And while Plaintiffs ask for a Court

7  order compelling USDA "to instruct states to continue sending" their files to EBT vendors, Compl.

8  13, the Court could not order states to follow that instruction, let alone to do so by a certain date.

9  *See Defs. of Wildlife*, 504 U.S. at 569-70. Any order that purported to impose such requirements

10  on a state, moreover, would interfere with a contractual relationship between parties who are not

11  before this Court.

12        Even if the Court accepted as true Plaintiffs' assertions under this theory, and even if those

13  assertions could form the basis of an Article III injury, that injury could not possibly become ripe

14  until the occurrence of an extended shutdown and the absence of a new appropriations bill by the

15  middle of the month before SNAP benefits would be due, but for which other federal funds are

16  unavailable. As it stands, Plaintiffs' stale allegations regarding the transmission of issuance files

17  in September 2023, based on purported fears about a shutdown in October 2023, cannot establish

18  injury stemming from conjecture about how California might react to the possibility of a lapse in

19  funding at some unknown future date.

20        Accordingly, none of Plaintiffs' allegations establish an actual or certainly impending

21  injury, and the Court must dismiss the case for lack of standing or ripeness.

22  **II.    Plaintiffs do not Challenge a Final Agency Action.**

23        The case should be dismissed for the additional reason that Plaintiffs bring their claim for

24  injunctive relief under the APA, *see* Compl. at 13, but fail to allege a final agency action, which is

25  a jurisdictional requirement in the Ninth Circuit. *See Winnemucca Indian Colony v. Dep't of*

26  *Interior*, 819 Fed. App'x 480, 482 (9th Cir. 2020). Plaintiffs also purport to bring claims for

27  declaratory relief under the Declaratory Judgment Act and for a writ of mandamus under 28 U.S.C.

28  § 1631, *id.* at 13-14, but neither statutory provision provides a path around the APA's jurisdictional

limitation for final agency action.  Accordingly, all three claims require dismissal because Plaintiff fails to the APA's "final agency action" requirement.

An agency action is final, first, if it "mark[s] the consummation of the agency's decisionmaking process" and, second, if it determines "rights or obligations" or carries "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).  Both elements are required but neither is present here.

The Complaint challenges no agency action[21] by USDA or OMB whatsoever, let alone one that meets the *Bennett* elements for finality.  Instead, the Complaint is premised on a series of assumptions about what actions the agencies *might* take in imagined factual scenarios.  "*If* USDA instructs states to delay the process to issue October benefits, or leaves unclear how states should respond to the impending governmental shutdown until dangerously close to the deadline," Plaintiffs assert, it will cause Plaintiffs injury.  Compl. ¶ 4 (emphasis added).  "*If* Congress fails to pass an annual appropriation bill or a continuing resolution for USDA by mid-September and USDA fails to instruct states to proceed with transmitting the necessary electronic files," Plaintiffs allege, "October SNAP benefits will be delayed or interrupted entirely." *Id.* ¶ 27 (emphases added).  And while USDA had never before "delayed or interrupted" SNAP benefits because of a lapse in appropriations, "Plaintiffs *believe* that USDA *will* interrupt SNAP benefits this year," based on statements or policy decisions made by USDA in other factual circumstances.[22] *Id.* ¶ 19 (emphases added).  With respect to OMB, Plaintiffs do not even speculate that the agency might take any particular action at all but instead make general allegations about the purported scope of OMB's apportionment duties under various statutory provisions.  *See, e.g.*, *id.* ¶ 72.  These allegations do not meet the APA's jurisdictional requirements for review of agency action.  The APA authorizes

---

[21] An "agency action" must fall within one of the APA's five categories—"'agency rule, order license, sanction [or] relief'"—each of which "involve[s] circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)).
[22] Plaintiffs may contend that discrete and unrelated policies or actions in 2015, 2019, and 2021 referenced in paragraph 19 of the Complaint together constitute a "polic[y] and practice[] of disrupting Plaintiffs' ability to receive and redeem SNAP benefits in the absence of an appropriation." Compl. at 15.  There would be no basis for such claim.  Plaintiffs do not contend that USDA relied on the alleged policies or actions to delay or suspend anyone's SNAP benefits, including Plaintiffs', in the past.  Indeed, it is undisputed that there has never before been an interruption to SNAP benefits because of a lapse in appropriations.  *Supra* Bckgd. § I.B.

1    Courts to review final agency action, which must be circumscribed and discrete, not a series of

2    potential actions an agency might take in the course of administering its programs.  *See SUWA*, 542

3    U.S. at 64 ("The limitation to discrete agency action precludes . . . broad programmatic attack[s.]")

4    Plaintiffs' failure to identify any such action by USDA or OMB dooms their claims.

5         Plaintiffs' claim for mandamus relief brought under 28 U.S.C. § 1361 does not provide an

6    avenue around this jurisdictional hurdle.  Section 706(1) of the APA provides an adequate remedy

7    for Plaintiffs' claim for relief and therefore precludes mandamus jurisdiction here.  *Nova Stylings,*

8    *Inc. v. Ladd*, 695 F.2d 1179, 1180 (9th Cir. 1983).  That section empowers courts to review claims

9    that, like those for a writ of mandamus, seek to "compel agency action unlawfully withheld or

10   unreasonably delayed."  5 U.S.C. § 706(1).  While Section 706(1) provides a narrow exception to

11   the APA's finality requirement, the exception is restricted to review of "discrete actions that are

12   unequivocally compelled by statute or regulation."  *Vietnam Veterans of Am. v. Cent. Intel. Agency*,

13   811 F.3d 1068, 1081 (9th Cir. 2016).  "Courts are not permitted under § 706(1) to enter 'general

14   orders compelling compliance with broad statutory mandates.'"  *Id.* (quoting *SUWA*, 542 U.S. at

15   66).

16        Here, Plaintiffs seek a writ of mandamus ordering OMB "to apportion the necessary funds

17   from the Fiscal Year 2023 annual appropriation to fund October 2023 SNAP benefits"[23] and USDA

18   "to direct state SNAP agencies to issue such benefits."  Compl. at 15.  Yet Plaintiffs point to no

19   statute specifically mandating that either agency take these actions and thus do not meet the

20   jurisdictional requirements for APA review.  In any event, Plaintiffs' failure-to-act claim is moot.

21   Indeed, before Plaintiffs even brought this case, OMB had apportioned funds from the FFY 2023

22   appropriation.  *See* OMB Decl. ¶ 10 ("On August 28, 2023, OMB signed the most recent updated

23   apportionment for fiscal year (FY) 2023 SNAP funds," which "provided all of the FY 2023 funding

24   appropriated for SNAP benefits to the states in one lump sum.").  And in October 2023, the states

25   issued those funds.  There is thus no relief the Court may order with respect to those allegations.

26   *See Am. Cas. Co. of Reading, Pa. v. Baker*, 22 F.3d 880, 896 (9th Cir. 1994).  Accordingly,

---

[23] Elsewhere, the Complaint alleges that OMB has a ministerial duty "to instruct USDA to obligate" benefits, but does not identify any statute in support of that assertion and Plaintiffs do not seek an order requiring OMB to issue such instruction.

1    Plaintiffs fail to allege a any discreet failure to act over which this Court has jurisdiction.

2         Nor does Plaintiffs' claim for declaratory relief provide a path around the APA's "final

3    agency action" requirement.  Although the Complaint cites the Declaratory Judgment Act at 28

4    U.S.C. § 2201-2202 in support of this claim, *see* Compl. at 14, "it is settled law that '[t]he operation

5    of the Declaratory Judgment Act is procedural only' and does not confer subject matter

6    jurisdiction." *Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Lab. Ass'n of the United*

7    *States of Am. Pension Tr.*, 153 F. Supp. 3d 1217, 1236 (E.D. Cal. 2015) (quoting *Calif. Shock*

8    *Trauma Air Rescue v. State Comp. Ins. Fund*, 636 F.3d 538, 543 (9th Cir. 2011)).  Accordingly,

9    "courts look to the subject matter of the underlying dispute to determine jurisdiction over

10   declaratory judgment claims." *Id.*  The subject matter of the dispute underlying Plaintiffs' claim

11   for declaratory relief is Defendants' alleged violations of the APA for failure to adhere to the

12   requirements of the Food and Nutrition Act.  *See* Compl. at 14 (seeking a declaration that

13   "Defendants' actions contradict the Food and Nutrition Act, 7 U.S.C. § 2020(e)(2)(B)(i), and

14   therefore violation the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)").  Here, there is

15   no underlying APA claim because there is no final agency action; the Court thus lacks jurisdiction

16   over the claim for declaratory relief.

17        Plaintiffs' Complaint therefore must be dismissed in its entirety for failure to allege a final

18   agency action as required to establish subject-matter jurisdiction under the APA.

19                                    **CONCLUSION**

20        For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint for lack of

21   subject-matter jurisdiction.

22   Dated:  January 23, 2024               Respectfully submitted,

23                                          BRIAN M. BOYNTON
24                                          Principal Deputy Assistant Attorney General

25                                          JULIE STRAUS HARRIS
                                            Assistant Branch Director
26
                                            /s/ *Kyla M. Snow*
27                                          KYLA M. SNOW
                                            OH Bar No. 96662
28                                          United States Department of Justice
                                            Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, D.C. 20005
(202) 514-3259
kyla.snow@usdoj.gov

*Counsel for Defendants*