1   Jodie Berger (SBN 124144)
    jberger@wclp.org
2   Richard Rothschild (SBN 67356)
    rrothschild@wclp.org
3   Robert Newman (SBN 86534)
    rnewman@wclp.org
4   Antionette Dozier (SBN 244437)
    adozier@wclp.org
5   **WESTERN CENTER ON LAW & POVERTY**
    3701 Wilshire Blvd., Suite 208
6   Los Angeles, CA 90010
    T: (213) 235-2617
7   F: (213) 487-0242

8   Lindsay Nako (SBN 239090)
    lnako@impactfund.org
9   Lori Rifkin (SBN 244081)
    lrifkin@impactfund.org
10  Fawn Rajbhandari-Korr (SBN 315888)
    fkorr@impactfund.org
11  Meredith Dixon (SBN 346864)
    mdixon@impactfund.org
12  **IMPACT FUND**
    2080 Addison St., Suite 5
13  Berkeley, CA 94704
    T: (510) 845-3473
14  F: (510) 845-3654

15  *Attorneys for Plaintiffs*

16                          **UNITED STATES DISTRICT COURT**

17                      **NORTHERN DISTRICT OF CALIFORNIA**

18

19  ANIKA OKJE ERDMANN-BROWNING         Case No. 4:23-cv-04678-JST
    and JACQUELINE BENITEZ, individually
20  and on behalf of all others similarly situated,   CLASS ACTION

21              Plaintiffs,              **PLAINTIFFS' NOTICE OF MOTION
                                         AND MOTION FOR PRELIMINARY
22         v.                            INJUNCTION; MEMORANDUM OF
                                         POINTS AND AUTHORITIES**
23  THOMAS J. VILSACK, Secretary of the
    United States Department of Agriculture, in   Hearing date: March 14, 2024
24  his official capacity; SHALANDA YOUNG,    Time: 2:00 p.m.
    Director of the United States Office of
25  Management and Budget, in her official
    capacity.                           Action filed: September 12, 2023
26
27              Defendants.
28

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

**PLEASE TAKE NOTICE** that on March 14, 2024, or as soon thereafter as counsel may be heard by the Court, Plaintiffs Anika Okje Erdmann-Browning and Jacqueline Benitez will move for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure and Rules 7-2 and 65-2 of the Local Civil Rules of the Court. The parties have stipulated to a shortened briefing schedule, subject to Court approval, for this Motion for Preliminary Injunction and the accompanying Motion for Class Certification.

The motion seeks a preliminary injunction to ensure the timely issuance of Supplemental Nutrition Assistance Program (SNAP) benefits if Congress does not pass a full-year appropriations bill. Plaintiffs seek a preliminary injunction on behalf of themselves and all others similarly situated. The motion is filed concurrently with a Motion for Class Certification that seeks certification of a proposed class of SNAP recipients.

This motion is made on the grounds that Defendants' actions violate the Administrative Procedure Act by failing to ensure that SNAP benefits will continue to be funded and distributed regardless of any a lapse in federal funding.[1] Defendants' actions contravene the requirements of the Food and Nutrition Act, which requires that SNAP benefits shall be timely distributed to all eligible recipients who apply for benefits. Defendants' actions cause irreparable harm to Plaintiffs and the putative class, and the equities and public interest weigh in Plaintiffs' favor.

The Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities; the Supplemental Declarations of Plaintiff Anika Okje Erdmann-Browning and Plaintiff Jacqueline Benitez, the Supplemental Declaration of David Super, the Supplemental Declaration of Erica Padilla Chavez, the Declaration of Jonetta Hall, the Declaration of Cynthia de la Mora, the Declaration of Salaam Bhatti, and the Declaration of Plaintiffs' counsel Jodie Berger and all exhibits thereto, filed herewith; the previously filed declarations of Gina Plato-Nino (ECF No. 12-2), Rebecca Silva (ECF No. 12-3), Shimica Gaskins (ECF No. 12-7), Louise Hayes (ECF No. 12-10); Hilary Hoynes (ECF No. 38-2),

---

[1] Plaintiffs' motion is not mooted by any impending or recently enacted stopgap funding legislation, as it only further demonstrates the precarity of Plaintiffs' SNAP benefits under Defendants' current agency positions and the continued uncertainty that Plaintiffs face.

Theresa Havelka (ECF No. 38-3); Plaintiffs' Notice of Motion and Motion for Class

Certification, the supporting Memorandum of Points and Authorities, and the Supporting

Declarations and all exhibits thereto; all of the pleadings, records and files in the action; and any

arguments heard by the Court on this motion.

      The parties request a hearing date of March 14, 2024.


Dated: February 29, 2024             Respectfully submitted:

                               Jodie Berger
                               *Attorney for Plaintiffs*

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ........................ 2

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES .................................... 10

   I. INTRODUCTION ............................................................................................. 10

   II. BACKGROUND ............................................................................................... 11

     A. Low-Income Households Rely on SNAP to Buy Just Enough Food to Survive. ....... 11

     B. Federal Regulations Require States to Administer SNAP Benefits with Federal
       Funding Every Month. ................................................................................. 13

     C. The Threat of Losing SNAP Benefits in the Event of a Government Shutdown Is
       Causing Ongoing Harm and Risk of Harm. ..................................................... 14

       1. USDA Considers SNAP Funding to be Dependent on Appropriation Legislation
        and Will Stop SNAP Benefits from Issuing Under Its Government Shutdown
        Contingency Plan. .................................................................................. 14

       2. The Uncertainty of SNAP Benefits Under USDA's Contingency Plan is Causing
        Plaintiffs and Other Households Harm.  .................................................... 16

   III. PROCEDURAL BACKGROUND ...................................................................... 18

   IV. ARGUMENT ................................................................................................. 19

     A. Plaintiffs Satisfy the Standard for a Preliminary Injunction. ........................... 19

       1. Plaintiffs are Likely to Succeed on their Administrative Procedure Act Claim. ... 20

        a. The 2024 Contingency Plan is a Final Agency Action Because It is USDA's
         Last Word on SNAP During a Lapse in Appropriations. ........................... 20

        b. The Food and Nutrition Act Creates an Enforceable Federal Obligation to
         Issue SNAP Benefits Unconditioned on Appropriation. ........................... 22

         i. The Supreme Court Has Affirmed that Congress Can Create an
          Enforceable Government Payment Obligation Unconditioned on Specific
          Appropriation. ................................................................................. 22

         ii. The Food and Nutrition Act Creates a Government Obligation to Furnish
          SNAP Benefits. ................................................................................ 22

        c. The Food and Nutrition Act Does Not Permit USDA to Suspend SNAP
         Benefits During a Government Shutdown. ............................................ 26

        d. Under the APA, the Court May Compel USDA to Take Action to Ensure
         that SNAP Benefits are Timely Paid. ................................................... 27

       2. Plaintiffs and the Proposed Class Will Continue to Suffer Irreparable Harm
        Absent Injunctive Relief. ........................................................................ 28

3. The Balance of Equities Favors Plaintiffs. ............................................. 30

4. A Preliminary Injunction is in The Public Interest. ................................. 31

5. Plaintiffs Satisfy the Legal Standard for a Preliminary Injunction Under Both the Prohibitory and Mandatory Injunction Tests. ............................................ 32

B. Certification of the Class is Not Necessary to Grant the Requested Relief. .............. 33

C. Plaintiffs Should Not be Required to Post a Bond. ..................................... 34

VII. CONCLUSION.......................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Futures LLC v. Boyd Street Distro, LLC,*
  35 F. 4th 682 (9th Cir. 2022) ............................................................... 24

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................ 19, 20

*Appalachian Power Co. v. E.P.A.,*
  208 F.3d 1015 (D.C. Cir. 2000) ............................................................ 22

*Arizona Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) .............................................................. 32

*Barahona-Gomez v. Reno,*
  167 F.3d 1228 (9th Cir. 1999) .............................................................. 34

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..................................................................... 21, 22

*Blanco v. Anderson,*
  39 F.3d 969 (9th Cir. 1994) .................................................................. 29

*Booth v. McManaman,*
  830 F. Supp. 2d 1037 (D. Haw. 2011) .............................................. 29, 31

*Brantley v. Maxwell-Jolly,*
  656 F. Supp. 2d 1161 .......................................................................... 33

*Bresgal v. Brock,*
  843 F.2d 1163 (9th Cir. 1987) .............................................................. 33

*D.C. v. U.S. Dept. of Agric.,*
  444 F.Supp. 3d 1 (D.D.C. 2020) ........................................................... 28

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ........................................................................ 20

*Disney Enters., Inc. v. VidAngel,*
  869 F.3d 848 (9th Cir. 2017) ................................................................ 19

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) .............................................................. 31

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
    92 F.3d 1486 (9th Cir. 1996) ............................................................. 33

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ............................................................. 32

*Gill v. U.S. Dep't of Justice,*
    913 F.3d 1179 (9th Cir. 2019) ........................................................... 21

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ......................................................................... 28

*Golden Gate Restaurant Ass'n v. City & County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ........................................................... 31

*Harris v. Bd. of Supervisors,*
    366 F.3d 754 (9th Cir. 2004) ............................................................. 29

*Haskins v. Stanton,*
    621 F. Supp. 622 (N.D. Ind. 1985) .................................................... 29

*Havasupai Tribe v. Provencio,*
    906 F.3d 1155 (9th Cir. 2018) ........................................................... 20

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ............................................................. 32

*I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist.,*
    805 F.3d 1164 (9th Cir. 2015) ........................................................... 22

*J.L. v. Cissna,*
    341 F. Supp. 3d 1048 (N.D. Cal. 2018) ............................................. 33

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ............................................................. 34

*Just Film, Inc. v. Merch. Servs., Inc.,*
    474 Fed. Appx. 493 (9th Cir. 2012) ................................................... 33

*Kildare v. Saenz,*
    325 F.3d 1078 (9th Cir. 2003) ........................................................... 30

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) ...................................................... 30, 32

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ............................................................... passim

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ................................................................................................ 34

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) .................................................................................................. 21

*Paxton v. Sec'y of Health & Human Servs.*,
    856 F.2d 1352 (9th Cir. 1988) ................................................................................................ 28

*Plaskett v. Wormuth*,
    18 F.4th 1072 (9th Cir. 2021) ................................................................................................. 27

*Price v. City of Stockton*,
    390 F. 3d 1105 (9th Cir. 2004) ............................................................................................... 33

*Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala*,
    65 F.3d 1472 (9th Cir. 1995) .................................................................................................. 22

*S.A. v. Trump*,
    No. 18-CV-03539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) ...................................... 32

*Sacks v. Office of Foreign Assets Control*,
    466 F.3d 764 (9th Cir. 2006) .................................................................................................. 24

*Saravia v. Sessions*,
    280 F.Supp.3d 1168 (N.D. Cal. 2017)
    *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ........................... 34

*Scholl v. Mnuchin*,
    489 F.Supp.3d 1008 (N.D. Cal. 2020) ................................................................................... 34

*Small v. Avanti Health Systems, LLC*,
    661 F.3d 1180 (9th Cir. 2011) ................................................................................................ 31

*Vietnam Veterans of Am. v. Cent. Intel. Agency*,
    811 F.3d 1068 (9th Cir. 2016) ................................................................................................ 28

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................................... 19

*Withrow v. Concannon*,
    942 F.2d 1385 (1991) ............................................................................................................. 30

*Zepeda Rivas v. Jennings*,
    445 F. Supp. 3d 36 (N.D. Cal. 2020) ..................................................................................... 34

**Statutes**

2 U.S.C. § 641(a)(1)(C) ............................................................................................................... 26

2 U.S.C. § 651 .................................................................................................. 26

2 U.S.C. § 900(b)(8) ......................................................................................... 26

2 U.S.C. §§ 622(9), 651, 900(b)(8) ................................................................. 11

5 U.S.C. § 706(1) ............................................................................... 20, 27, 28

5 U.S.C. § 706(2) ............................................................................................. 20

7 U.S.C. § 2013(b)(6)(A) ................................................................................. 25

7 U.S.C. § 2014 ......................................................................................... 12 24

7 U.S.C. § 2014(a) ................................................................................... passim

7 U.S.C. § 2014(b) ........................................................................................... 24

7 U.S.C. §§ 2011, 2014(a) .............................................................................. 10

7 U.S.C. §§ 2013(a), 2020 .............................................................................. 13

7 U.S.C. § 2027 ............................................................................................... 27

7 U.S.C. §§ 2027(b), (c) .................................................................................. 26

7 U.S.C. §§ 2027(b), (c), (d) ........................................................................... 27

31 U.S.C. § 1341 ...................................................................................... 11, 23

31 U.S.C. § 1341(a) ......................................................................................... 31

31 U.S.C. § 1341(a)(1) ..................................................................................... 31

31 U.S.C. § 1512(b)(2) .................................................................................... 13

42 U.S.C. § 18062 ........................................................................................... 23

Pub. L. 118-15, 137 Stat. 71 ..................................................................... 14, 18

Pub. L. 118-22, 137 Stat. 112 ................................................................... 14, 19

Pub. L. 118-35, 138 Stat. 3 ....................................................................... 15, 19

U.S. Const. art. I, § 9, cl. 7 ....................................................................... 11, 13

## Rules

Federal Rules of Civil Procedure and Rules 7-2 and 65 ..................................... 2

## Regulations

7 C.F.R. § 273.10(e)(1)(ii)(A) ........................................................................ 12

7 C.F.R. § 273.9-10 ......................................................................................... 12

7 C.F.R. § 274.1(h) .......................................................................................... 13

7 C.F.R. § 274.8(c)(1)(iii) ............................................................................... 31

7 C.F.R. §§ 273.2(a)(2), (i)(l) ......................................................................... 25

## Other Authorities

*Fed. Civ. P. Before Trial,* § 10:773 at 10-116 (The Rutter Group 2008) ..................... 33

H. Rep. No. 99-271 .......................................................................................... 27

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

A timely preliminary injunction is necessary to ensure that Plaintiffs and more than 40 million people will be able to eat in the coming months, despite the ongoing Congressional impasse. The United States Department of Agriculture (USDA) has taken the position that SNAP recipients will not receive their benefits after March 31 unless Congress passes a fourth continuing resolution or full-year appropriations bill because SNAP funding is dependent upon a specific appropriation. Unless USDA instructs states by mid-March to process benefits, April benefits will not issue. Plaintiffs Anika Okje Erdmann-Browning and Jacqueline Benitez seek to prevent such unlawful suspension of SNAP benefits for themselves and millions of people.

The uncertainty Plaintiffs and other SNAP participants have experienced over continued receipt of SNAP benefits and access to food during the 153 days since the end of federal fiscal year 2023 has already caused them grave harm. This harm increases with each passing day. When Plaintiffs learned that a government shutdown could suspend their SNAP benefits, they started to ration food, reduce meals, and drink water to distract themselves from their growing hunger. Plaintiffs live in constant worry that they will not receive next month's SNAP benefits. Beyond starving themselves, Plaintiffs have no choice but to seek Court intervention. As Plaintiff Benitez explained, "I don't know what else I can do. I am helpless to do anything more." Suppl. Decl. of Jacqueline Benitez in Supp. of Pls. Mot. for Prelim. Inj. (Benitez Suppl. Decl.), ¶ 18.

Plaintiffs meet the requirements for a preliminary injunction. As set forth below, they are likely to succeed on the merits of their claim that Defendants' failure to adhere to the provisions of the Food and Nutrition Act violates the Administrative Procedure Act. The Food and Nutrition Act contains mandatory language directing the issuance of SNAP benefits to qualifying households. 7 U.S.C. §§ 2011, 2014(a). Section 2014(a), for example, expressly provides that: "Assistance under this program shall be furnished to all eligible households who make application for such participation." *Id.* § 2014(a). USDA has a continuing statutory obligation to provide benefits to eligible households that have completed the application process, regardless of whether Congress passes a specific appropriation directly funding SNAP. Legislation governing the

congressional budget procedure confirms that the expenditure of funds necessary to deliver SNAP benefits is not dependent on an annual appropriation.  2 U.S.C. §§ 622(9), 651, 900(b)(8).  The entitlement language in these statutes is an explicit congressional instruction to spend money, satisfying the requirements of the Appropriations Clause and the Anti-Deficiency Act.  U.S. Const. art. I, § 9, cl.7; 7 U.S.C. § 2014(a); 31 U.S.C. § 1341.

Forty million people will suffer irreparable harm from interruption of April 2024 and future SNAP benefits.  The balance of equities and public interest weigh strongly in favor of enforcing Defendants' statutory obligations and preventing this harm.  Plaintiffs ask this Court to enjoin USDA Secretary Thomas Vilsack and Office of Management and Budget (OMB) Director Shalanda Young from causing interruption of the normal issuance of SNAP benefits from April 1 onward.  Specifically, the Court should (1) order Secretary Vilsack and USDA to inform states that they can and should continue to take all actions on the normal schedule to ensure timely issuance of SNAP benefits for April 2024 and subsequent months, and (2) order Director Young and OMB to obligate April 2024 and future benefits and provide any necessary apportionments regardless of whether Congress has passed a continuing resolution or appropriations bill.

## II.    BACKGROUND

### A.  Low-Income Households Rely on SNAP to Buy Just Enough Food to Survive.

SNAP is the nation's most important anti-hunger program, assisting 40 million people to purchase food each month.[2]  Congress enacted SNAP to "alleviate hunger and malnutrition" by "permit[ing] low-income households to obtain a more nutritious diet through normal channels of trade."  7 U.S.C. §§ 2011, 2013(a).  USDA has found that SNAP benefits are critical to relieve food insecurity[3] and decrease the harmful effects poverty, particularly child poverty.[4]  In

---

[2] Food and Nutrition Service, SNAP Data Tables, "Supplemental Nutrition Assistance Program: Number of Persons Participating (Data as of Feb. 9, 2024)," avail. at https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-persons-2.pdf (last visited Feb. 28, 2024).

[3] Food and Nutrition Serv., Office of Policy Support Aug. 2013, "Measuring the Effect of Supplemental Nutrition Assistance Program (SNAP) Participation on Food Security," avail. at https://fns-prod.azureedge.us/sites/default/files/Measuring2013Sum.pdf (last visited Feb. 28, 2024).

[4] USDA, Economic Research Serv., SNAP Benefits Alleviate the Intensity and Incidence of Poverty, Jun. 5, 2012, avail. at https://www.ers.usda.gov/amber-waves/2012/june/snap-benefits/ https://www.ers.usda.gov/amber-waves/2012/june/snap-benefits/ (last visited Feb. 28, 2024).

---

California, more than half of SNAP recipients are in families with children, and more than one-third of SNAP recipients are in families with older adults or disabled members.[5]  In addition to standard food items, households with babies rely on SNAP to purchase infant formula because it is not readily available at food banks.  Decl. of Rebecca Silva in Supp. of Pls. Ex Parte App. for TRO (Silva Decl.), ECF No. 12-3, ¶ 6.  Individuals with food allergies or sensitivities also rely on SNAP to meet their dietary needs because food banks cannot ensure sufficient options.  *Id*.

SNAP participants are extremely poor.  To be eligible for SNAP, a household's income (before any program deductions are applied) generally must be at or below 130 percent of the poverty line.  7 U.S.C. § 2014; 7 C.F.R. § 273.9-10.  The maximum income for receiving benefits is currently $1,215 per month for an individual or $2,500 per month for a family of four.[6]

The actual amount of SNAP benefits a household receives monthly is calculated based on the household's income after deducting expenses for basic living necessities. 7 C.F.R. § 273.10(e)(1)(ii)(A).  Households that receive maximum monthly SNAP benefits have zero net income after subtracting expenses for basic necessities other than food.  *Id*.  More than one third of SNAP households receive the maximum amount.[7] Without SNAP benefits, these households have no money to buy food unless they forgo other necessities, such as housing, utilities, or healthcare. Decl. of Gina Plato-Nino in Supp. of Pls. Ex Parte App. for TRO (Plato-Nino Decl.), ECF No. 12-2, ¶ 5; Decl. of Hilary Hoynes in Supp. of Pls. Mot. for Prelim. Inj. (Hoynes Decl.), ECF No. 38-2, ¶ 22; Decl. of Cynthia De La Mora in Supp. of Pls. Mot. for Prelim. Inj. (De La Mora Decl.), ¶ 8; Decl. of Salaam Bhatti in Supp. of P.s. Mot. for Prelim. Inj, ¶¶ 5-6, 11.  In other words, SNAP fills the gap between eating and going hungry.  Moreover, even with maximum

---

[5] Center on Budget and Policy Priorities, A Closer Look at Who Benefits from SNAP: State-by-State Fact Sheets, Feb. 13, 2023, avail. at https://www.cbpp.org/research/a-closer-look-at-who-benefits-from-snap-state-by-state-fact-sheets#California (last visited Feb. 28, 2024).

[6] Letter from Food and Nutrition Service to All State Agencies (Aug. 3, 2023), https://fns-prod.azureedge.us/sites/default/files/resource-files/FY24-SNAP-COLA-Memo.pdf#page=2  (last visited Feb. 28, 2024).

[7] Food and Nutrition Service, Characteristics of SNAP Households: FY 2019, avail. at https://www.fns.usda.gov/snap/characteristics-snap-households-fy-2019#:~:text=Thirty-two%20percent%20of%20SNAP%20participants%20were%20nondisabled%2C%20non-elderly,received%20the%20maximum%20benefit%20for%20their%20family%20size. (last visited Feb. 28, 2024).

SNAP benefits, many low-income households still fall below subsistence levels.[8]

### B. Federal Regulations Require States to Administer SNAP Benefits with Federal Funding Every Month.

SNAP is a federal-state partnership. USDA funds the full cost of SNAP benefits, which are then administered by state SNAP agencies. 7 U.S.C. §§ 2013(a), 2020. This partnership requires state agencies to fulfill their obligations so that SNAP households timely receive their benefits each month. *Id.* States provide monthly SNAP benefits to households by issuing Electronic Benefit Transfer (EBT) cards that allow participants to purchase groceries from authorized retail food stores. *Id.* § 2013.

USDA is responsible for ensuring that state agencies comply with the Food and Nutrition Act, including by ensuring state agencies provide timely service for SNAP recipients. *Id.* §§ 2020(e)(2)(B)(i), 2020(g). OMB is responsible for apportioning funds necessary for USDA to obligate the funds related to the benefits issuance. 31 U.S.C. § 1512(b)(2).

Every month, state SNAP agencies must begin the benefits issuance process for the following month by submitting electronic data files to a third-party EBT vendor. 7 C.F.R. § 274.1(h) (state EBT issuance files); *id.* § 274.2 (state agency responsibility for coordination and management of EBT system). The California Department of Social Services has confirmed it must start sending data issuance files for April 2024 benefits by March 19 if there is a government shutdown or March 22 if there is not. Suppl. Decl. of Jodie Berger in Supp. of Pls. Mot. for Prelim. Inj. (Berger Suppl. Decl.), ¶ 5, Ex. 4. According to Cary Jeffers, Director at Fidelity National Information Services, approximately 20 of the 31 states that vendor serves must send data issuance files approximately 9 days before the end of the month.[9] *Id.*, ¶ 6.

//

//

---

[8] In 2021, USDA discovered that the poorest 20 percent of households, most of whom are eligible to participate in SNAP, spent 27 percent more on food than the then-current Thrifty Food Plan provided for its size. Yet, the 2021 Thrifty Food Plan only increased the cost of food by 21.03 percent, knowingly leaving low-income households with a monthly deficient for their basic food subsistence. *Id.* at 47.

[9] This vendor, Fidelity Information Services (FIS) is the EBT vendor for many states. USDA, "EBT: Electronic Benefits Transfer (EBT) Status Report by State," May 16, 2023, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-ebt-status-report-state-052423.pdf.

### C. The Threat of Losing SNAP Benefits in the Event of a Government Shutdown Is Causing Ongoing Harm and Risk of Harm.

#### 1. USDA Considers SNAP Funding to be Dependent on Appropriation Legislation and Will Stop SNAP Benefits from Issuing Under Its Government Shutdown Contingency Plan.

Congress funds federal programs dependent upon discretionary funding through annual appropriation acts that typically expire at the end of the federal fiscal year (September 30).[10] When new annual appropriations are not enacted by the beginning of the next federal fiscal year (October 1), it creates a funding gap.[11] This funding gap can result in a government "shutdown."[12] In a shutdown, federal agencies must discontinue all non-essential discretionary functions until new funding legislation is passed.[13] To avoid a government shutdown, Congress may enact stopgap measures, known as "continuing resolutions," to keep the government funded at previous levels for a specified period of time.[14]

In contrast to federal programs dependent upon discretionary funding, entitlement programs are based on the eligibility and benefit criteria established by law and are not controlled by the appropriations process.[15]

Since the impending shutdown at the end of September 2023, Congress has passed three continuing resolutions that temporarily extended federal funds, including for SNAP. The first was passed just before midnight on September 30, 2023, which extended SNAP funding through November 17, 2023.[16] On November 16, 2023, Congress passed a second continuing resolution, resulting in SNAP funding through February 2, 2024.[17] On January 19, 2024, Congress adopted

---

[10] The Congressional Budget Act of 1974 established that fiscal years would commence on October 1 of each year and end on September 30 of the following year. James Saturno, Cong. Rsch. Serv. R47106, The Appropriations Process: A Brief Overview, 8 (2023)
[11] *Id.*
[12] James Saturno, Cong. Rsch. Serv. R46595, Continuing Resolutions: Overview of Components and Practices, 1 (2023).
[13] *Id.*
[14] U.S. Gov't Accountability Off., GAO-22-104701, Federal Budget: Selected Agencies and Programs Used Strategies to Manage Constraints of Continuing Resolutions 6 (2002).
[15] Bill Heniff, Jr., Cong. Rsch. Serv. RS20129, Entitlements and Appropriated Entitlements in the Federal Budget Process, 1 (2023).
[16] Continuing Appropriations Act, 2024 and Other Extension Act §§ 101, 106, Pub. L. 118-15, 137 Stat. 71 (Sept. 30, 2023).
[17] Further Continuing Appropriations and Other Extensions Act, 2024 § 101(4), Pub. L. 118-22, 137 Stat. 112 (Nov. 17, 2023).

---

a third continuing resolution, which extended SNAP funds through March 8, 2024.[18]

With no guarantee that Congress will pass an appropriations act or continuing resolution, a government shutdown is a real possibility whenever annual appropriations or a prior continuing resolution approach their expiration date.  Each federal agency is required to develop its own detailed government shutdown plan, following guidance released in previous shutdowns and coordinated by the OMB.[19]  OMB Circular No. A-11 requires that agencies decide what agency activities are expected or otherwise legally authorized to continue during a lapse in appropriations." (2023), Section 124.1(b).

USDA's government shutdown plan, the "2024 Contingency Plan," takes the position that SNAP benefits will cease during a shutdown "[i]f multi-year and directly appropriated funding is insufficient to fund these programs during the period of the lapse[.]"  In other words, USDA has interpreted the continuation of SNAP benefits during a government shutdown as dependent upon the availability of leftover funds from specific appropriations.  Because SNAP benefits are federally funded and administered by states, if USDA stops SNAP benefits due to a lapse in funding pursuant to the 2024 Contingency Plan, states cannot begin the benefits issuance process as there are no federal funds to allocate.

USDA affirmed its position in the 2024 Contingency Plan with respect to SNAP.  In late September 2023, when the first fiscal year 2024 government shutdown was looming, Secretary Vilsack stated that "if the shutdown were to extend longer than that [October] there would be some serious consequences to SNAP."[20]  The 2024 Contingency Plan is also consistent with USDA's 2013 warning to the states that (1) if they used state funds to pay food benefits during a lapse in federal appropriations, they would have no assurance of federal reimbursement, and (2) if they issued cash payments for food, there would be no reimbursement absent a specific congressional vehicle.  Decl. of Jodie Berger in Supp. of Pls. Ex Parte App. for TRO (Berger

---

[18] Further Additional Continuing Appropriations and Other Extensions Act, 2024, Pub. L. 118-35, 138 Stat. 3 (Jan. 19, 2024).
[19] OMB Circular No. A-11 (2023), section 124.1(b).
[20] Press Briefing by Press Secretary Karine Jean-Pierre and Secretary of Agriculture Tom Vilsack, avail. at https://www.whitehouse.gov/briefing-room/press-briefings/2023/09/25/press-briefing-by-press-secretary-karine-jean-pierre-and-secretary-of-agriculture-tom-vilsack (last visited February 28, 2024).

Decl. in Supp. of TRO), ECF No. 12-9. ¶ 8, Ex. 5.  Moreover, despite multiple attempts by Plaintiffs' counsel since September 2023 to meet and confer with USDA regarding its position with respect to the claims in this case, USDA has declined to clarify or issue any further instructions regarding the continuation of benefits past March 2024 to avoid the implementation of the 2024 Contingency Plan. *See* Decl. of Jodie Berger in Supp. Of Pls. Mot. For Prelim. Inj. (Berger Decl. in Supp. of Prelim. Inj.), ECF No. 38-1, ¶¶ 2, 7; Berger Suppl. Decl., ¶¶ 2-4, 15. USDA's position has steadily threatened to pause the benefits issuance process, leaving SNAP benefits—and the people counting on them—in limbo.

### 2. The Uncertainty of SNAP Benefits Under USDA's Contingency Plan is Causing Plaintiffs and Other Households Harm.

SNAP's uncertainty during this prolonged period of impending government shutdown is causing increased food insecurity and economic stress among households nationwide.  Benitez Suppl. Decl., ¶ 15; Suppl. Decl. of Anika Erdmann-Browning in Supp. of Pls. Mot. for Prelim. Inj. (Erdmann-Browning Suppl. Decl.), ¶ 17; Decl. of Jonetta Hall in Supp. of Pls. Mot. for Prelim. Inj. (Hall Decl.), ¶ 11; De La Mora Decl., ¶ 13.   As the expiration date for the current continuing resolution approaches, the daily news has covered the impending government shutdown and the effect it could have on suspending government services, including SNAP.[21]

Even before the government narrowly averted a shutdown in September 2023, Plaintiffs struggled to meet their food needs and stretched their SNAP benefits to last a full month. Benitez Suppl. Decl. ¶ 13; Erdmann-Browning Suppl. Decl. ¶¶ 10-12. Given the uncertainty of ongoing SNAP benefits since September 2023, households receiving SNAP have turned to several strategies to stretch their benefits even further, including (1) ***rationing food*** by reducing the size of meals or skipping meals (Benitez Suppl. Decl. ¶ 15; Erdmann-Browning Suppl. Decl. ¶¶ 17-

---

[21] *See, e.g.* Deal to dodge government shutdown appears to stall amid GOP policy demands, The Wash. Post, Feb. 25, 2024, https://www.msn.com/en-us/news/other/deal-t-dodge-government-shutdown-appears-to-stall-amid-gop-policy-demands/ar-BB1iS26S ("Even a partial shutdown would trouble federal food assistance programs")]; Will there be a government shutdown? Congress running out of time to strike a deal, USA Today, Feb. 26, 2024 https://www.msn.com/en-us/news/politics/will-there-be-a-government-shutdown-congress-is-running-out-of-time-to-strike-a-deal/ar-BB1iW6Dp ("With only five days to go until a partial shutdown, leaders have still not released bills to fund programs for agriculture, food and drugs, energy and water, military construction, veteran affairs, transportation and housing."); *see also* Suppl. Decl. of David Super In Support Of Plaintiffs' Mot. for Preliminary Injunction (Suppl. Super Decl.), ¶¶ 31-32.

18; Hall Decl. ¶ 13; De La Mora Decl., ¶ 11), (2) ***drinking water to mask hunger*** between meals (Benitez Supp. Decl., ¶ 15; Erdmann-Browning Suppl. Decl., ¶ 18; Hall Decl. ¶ 15), and (3) ***choosing between basic necessities*** such as food, medicine, or electricity. Benitez Suppl. Decl., ¶ 16; De La Mora Decl., ¶ 12; Hoynes Decl., ¶¶ 3, 22 (when a family receives SNAP benefits, it frees up economic resources to pay for other life necessities such as housing and healthcare).

Diagnosed with multiple sclerosis, Plaintiff Erdmann-Browning is unhoused and relies solely upon SNAP benefits provided through California's CalFresh program for her food. Erdmann-Browning Suppl. Decl., ¶¶ 5, 16.  She uses her limited income for motel rooms to sleep and to purchase ice to keep her multiple sclerosis medications cool.  *Id.* ¶ 10.  She is unable rely on bags of produce and perishables from food banks because she cannot afford to expend her limited funds on gas to travel to the food bank site, and she is unable to cook or store perishables in her car.  *Id.* ¶ 14.  Even if she were able to utilize food from the food banks, the food supply at food banks has diminished following the end of pandemic-era emergency allotments and natural disasters in California.  Silva Decl. ¶ 5.

Plaintiff Erdmann-Browning and her husband receive the maximum allotment for a family size of two people: $535 per month.[22]  Erdmann-Browning Suppl. Decl. ¶ 4.  In a 31-day month, Plaintiff Erdmann-Browning and her husband each have $8.62 to spend on food per day and only $2.87 to spend per meal.  Because of the current uncertainty of federal funding of SNAP benefits, she is drinking water and rationing her food intake in case her SNAP benefits are interrupted.  *Id.* ¶ 17.  This uncertainty has caused her additional stress when her life is already in turmoil because she is unhoused and struggling to manage a complex health condition.  *Id.* ¶¶ 5, 20.

Plaintiff Benitez is a preschool teacher and a student.  Benitez Suppl. Decl. ¶ 8.  She has a total food budget of $175 per month, half of which comes from her SNAP benefits.  *Id.* ¶ 11.  That means that with her combined SNAP benefits and cash income in a 31-day month, Plaintiff Benitez has $5.64 to spend on food per day and only $1.88 to spend per meal, if she were to eat three meals.  Once she learned there may be a government shutdown that could mean her SNAP

---

[22] Letter from Food and Nutrition Service to All State Agencies (Aug. 3, 2023), https://fns-prod.azureedge.us/sites/default/files/resource-files/FY24-SNAP-COLA-Memo.pdf#page=2  (last visited Feb. 28, 2024).

benefits ceased or were delayed, she too began rationing her food, and went from eating two small meals a day to only one. *Id.* ¶¶ 14-15. She now apportions one small serving for a meal in the evening, sometimes supplementing her diet with snacks from her worksite. *Id.* ¶ 15. She drinks water throughout the day to feel full so that she can perform her job of taking care of low-income preschool children. *Id.* Plaintiff Benitez feels "constantly scared and panicked" but "can't eat less than one small meal a day." *Id.* ¶ 18.

Even if another stopgap continuing resolution is passed in March, SNAP recipients will continue to experience increased food insecurity and attendant harms as another new expiration date for their basic food subsistence approaches.

## III.    PROCEDURAL BACKGROUND

With the threat of a government shutdown approaching, Plaintiffs filed this action on September 12, 2023, seeking to ensure timely issuance of October SNAP benefits. ECF No. 1. They simultaneously filed an ex parte application for provisional class certification and an ex parte motion for a temporary restraining order. ECF Nos. 11, 12. At a hearing on September 14, the Court denied Plaintiffs' motion for a temporary restraining order without prejudice and set a subsequent hearing for September 27. ECF Nos. 24, 26. On September 19, USDA submitted a statement to the Court describing a permanent change to its accounting policy that makes federal funds available for benefits issued to ongoing and newly certified households for one month following expiration of a specific appropriation, meaning SNAP benefits would continue through October in the event of a shutdown. ECF No. 31-1. The parties then stipulated to the withdrawal of Plaintiffs' remaining motions and removal of the September 27 hearing from the Court calendar. ECF No. 33. On September 30, 2023, the date the annual appropriations for Federal Fiscal Year 2023 expired, Congress passed a continuing resolution extending funding for SNAP through November 17, 2023. *See* Continuing Appropriations Act, 2024 and Other Extension Act §§ 101, 106, Pub. L. 118-15, 137 Stat. 71 (Sept. 30, 2023).

On November 14, 2023, faced with a second impending government shutdown, Plaintiffs filed motions for preliminary injunction and class certification along with a stipulation to shorten time for a hearing on December 13, 2023, for both motions. ECF Nos. 38, 39, 40. The Court

entered an order to shorten time for motions for preliminary injunction and class certification. ECF No. 41.  On November 16, President Biden signed a second continuing resolution that funded SNAP benefits through February 2, 2024.  *See* Further Continuing Appropriations and Other Extensions Act, 2024 § 101(4), Pub. L. 118-22, 137 Stat. 112 (Nov. 17, 2023).  The parties then stipulated to the withdrawal of Plaintiffs' motions for preliminary injunction and class certification and removal of the December 13 hearing from the Court calendar.  ECF No. 43.

On January 19, 2024, Congress passed a third continuing resolution extending federal funds for SNAP through March 8, 2024, with other programs funded through March 1, 2024. *See* Further Additional Continuing Appropriations and Other Extensions Act, 2024, Pub. L. 118-35, 138 Stat. 3 (Jan. 19, 2024).  As the end of the third continuing resolution nears, SNAP benefits for April 2024 and after are once again in question.  On January 22, 2024, Plaintiffs' counsel requested USDA's position on whether April 2024 benefits would issue.  On January 31 and February 6, Plaintiffs' counsel again attempted to obtain this information, as well as discuss any plans to use the $6 billion in SNAP contingency reserve funds for April 2024 benefits.  On February 6, 2024, Defendants' counsel stated she could not provide any additional information beyond what was stated in Defendant's Motion to Dismiss.  Berger Suppl. Decl., ¶ 4, Ex. 3.

Consequently, Plaintiffs now file a new motion for preliminary injunction to avoid interruption of their SNAP benefits and stop the harm caused by the ongoing uncertainty in the absence of an annual appropriation by Congress.

## IV.    ARGUMENT

### A.  Plaintiffs Satisfy the Standard for a Preliminary Injunction.

Plaintiffs seeking a preliminary injunction must show that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Disney Enters., Inc. v. VidAngel*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction," so long as the second and fourth *Winter* factors are also satisfied. *All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

### 1. Plaintiffs are Likely to Succeed on their Administrative Procedure Act Claim.

The Administrative Procedure Act directs reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). The Act also grants federal courts the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

Plaintiffs are likely to succeed on their Administrative Procedure Act claim that Defendants must ensure SNAP benefits issue in April 2024 and subsequent months in the absence of an appropriations bill for Federal Fiscal Year 2024. As set forth below, the Food and Nutrition Act directs that, "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). This language requires USDA to provide SNAP benefits to all eligible households who have applied, regardless of whether Congress has separately appropriated funds. However, the USDA 2024 Contingency Plan makes SNAP operations during a lapse in appropriations contingent on the availability of funding from multi-year carryover funds, contingency reserves, or apportionment of funds by OMB under a continuing resolution. Berger Suppl. Decl. ¶ 12, Ex. 10. This final agency action must be set aside because it is inconsistent with the plain language of 7 U.S.C. § 2014(a), which requires Defendant Vilsack to furnish SNAP benefits to "all eligible households who make applications for such participation."

### a. The 2024 Contingency Plan is a Final Agency Action Because It is USDA's Last Word on SNAP During a Lapse in Appropriations.

Section 704 of the Administrative Procedure Act authorizes judicial review of "final agency action." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018). USDA's Contingency Plan[23] is such an action. It requires cessation of the program once carryover funds, contingency reserves and continuing resolution appropriations are expended. USDA's official

---

[23] https://www.usda.gov/sites/default/files/documents/fsis-2024-contingency-plan.pdf.

summary of the 2024 Contingency Plan states that "All Federal activities supporting unfunded discretionary programs would cease . . . New store authorization for SNAP and WIC programs will cease."[24]

The Supreme Court has identified two conditions necessary for an agency action to be final for the purposes of 704 review. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, the action must "mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature." *Id.* Second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citations and internal quotation marks omitted). Courts applying this test "focus on the practical and legal effects of the agency action and interpret finality in a pragmatic and flexible manner." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)) (internal quotation marks omitted).

Both *Bennett* conditions are satisfied here. In evaluating *Bennett*'s first condition, courts consider "whether the action amounts to a definitive statement of the agency's position" and whether the agency expects "immediate compliance" with its terms. *Or. Nat. Desert Ass'n*, 465 F.3d at 982. The 2024 Contingency Plan is created and maintained in accordance with OMB Circular A-11, which requires that "agency heads, in consultation with their general counsels, must decide what agency activities are expected or otherwise legally authorized to continue during a lapse in appropriations." Berger Suppl. Decl., ¶ 8, Ex. 6. OMB Circular A-11, Section 124.2, provides lengthy lists of determinations that must be included in contingency plans, including categorizing all agency activities based on how essential they are. *Id.* The Agency expects "immediate compliance" with the contingency plan, requiring the plan be "maintained" and "up-to-date," so that it can be implemented immediately upon a lapse in appropriations. *Id.* Thus, the 2024 Contingency Plan represents a definitive statement of USDA's position as to the appropriate activities to continue during a lapse in appropriations.

*Bennett*'s second condition is also satisfied. The 2024 Contingency Plan has immediate

---

[24]United States Department of Agriculture, FY 2024 Summary of Activities to be Continued in the Event of a Government Shutdown, avail. at :
https://www.usda.gov/sites/default/files/documents/usda-2024-contingency-plan-summary.pdf

and concrete legal consequences because it will cause states to immediately halt SNAP issuances upon a lapse in funding. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (*Bennett*'s second condition is satisfied where a guidance document "give[s] the States their 'marching orders'"). The 2024 Contingency Plan provides that funding for SNAP will cease absent availability of funding from a full-year annual appropriations bill or apportionment of funds by OMB under a continuing resolution, immediately affecting states' ability to obligate federal funds in the form of SNAP benefits loaded onto EBT cards. Because USDA informed states that they risk state funds used for SNAP benefits during a federal funding lapse, states cannot allocate funds that do not appear to be federally obligated. Because both *Bennett* conditions are met, the 2024 Contingency Plan is a final agency action.

### b. The Food and Nutrition Act Creates an Enforceable Federal Obligation to Issue SNAP Benefits Unconditioned on Appropriation.

If the plain meaning of a statute is clear, an agency "must give effect to the unambiguously expressed intent of Congress." *Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala*, 65 F.3d 1472, 1477 (9th Cir. 1995) (citation omitted). To determine plain meaning, courts evaluate the language of the statute "in light of the overall purpose and structure of the whole statutory scheme." *I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist.*, 805 F.3d 1164, 1167 (9th Cir. 2015).

The Food and Nutrition Act directs that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). This language requires USDA to provide SNAP benefits to all eligible households who have applied, regardless of whether Congress has separately appropriated funds. The Supreme Court recently found similar statutory language to be "obligation-creating language" that requires government payment, even without direction as to the manner in which the obligation is to be satisfied. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1322 (2020).

### i. The Supreme Court Has Affirmed that Congress Can Create an Enforceable Government Payment Obligation Unconditioned on Specific Appropriation.

In *Maine,* the Supreme Court considered whether specific language from the Affordable Care Act created an enforceable government obligation, despite lacking any formal appropriation

or direction on how the obligation would be paid.  Section 1342 of the Affordable Care Act requires the government to compensate insurers participating in the "Risk Corridors" program, which was created to encourage insurers to enter online insurance marketplaces by defraying their costs and limiting their risk.  *Maine*, 140 S. Ct. at 1315 (analyzing section 1342, 42 U.S.C. § 18062).  Specifically, section 1342 provides that "the Secretary shall pay" participating plans with financial losses that exceeded a certain predicted threshold.  *Id.* at 1316.  However, "[w]hen it enacted the Affordable Care Act in 2010, Congress did not simultaneously appropriate funds for the yearly payments the Secretary could potentially owe under the Risk Corridors program. Neither did Congress limit the amounts that the Government might pay under § 1342."  *Id.*

The lack of appropriation did not prevent the Court from finding that the Affordable Care Act created a mandatory legal obligation.  Starting from the premise that "[t]he Government may incur an obligation by contract or by statute," *id.* at 1319, the Court acknowledged that government obligations are "typically" created by the passage of a statute *and* appropriated funds separately enacted by Congress.  *Id.*  The Court concluded, however, that, "Congress can deviate from this pattern," and "create an obligation directly by statute, without also providing details about how it must be satisfied."  *Id.*

The Court found that the language of section 1342 created a legal obligation.  "The first sign that the statute imposed an obligation is its mandatory language: 'shall.' 'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement.'"  *Id.* at 1320. In addition, adjacent provisions differentiated between when the Secretary of Health and Human Services "shall" act and when she "may" exercise discretion, demonstrating that Congress specifically chose mandatory terms for section 1342.  *Id.*  Although Congress could have expressly tied the obligation to pay to available appropriations or capped the dollar mounts, Congress did not do so.  Instead, Congress created a non-contingent obligation to pay.

The government argued in *Maine* that the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Anti-Deficiency Act, 31 U.S.C. § 1341, made appropriated funds a necessary prerequisite to any payments.  *Maine*, 140 S. Ct. at 1321.  The Court rejected these arguments, concluding that both the Constitution and the Anti-Deficiency Act limit financial commitments

by federal employees, not by Congress itself. *Id.* at 1321-22. Ultimately, the Court held:

> [Section] 1342's obligation-creating language does not turn on whether Congress expressly provided "budget authority" before appropriating funds. . . . Congress usually gives budget authority through an appropriations Act or by expressly granting an agency authority to contract for the Government. But budget authority is not necessary for Congress itself to create an obligation by statute.

*Id.* Thus, Congress can create mandatory obligations for the federal government, even without an associated appropriation to fund the obligation. *Id.*

### ii. The Food and Nutrition Act Creates a Government Obligation to Furnish SNAP Benefits.

Like the Affordable Care Act, the Food and Nutrition Act uses obligation-creating language to direct the issuance of critical food assistance benefits to low-income households across the country. Section 2014 of the Food and Nutrition Act provides: "Assistance under this program *shall be furnished* to all eligible households who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added). *See also Maine*, 140 S. Ct. at 1320 (explaining Congress's use of the word "shall" usually connotes a requirement); *accord Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 778 (9th Cir. 2006) ("Congress's or an agency's use of the word 'shall' indicates a mandatory duty that is not subject to discretion."). In addition to the word "shall," section 2014(a) also uses the word "all," specifying that assistance shall be provided to "all" eligible households. "The use of 'all' indicates a sweeping statutory reach." *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F. 4th 682, 690-691 (9th Cir. 2022) (construing a provision of the Farm Act).

The surrounding provisions of the Food and Nutrition Act also use mandatory language to ensure uniform and reliable provision of SNAP benefits and are also not conditioned on annual appropriations. *See* 7 U.S.C. § 2014(b) ("[T]he Secretary *shall* establish uniform national standards of eligibility.") (emphasis added); *id.* § 2020(b) ("[The] State agency *shall* properly restore any improperly denied benefits . . . and *shall* take other steps to prevent a recurrence of such errors[.]") (emphasis added); *id.* § 2020(e)(5) ("[T]he specific standards to be used in determining the eligibility of applicant households which *shall* be in accordance with sections 2014 and 2015 of this title and *shall* include no additional requirements imposed by the State agency[.]" (emphasis added); *id.* § 2020(e)(3); (in general, SNAP applications "shall" be

processed, and benefits issued to those eligible, no later than 30 days after the date of application); *id*. § 2016(g)(2)(ii) ("[States] shall . . . ensure that no household experiences an interval between issuances of more than 40 days" if changing staggered issuance dates). Federal law also requires that benefits "shall" be issued within seven days of the date of application to households in immediate need. *Id*. § 2020(c)(9); *see also* 7 C.F.R. §§ 273.2(a)(2), (i)(l).

Congress used conditional appropriation-dependent language elsewhere in the Food and Nutrition Act, such as "subject to the availability of appropriations" (7 U.S.C. § 2013(b)(6)(A)), and "subject to the availability of appropriations to carry out this paragraph" (*id*. § 2013(b)(5)), when it did not intend to create an obligation. *See Maine*, 140 S. Ct. at 1321 (looking at language in surrounding provisions to determine whether the section in question was obligation-creating, noting other provisions utilized "may" language).

Congress's deliberate use of mandatory language in section 2014(a) demonstrates its intent that USDA provide benefits to all eligible households that apply, regardless of appropriation. Indeed, the evidence of congressional intent is even stronger here than it was in *Maine*. In *Maine*, not only did Congress fail to appropriate money for the Risk Corridors program, but two successive lump sum appropriations included riders specifying that "[n]one of the funds made available by this Act . . . may be used for payments . . . relating to risk corridors." 140 S. Ct. at 1317. The Supreme Court discounted the riders and concluded that "Congress merely appropriated a less amount than that required to satisfy the Government's obligation, without expressly or by clear implication modif[ying] it." *Id.* at 1324. Other funds could be used to satisfy the government's obligation. *Id.* Here, Congress has never expressed intent to deny or delay funding to SNAP, much less to modify the funding obligation.

In addition, at least two pieces of Congressional legislation explicitly define or categorize SNAP as an obligation of the United States government or an entitlement that exists independent of appropriated funds. First, a statutory provision governing congressional budget procedure includes the food stamp program (as SNAP was formerly known) within the definition of "entitlement authority," along with authority to make payments outside of appropriated funds. 2 U.S.C. § 622(9). The statute provides:

(9) The term "entitlement authority" means—

    (A)  the authority to make payments . . . , the budget authority for which is not provided for in advance by appropriation Acts, . . . if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law; and

    (B)  the food stamp program.

Second, Congress explicitly named SNAP in its definition of "direct spending," which is spending authorized without appropriated funds. 2 U.S.C. § 900(b)(8). The statute provides:

(8) The term "direct spending" means

    (A)  budget authority provided by law other than appropriation Acts;

    (B)  entitlement authority; and

    (C)  the Supplemental Nutrition Assistance Program.

*Id.* Congress differentiated "direct spending" from "discretionary appropriations," the immediately previous definition, which references "budgetary resources (*except to fund direct spending programs*) provided in appropriation Acts." *Id.* § 900(b)(7).

Rather than being limited by an appropriation, SNAP's entitlement status places it under the provisions of the Congressional Budget Act (2 U.S.C. § 651) that govern "[b]udget-related legislation not subject to appropriations." USDA's spending is controlled through the budget reconciliation process of the Congressional Budget Act. 2 U.S.C. § 641(a)(1)(C).

The statutory language, surrounding legislative provisions, and treatment of the program in congressional budget legislation demonstrate that SNAP benefits are an obligation of the federal government, independent of annual appropriations or continuing resolutions.

### c. The Food and Nutrition Act Does Not Permit USDA to Suspend SNAP Benefits During a Government Shutdown.

The Food and Nutrition Act identifies the conditions under which the Secretary of Agriculture may reduce SNAP benefits and the manner in which such reductions may occur. 7 U.S.C. §§ 2027(b), (c). The Act contemplates a benefit reduction in only one scenario: when the total value of benefit allotments will exceed the appropriation for the same fiscal year. *Id.* § 2027(b) ("In any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of the appropriation for such fiscal year."). The Act does not permit or

direct USDA to shut SNAP down entirely when Congress fails to pass any appropriation at all.

Indeed, the Food and Nutrition Act's legislative history demonstrates that Congress implemented section 2027 to prevent the sudden interruption of SNAP benefits when appropriated funds were not available. During deliberations over the Food Security Act of 1985, the precursor to the Food and Nutrition Act, the House Agriculture Committee sought "to leave leeway for inaccurate economic forecasts so that Congress need not adjust the spending ceilings every year."[25] The resulting provisions identified the circumstances where allotments could be reduced, set the "[m]anner of reducing allotments," and required the Secretary prepare a report to Congress on the need for benefit reductions at least 60 days before any action is taken. 7 U.S.C. §§ 2027(b), (c), (d). The House Agriculture Committee, which proposed the amendment to section 2027's spending limits, declared that it would no longer accept:

> the unfortunate situation of the past few years where . . . the continuation of full food stamp benefits has been uncertain [and r]ecipients nationwide have been threatened with delays and reductions pending Congressional approval of supplemental appropriations legislation late in the fiscal year. This has led to confusion and unnecessary fear at the local level, as well as additional administrative cost and burden.[26]

The Committee declared that benefit reductions should result only from "an explicit decision to do so," not the mere failure to pass legislation. *Id.*

Defendants' failure to comply with their statutory obligations to ensure SNAP benefits continue absent an annual appropriation violates the Administrative Procedure Act.

### d. Under the APA, the Court May Compel USDA to Take Action to Ensure that SNAP Benefits are Timely Paid.

The APA "expressly authorizes a court to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Plaskett v. Wormuth*, 18 F.4th 1072, 1081 (9th Cir. 2021), citing 5 U.S.C. § 706(1). USDA has unlawfully withheld and delayed announcing to the states or taking other action to ensure that SNAP benefits will continue to be timely paid in the event of shutdown.

USDA may choose the means of communication and wording of any guidance or

---

[25] H. Rep. No. 99-271 (pt. 1) at 165, *reprinted in* 1985 U.S. Code Cong. & Admin. News 1265.
[26] *Id.* at 166, *reprinted in* 1985 U.S. Code Cong. & Admin. News 1270.

announcement. But "discretion in the manner in which the duty may be carried out" does not negate the "duty to perform a 'discrete action' within the meaning of § 706(1) . . . ." *Vietnam Veterans of Am. v. Cent. Intel. Agency,* 811 F.3d 1068 (9th Cir. 2016). (Army required under § 706(1) to warn past subjects of human experimentation of possible harms). Ensuring timely payment of benefits is a discrete action required by the SNAP statute.

### 2. Plaintiffs and Proposed Class Members Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.

Since September 2023, the threat of losing critical food benefits has caused and will continue to cause millions of recipients to go to bed hungry each night. Benitez Suppl. Decl., ¶ 15; Erdmann-Browning Suppl. Decl., ¶ 18; Hall Decl., ¶ 15; De La Mora Decl., ¶ 11. SNAP participants apportion food benefits in reliance on the assurance that their benefits will not be delayed, terminated, or otherwise threatened. However, as Plaintiff Benitez explains, "Once I learned that there may be a government shutdown that could mean my CalFresh stopped, I dropped breakfast and only eat a small meal for dinner. I stopped eating breakfast to ration my food intake in case my CalFresh benefits are terminated." Benitez Suppl. Decl., ¶ 15; *see also* Suppl. Super Decl., ¶¶ 31-32. Denying subsistence benefits to eligible people deprives them "of the very means by which to live[.]" *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). Plaintiffs and the proposed class will continue to suffer unless Defendants fulfill their statutory obligation to ensure normal issuance of SNAP benefits.

Going without food is an irreparable harm. *D.C. v. U.S. Dept. of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020). "When a family is living at subsistence level, the subtraction of any benefit can make a significant difference to its budget and to its ability to survive." *Paxton v. Sec'y of Health & Human Servs.*, 856 F.2d 1352, 1354 (9th Cir. 1988). Food insecurity is connected with an array of negative outcomes, including poor health among children, lower academic achievement, and depression.[27] USDA has also documented the strong correlation between food insecurity and chronic health conditions among low-income working-age adults.[28] According to

---

[27] Caroline Ratcliffe, Signe-Mary McKernan, and Sisi Zhang, "How Much Does the Supplemental Nutrition Assistance Program Reduce Food Insecurity?, American Journal of Agricultural Economics, Jul. 12, 2011, avail. at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4154696/ (last visited Feb. 28, 2024).

a nationwide food security program expert, delays in providing SNAP benefits cause low-income households to suffer or be at risk of suffering hardships," including going hungry, paying for food at the expense of other life necessities, or, alternatively, paying for other necessities at the expense of having enough to eat.  Hoynes Decl.  ¶¶ 1, 3-12.

The government threatens irreparable harm when it tips the scales toward worse conditions for public benefit recipients.  *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding irreparable harm with a threatened county proposal to reduce healthcare resources where chronically ill plaintiffs demonstrated the county already struggled to provide them access to health care before a preliminary injunction was filed.)  With regard to food assistance, multiple courts have also concluded that potential harm is particularly acute:

> [I]t is reasonable to conclude that, unless a preliminary injunction issues to prevent delays and interruptions in food stamp benefits, the plaintiffs may be deprived of food.  The deprivation of this basic human need is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients.

*Haskins v. Stanton*, 621 F. Supp. 622, 627 (N.D. Ind. 1985), *aff'd*, 794 F.2d 1273 (7th Cir. 1986) (citation omitted); *accord*, *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043-44 (D. Haw. 2011).  *See also Blanco v. Anderson*, 39 F.3d 969, 973 (9th Cir. 1994) (finding that lack of resources is no excuse for failing to provide the plaintiffs their statutory entitlements under the Food Stamp Act).  As detailed above, USDA's policy has already caused Plaintiffs to start experiencing additional food insecurity and the resultant harms.

Plaintiffs cannot turn to food banks to fill the gap left in the wake of SNAP's uncertainty. Food banks are already stretched to capacity and struggle to meet the tremendous increase in demand following the March 2023 end of Emergency Allotments, which had significantly increased household benefits.  Silva Decl., ¶ 5; Decl. of Shimica Gaskins in Supp. of Pls. Ex Parte App. for TRO, ECF 12-7, ¶¶ 7-10. ("Disrupting [SNAP] benefits would cause immense harm to the households who rely on the program to eat" and "overwhelm our partner food assistance agencies"); Suppl Decl. of Erica Padilla Chavez in Supp. of Pls. Ex. Parte App. for TRO, ECF No. 12-6, ¶¶ 8-9 ("If the largest program feeding our community were to stop, our food bank would simply not be able to meet the needs"); *See also* Silva Decl. ¶ 6; Decl. of Theresa Havelka

in Supp. of Pls. Mot. for Prelim. Inj., ECF No. 38-3, ¶ 9.  As discussed in Section II.A., *supra*, food banks cannot meet all the same needs as SNAP.

Retroactive allotments will not resolve the daily hunger or related repercussions experienced by millions of people dependent on SNAP benefits. *See Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003) (recognizing that "back payments cannot erase either the experience or the negative effect of delays in the prompt provision of benefits.").  Nor can retroactive food benefits issued on an EBT card remedy the serious financial disruptions caused by a delay in SNAP benefits.  Because food is a basic survival need, many SNAP recipients will forgo other necessary expenditures such as housing, utilities, or transportation to places of employment.  EBT card funds loaded weeks or months later are only available for purchasing food and cannot be re-allocated to pay past due rents or other bills.  For example, Plaintiff Erdmann-Browning uses all of her income to meet her subsistence needs and uses whatever she has left over to pay for motel rooms.  Erdmann-Browning Suppl. Decl. ¶ 10.  When she must use her available income to purchase food, she cannot afford to pay for shelter and must sleep in her car, which complicates her serious health condition and her use of necessary medications. *Id.* ¶ 13.

The harm resulting from USDA's treatment of SNAP benefits as dependent on specific appropriation in the context of ongoing federal budget uncertainty weighs strongly in favor of a preliminary injunction.

### 3. The Balance of Equities Favors Plaintiffs.

There is little question the balance of equities favors Plaintiffs, who will continue to suffer serious irreparable harm absent an injunction.  Plaintiffs' resources are extremely limited, and they cannot survive escalating food insecurity pending a trial on the merits. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (finding that deprivation of benefits pending trial might cause economic hardship, suffering or even death and retroactive restoration of benefits would not remedy these hardships).  Moreover, a preliminary injunction requiring agencies to comply with the Food and Nutrition Act should not be considered a burden when balancing the equities because "[t]he Act itself imposes the burden; th[e] injunction merely seeks to prevent the defendants from shirking their responsibilities under it." *Withrow v. Concannon*, 942 F.2d 1385, 1388 (1991).

Defendants may argue that they stand to suffer harm if they violate the Appropriations Clause and the Anti-Deficiency Act, which prohibits agencies from incurring obligations in excess of legally available amounts.  31 U.S.C. § 1341(a).  As discussed above, the Supreme Court in *Maine Community Health Options* rejected both arguments.  While the Appropriations clause requires "Appropriatio[n] made by Law" before money may "be drawn" to satisfy a payment obligation, U. S. Const., art. I, § 9, cl. 7, the Court differentiated between the obligation and payment, noting that statutory obligations without appropriation can be enforced through lawsuits.  *Maine,* 140 S. Ct. at 1320.  Plaintiffs are seeking enforcement of the government's obligation to timely issue SNAP benefit, not payment of federal funds.  Federal payment for SNAP benefits does not occur until grocery vendors are reimbursed.  7 C.F.R. § 274.8(c)(1)(iii).

Nor would an order directing timely issuance of SNAP benefits run afoul of the Anti-Deficiency Act.  That Act's prohibitions give way "as specified" or "authorized" by "any other provision of law."  31 U.S.C. § 1341(a)(1).  SNAP is an "other provision of law" that authorizes obligating federal funds for SNAP benefits regardless of appropriation.  The government's "valid obligations will remain enforceable in the courts."  *Maine*, 140 S. Ct. at 1320.

Moreover, any financial concerns raised by Defendants in opposition to granting this preliminary injunction would not tip the scales in Defendants' favor.  *See Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("Faced with [ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter.").  Defendants cannot identify any cognizable harm that would result from the requested preliminary injunction.

### 4.  A Preliminary Injunction is in The Public Interest.

The public interest also favors Plaintiffs.  First, the public has an interest in the enforcement of federal laws, which includes SNAP.  *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1044 (D. Haw. 2011), citing *Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1196–97 (9th Cir. 2011) ("the public interest favors applying federal law correctly"); *see also Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party to a lawsuit, the balance of the equities and public interest prongs of the preliminary injunction

test merge.").  Second, an order directing SNAP continuation will further the purpose of the Food and Nutrition Act to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  7 U.S.C. § 2011.  In weighing the public interest factor, the Ninth Circuit has stated it "would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time."  *Lopez*, 713 F.2d at 1437.  Finally, the public interest in preserving congressional intent also supports an injunction.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679 (9th Cir. 2021).  When enacting SNAP, Congress did not intend to deny or delay the funding for food benefits in the absence of an annual appropriation or continuing resolution, or it would have explicitly stated such an intent.

### 5.  Plaintiffs Satisfy the Legal Standard for a Preliminary Injunction Under Both the Prohibitory and Mandatory Injunction Tests.

An injunction may be either mandatory or prohibitory.  Whether the relief Plaintiffs seek here is prohibitory or mandatory depends upon the way the "status quo" is characterized.  The status quo here is continuation of SNAP benefits to eligible participants without interruption; thus Plaintiffs are seeking a prohibitory injunction in this case.  *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (finding "status quo" for purposes of an injunction "refers to the legally relevant relationship between the parties before the controversy arose"); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *13 (N.D. Cal. Mar. 1, 2019) (granting prohibitory injunction ordering Department of Homeland Security (DHS) to continue processing 2,714 existing applications for parole after DHS terminated the program, reasoning that the last uncontested status was when DHS was continuing to process the applications as usual).

Even if the court considers the injunction sought to be mandatory, Plaintiffs meet that standard, given that tens of millions of people will be unable to adequately feed their families without forgoing other basic necessities, and retroactive lump sum food benefits cannot compensate for the diversion of cash income from subsistence needs such as rent, utilities, and medication.  *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when extreme or very serious damage will result that is not capable of compensation in damages, and

the merits of the case are not doubtful.").

### B. Certification of the Class is Not Necessary to Grant the Requested Relief.

Importantly, although Plaintiffs meet the requirements for class certification as explained in the concurrently-filed class certification motion, this Court need not certify a class to grant the equivalent of class-wide relief in connection with the instant preliminary injunction motion. Because all putative class members face the same harm as named Plaintiffs, injunctive relief that secures named Plaintiffs' SNAP benefits regardless of whether an annual appropriations bill is passed will appropriately provide relief to those households as well. *See, e.g.*, *Price v. City of Stockton*, 390 F. 3d 1105, 1118 (9th Cir. 2004) ("Because the breadth of the [preliminary] injunction was necessary to preserve the status quo for all Plaintiffs, the district court did not abuse its discretion by ordering that relocation assistance benefits be provided to all displaced persons.").

Indeed, "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987). In *Bresgal*, the Ninth Circuit upheld a permanent injunction against the Secretary of Labor applicable nationwide because there was no injunction that could practically be limited to a smaller group of specific labor contractors. *Id.* at 1171. Similarly, in *Easyriders Freedom F.I.G.H.T. v. Hannigan*, the court ruled that a permanent injunction forbidding the California Highway Patrol from engaging in unconstitutional stops of all motorcyclists, including non-plaintiffs, was not overbroad. 92 F.3d 1486, 1501 (9th Cir. 1996).

The Ninth Circuit has also held that a preliminary injunction is appropriate where "carefully tailored to maintain the status quo [and] where class certification is *pending* and the plaintiff has shown that a class-wide injunction is necessary to remedy the alleged class-wide harm." *Just Film, Inc. v. Merch. Servs., Inc.*, 474 Fed. Appx. 493, 495 (9th Cir. 2012) (emphasis added); *see also J.L. v. Cissna,* 341 F. Supp. 3d 1048, 1070 (N.D. Cal. 2018) ("Although a class has not yet been certified, California-wide preliminary injunctive relief is necessary to preserve the status quo and to prevent irreparable harm for all Plaintiffs and the putative class."); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1178 n.14 ("District courts are empowered to grant preliminary injunctions 'regardless of whether the class has been certified,'" *quoting* Schwarzer, Tashima & Wagstaffe, *Fed. Civ. P. Before Trial,* § 10:773 at 10-116 (The Rutter Group 2008)).

If the Court determines that class certification is necessary to grant class wide relief in this case, then Plaintiffs request that it rule upon the concurrently-filed class certification motion in conjunction with the instant motion. *See, e.g.*, *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1202-06 (N.D. Cal. 2017) (court provisionally certified a class of noncitizen minors and granted preliminary injunction on their behalf), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Under other "time sensitive" circumstances, courts of this District have "[found] persuasive the approach" of provisionally certifying classes for purposes of preliminary injunctive relief. *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1043 (N.D. Cal. 2020) (citing *Saravia*, 280 F. Supp. 3d 1168); *see also Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 38-40 (N.D. Cal. 2020) (granting provisional certification of class in conjunction with issuance of TRO); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (holding court did not abuse its discretion by provisionally certifying class for purpose of entering preliminary injunction).

### C. Plaintiffs Should Not be Required to Post a Bond.

The court has discretion to waive the preliminary bond requirement for low-income persons. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). As SNAP recipients, Plaintiffs have extremely limited income and resources. *See* 7 U.S.C. § 2014(a); Erdmann-Browning Suppl. Decl.; Benitez Suppl. Decl. The court may also waive the bond requirement where an injunction poses minimal likelihood of harm to a defendant. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). The Court should waive the bond requirement in this case.

## V.   CONCLUSION

Plaintiffs meet the preliminary injunction standard and this relief is necessary to prevent ongoing irreparable injury to millions of people already struggling to eat. Plaintiffs respectfully request that the Court grant their motion to ensure that critical SNAP benefits continue.

Dated: February 29, 2024

Respectfully submitted:

Jodie Berger
*Attorney for Plaintiffs*