1  Jodie Berger (SBN 124144)
   jberger@wclp.org
2  Richard Rothschild (SBN 67356)
   rrothschild@wclp.org
3  Robert Newman (SBN 86534)
   rnewman@wclp.org
4  Antionette Dozier (SBN 244437)
   adozier@wclp.org
5  **WESTERN CENTER ON LAW & POVERTY**
   3701 Wilshire Blvd., Suite 208
6  Los Angeles, CA 90010
   T: (213) 235-2617
7  F: (213) 487-0242

8  Lindsay Nako (SBN 239090)
   lnako@impactfund.org
9  Lori Rifkin (SBN 244081)
   lrifkin@impactfund.org
10 Fawn Rajbhandari-Korr (SBN 315888)
   fkorr@impactfund.org
11 Meredith Dixon (SBN 346864)
   mdixon@impactfund.org
12 **IMPACT FUND**
   2080 Addison St., Suite 5
13 Berkeley, CA 94704
   T: (510) 845-3473
14 F: (510) 845-3654

15 *Attorneys for Plaintiffs*

16          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
17

18

19 ANIKA OKJE ERDMANN-BROWNING         Case No.: 4:23-cv-04678-JST
   and JACQUELINE BENITEZ, individually
20 and on behalf of all others similarly situated,   CLASS ACTION

21                   Plaintiffs,           **SUPPLEMENTAL DECLARATION**
                                           **OF DAVID A. SUPER IN SUPPORT**
22              v.                         **OF PLAINTIFFS' MOTION FOR**
                                           **PRELIMINARY INJUNCTION**
23 THOMAS J. VILSACK, Secretary of the
   United States Department of Agriculture,   Hearing date: March 14, 2024
24 in his official capacity; SHALANDA      Time: 2:00 p.m.
   YOUNG, Director of the United States
25 Office of Management and Budget, in her
   official capacity.                      Action filed: September 12, 2023
26
27                   Defendants.

28

**SUPPLEMENTAL DECLARATION OF DAVID A. SUPER**

I, David A. Super, declare as follows:

1.      I previously signed a declaration in this matter on September 12, 2023, in which I described at length my expertise on the Supplemental Nutrition Assistance Program (SNAP) and its predecessor, the Food Stamp Program. ECF_No. 12-5 at ¶¶ 1-5, and Exh. 1. If called as a witness, I could and would competently testify to the following.

2.      I am submitting this declaration to respond to the position set out in Defendants' Motion to Dismiss that SNAP was unaffected in any prior government shutdown after a lapse in discretionary appropriations.

**USDA Communications about Threats to SNAP Benefits in Past Government Shutdowns**

***2013 Shutdown***

3.      On October 1, 2013, the federal government began a partial shutdown due to a lapse in annual appropriations.  USDA's own operations were affected, but the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111–5, as amended, provided an unlimited appropriation for SNAP benefits through the end of October.  Between October 2 and October 16, 2013, USDA issued six Q & A documents relating to the possible interruption of SNAP benefits beginning November 1.

4.      On October 3, four weeks before a potential interruption of SNAP benefits, USDA stated in the second of these Q & A documents that at least one "State makes clear that they feel compelled to alert partners no later than the 12th or 13th that there may not be November benefits" and that a "State advises they are flooded with calls about October benefits".  A true copy of the October 3 document is attached as **Exhibit A.**

5.      On October 7, 2013, when USDA issued the third of these Q & A documents, it stated that "[a]s recently as yesterday, a State/local agency was hearing anecdotally that some merchants have refused to accept Electronic Benefit Transfer (EBT) cards for SNAP, erroneously believing that funding is not available for them because of the shutdown."   A true copy of the October 7 document is attached as **Exhibit B**.

6.    In this October 7 document, USDA also encouraged state SNAP agencies to publicize the impending threat to households' ability to purchase food with SNAP benefits: "States should handle the noticing as mass changes, which may be publicized via news media, posters in certification offices, issuance locations, or other sites frequented by certified households, or general notices mailed to households." USDA did suggest, but not require, that "States sending a separate notice [to SNAP households] may want to consider delaying the release of the notification in order to avoid client confusion."

7.    On October 7, 2013, USDA acknowledged that "[d]uring this lapse in funding, we are limited" in the mechanisms it may use to correct misinformation and "[a]s of now, we do not have the capacity to use the automated systems that would provide for the email blast used during disasters".

8.    On October 11, 2013, Food and Nutrition Service  Administrator Audrey Rowe (Administrator Rowe) wrote to state SNAP agencies saying that: "According to the information we have received, several States provide the next month's issuance files as early as the 15th of the month.  With that in mind, understanding the operational issues and constraints that States face, and in the interest of preserving maximum flexibility, we are directing States to hold their November issuance files and delay transmission to State electronic benefit transfer (EBT) vendors until further notice." A true copy of the October 11 document is attached as **Exhibit C**.

### *2015 Shutdown*

9.    On September 18, 2015, Administrator Rowe wrote to state SNAP agencies stating "we understand that several States will begin sending October benefit issuance files to their EBT vendors soon. Considering the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility, we are directing States to hold their October issuance files and delay transmission to State electronic benefit transfer (EBT) vendors until further notice." A true copy of this September 18 letter from Administrator Rowe is attached to this declaration as **Exhibit D**.

10.    Nothing in this September 18 letter asked state officials to keep these actions confidential, and I heard about it promptly from social services agency staff and anti-hunger

---

3

1  advocates in several states. These staff members and advocates asked me whether SNAP

2  benefits were indeed at risk of being cut off. I confirmed that their states were indeed acting

3  under USDA's direction. The staff and advocates asked me how they should advise SNAP

4  recipient households. I told them that USDA had not committed to any particular method of

5  implementing a benefit cut-off and therefore it was impossible to know if households could

6  spend benefits issued in September after October 1. My inability to provide clear advice led to

7  frustrated responses from these staff members and advocates, who felt a strong need to advise

8  recipient households. I do not know what they may have told households, but based on what

9  they said it seems possible some recommended that households expend all benefits by

10 September 30 and others advised households to cut back on food expenditures because they

11 might have to stretch the food they currently had over an indeterminate period after October 1.

12     11.     On September 23, 2015, Administrator Rowe wrote again to state SNAP

13 agencies, "directing States to send their issuance files to their EBT vendors without further

14 delay. This is to ensure that October benefits can be issued on a timely basis." This letter went

15 on to say that, in the event in a lapse in annual appropriation legislation, USDA would "take

16 steps, including the de-authorization of retailers in the first several days of the month to prevent

17 SNAP benefits from being redeemed during an appropriations lapse." A true copy of this letter

18 is attached to this declaration and marked as **Exhibit E**.

19     12.     Nothing in this September 23 letter, either, asked state officials to keep these

20 actions confidential, and in fact I heard about it promptly from social services agency staff and

21 anti-hunger advocates in several states. Based on this new communication, the staff and

22 advocates were advising households to make sure they spent all benefits in their SNAP accounts

23 no later than September 30. Some expressed concern that this was contradicting their usual

24 advice to budget limited SNAP benefits carefully. Some also expressed concern that some

25 households had inadequate food storage facilities and might suffer food waste as a result of

26 emptying out their SNAP accounts by the end of the month.

27     13.     Any grassroots anti-hunger advocates, social services agency staff people, state

28 or local SNAP agency officials, or low-income people who searched for guidance about the

government shutdown impending on October 1, 2015, on the Food and Nutrition Service, which is the part of USDA that administers SNAP, would have found a document entitled "Q&A for SNAP Recipients in the Event of a Government Shutdown". Through last fall, this document was on USDA's SNAP website at https://www.fns.usda.gov/snap/2015-qas, but it is no longer available online. I downloaded a copy of this document before it was removed from the website. A true copy of this document is attached to this declaration and marked as **Exhibit F**.

14.      Among other things, this document states that "If we do not have funding from Congress, USDA will have limited funding for SNAP benefits in October and will be forced to stop providing benefits within the first few days of October. Once that occurs, families won't be able to use these benefits at grocery stores to buy the food their families need."

15.      This document also states that, in the event of a government shutdown, "USDA would need to take steps to prevent retailers from accepting SNAP EBT benefits during the lapse" and that households will not be able to spend even benefits from prior months that USDA charged to the prior fiscal year's SNAP appropriation: "once retailers are blocked from accepting SNAP EBT benefits, previously issued benefits will not be accessible."

16.      This document acknowledges that its actions will force households to choose between not having food after the government shutdown begins and stocking up on food before USDA interrupts SNAP benefits, having some of that food become unsafe to eat, and lacking sufficient food when USDA again makes SNAP available:

"SNAP benefits are currently available and will remain so through at least the first couple of days in October. Households may use those benefits to stock up on food now so they are prepared if SNAP benefits become inaccessible after the first couple of days in October."

"However, some foods cannot be stored safely for long periods of time, while others can be stored safely, and households should take safe storage into consideration when making purchases to prepare for a period when they may not be able to use SNAP benefits. If households use up their benefits and the food goes bad because it wasn't properly stored, they won't have SNAP benefits available when the shutdown ends and the access to benefits is restored. More information about food safety and storing food is available at Foodsafety.gov."

17.      This document acknowledges that SNAP households were widely aware of the

1    threat of an interruption in their benefits that might have occurred in early October.  It informed

2    food retailers to expect an "increase in SNAP customers at the end of September", stating that

3    "[a]s we approach the end of September and as the threat of a lapse in funding becomes more

4    imminent, it is very likely that you will need additional stock to serve customers who are using

5    up their September benefits to be prepared in the event of a shutdown."

6        18.    In the days leading to the government shutdown threatened for October 1, 2023,

7    recipient households could reasonably conclude that this document represented current program

8    policy because no more recent policy statement was readily visible on USDA's SNAP website.

9    These households therefore could reasonably expect that the measures it describes would be

10   implemented if a government shutdown occurred in Fall 2023.

11       19.    I have frequently spoken with USDA staff and social service agency staff about

12   the reach and effectiveness of the USDA's public communication efforts.  These are important

13   to make potentially eligible low-income households aware of how to obtain SNAP benefits and

14   to understand their rights and responsibilities under program rules.  From these conversations,

15   my strong impression was that the reach of these communication efforts is highly variable and

16   difficult to predict even during ordinary times, with some messages reaching large segments of

17   the public and others reaching relatively few people.  I had the impression that these USDA

18   officials held a similar view.  This inconsistency results from the fact that many eligible

19   households do not understand USDA's central role in program administration and therefore may

20   not call its telephone numbers or visit its website.  During a government shutdown, however,

21   even these unreliable strategies are likely to be unavailable because many of USDA's public

22   information staff members will not be working.

23       20.    FNS's 2024 Contingency Plan, on the USDA's website at

24   www.usda.gov/sites/default/files/documents/fns-2024-contingency-plan.pdf, makes no specific

25   allowance for keeping any public information officers working during a lapse of annual

26   appropriations; I see no indication that they would be among the SNAP specialists would be

27   among the discretionary actively working employees under Table 2's plan for longer lapses in

28   annual appropriations.  USDA's capacity to counteract alarming rumors and reports therefore

1   will be even more sharply curtailed under these circumstances.  These public information staff

2   members may record messages on USDA's public-facing telephone numbers and may post

3   information on its website before the shutdown begins, but if they are barred from working,

4   they will be unable to update those messages to correct misinformation that begins to circulate

5   after the shutdown has started.

6   **Public Announcements Warned SNAP Recipients About Threats to Their SNAP Benefits**

7        21.    Actual and threatened government shutdowns and appropriations lapses have

8   frequently led to public announcements that SNAP benefits were at risk, media coverage of

9   those announcements, and word-of-mouth among retailers, social services agency staff

10  members, and SNAP recipients.

11       22.    During prior years when there was a threatened or actual lapse in funding, USDA

12  took the position that individualized 10-day advanced notice to recipients about changes or

13  delays to benefits issuance not required, and that state SNAP agencies should treat these

14  changes as a "mass change" pursuant to 7 C.F.R. § 273.12(e)(1)(ii), which permits noticing by

15  means the news media, posters in office, or generalized notices to households.  Exhibit B;

16  Fourth and Fifth Set 2013 Questions and Answers, true copies of which are attached as **Exhibit**

17  **G and H**; 2019 Early Issuance Q&As #1 (Jan. 10, 2019), available at https://fns-

18  prod.azureedge.us/sites/default/files/EarlyIssuanceQAEmail1-10-19.pdf; Q&A #2 (Jan. 14,

19  2019), available at https://fns-

20  prod.azureedge.us/sites/default/files/EarlyIssuanceStateQAEmail1-14-19.pdf) and a true copy

21  attached as **Exhibit I.**

22       23.    It is my recollection that Public Service Announcements (PSAs) went out in

23  some states in 2013 to inform the public that benefits were ending, although the SNAP program

24  did not stop due to a government shutdown in 2013, because the American Recovery and

25  Reinvestment Act of 2009 (ARRA) protected recipients through October, 2013.

26       24.    In advance of the potential government shutdown in 2015, PSAs went out that

27  people needed to spend their benefits early.  This could cause budgeting issues to get two

28  months benefits in one month, as well as issues with buying food in advance if recipients had no

7

1   or poor food storage, as well as generating fears about benefits ending.

2       25.    Senator Jeff Merkley of Oregon stated on the Senate Floor, "come October 1, if

3   we shut this government down, then we are also going to be shutting down food stamps, that's

4   shutting down food stamps for 45 million Americans." He made this statement on September

5   22, 2015.." See, https://www.merkley.senate.gov/merkley-a-government-shutdown-would-

6   shut-down-food-stamps/ (last visited February 23, 2024) and a true copy attached as **Exhibit J**.

7       26.    Senator Sherrod Brown of Ohio warned that a government shutdown "could

8   result in the loss or interruption of food assistance for nearly 45 million Americans." Senator

9   Brown joined the executive director of the Ohio Association of Foodbanks, which has direct

10  contact with large numbers of low-income people across that state, in making this appeal to the

11  Senate Republicans on September 23, 2015.

12  https://www.brown.senate.gov/newsroom/press/release/with-17-million-ohioans-depending-on-

13  food-assistance-brown-calls-for-action-to-prevent-a-government-shutdown (last visited

14  February 23, 2024) and a true copy attached as **Exhibit K**.

15      27.    Senator Brown informed Ohioan SNAP applicants and recipients that USDA was

16  likely to interrupt their food assistance benefits in days and stating that this threat was "causing

17  needless stress and worry for millions of families who depend on SNAP to help put food on the

18  table." *Ashland Times-Gazette* (September 29, 2015).

19      28.    The *Huffington Post* published an article on January 23, 2019, stating "SNAP,

20  which helps 38 million people and is one of America's biggest safety net programs, could stop

21  providing benefits if the government shutdown continues."

22  https://www.huffpost.com/entry/government-shutdown-food-assistance-

23  snap_n_5c488cb1e4b0b66936760e94 (last visited February 23, 2024).

24      29.    In 2019, USDA directed states to issue February 2019 benefits in January 2019

25  to fall within what it believed was the budget authority provided by the 2018 continuing

26  resolution. Anyone who needed to be certified in February 2019 (both new applicants and

27  recipients whose periodic recertification of eligibility was not completed by January 20) had to

28  wait until March 2019 to receive subsistence food aid. The pre-issuing of benefits also caused

1  large gaps in low-income households' receipt of food aid, reaching six or seven weeks for many

2  households between a mid-January issuance and one in mid-March. For these households, too,

3  limited food storage and budgeting skills meant that getting food assistance far in advance of

4  their regular issuance dates caused them to suffer hardship. This was confirmed in a study

5  performed for the National Institutes of Health by Wendi Gosliner and colleagues. Wendi

6  Gosliner, et al., Participants' Experiences of the 2018–2019 Government Shutdown and

7  Subsequent Supplemental Nutrition Assistance Program (SNAP) Benefit Disruption Can Inform

8  Future Policy (2020). Recipients consistently reported confusing and inadequate

9  communications from the state SNAP agency surrounding the government shutdown. Some

10 had spent the advanced February allotment before learning that they would receive no further

11 food aid for that month. Others thought the national SNAP program was ending and understood

12 the advanced allotment as a sort of severance bonus. Most ran out of food long before their

13 March issuance was due and believed they could not count on that issuance coming.

14 Accordingly, they diverted funds needed to pay other bills to purchase food for their families.

15 This led to a cascade of problems resulting from unpaid rent and utility bills. The researchers

16 found that the recipients experienced substantial stress both during February and March as they

17 ran out of food and again later in the spring as they had to cope with the consequences of having

18 diverted funds to buy food and as they worried about future interruptions in SNAP. That study

19 is available at

20 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7353319/#:~:text=We%20found%20that%20p

21 articipants%20routinely,some%20participants'%20faith%20in%20government (last visited

22 February 23, 2024).

23     30.    Senator Jeff Merkley of Oregon warned that USDA might interrupt SNAP

24 benefits in September 2020 because the surge in SNAP participation due to the coronavirus

25 pandemic might exceed what the annual appropriation could support. He stated on August 12,

26 2020: "For the 43 million Americans who receive SNAP benefits, this program is the

27 difference between going to bed with a full or an empty belly. But now, without more funding

28 for SNAP, we run the very real risk that this lifeline will not be there for them by the time the

1  fiscal year ends." https://www.merkley.senate.gov/merkley-warns-snap-benefits-could-run-out-
2  calls-for-robust-funding-in-current-and-upcoming-fiscal-year-2020/ (last visited February 23,
3  2024), and a true copy attached as **Exhibit L**.

4  **The Current State of Public Information on the Effects a Government Shutdown on SNAP**

5      31.    The prospect of a government shutdown since September 2023 has already
6  received considerable media attention. Predictably, this coverage contains inaccurate and
7  confusing information that is likely to cause stress for eligible low-income households and
8  could prompt them to take precautions that cause them difficulties in the future. For example, a
9  February 23, 2024, story for CNN by Betsy Klein and Tami Luhby, *Federal government to*
10 *begin the formal process of preparing for partial shutdown – again*, https://www.msn.com/en-
11 us/news/politics/federal-government-to-begin-the-formal-process-of-preparing-for-partial-
12 shutdown-again/ar-BB1iLlkZ, states that current recipients will receive SNAP for March but
13 could be read to imply that new applicants and those whose recertifications are not complete by
14 the end of February would be denied the food assistance for which the Food and Nutrition Act
15 renders them eligible.

16     32.    Senator Chuck Schumer stated on February 25, 2024 that despite "intense
17 discussions" that were continuing among top lawmakers to break the impasse, Republican
18 recalcitrance was raising the prospect of a "disruptive shutdown" at midnight on Friday.
19 "While we had hoped to have legislation ready this weekend that would give ample time for
20 members to review the text, it is clear now that House Republicans need more time to sort
21 themselves out," Mr. Schumer said in a letter to Democratic senators. "With the uncertainty of
22 how the House will pass the appropriations bills and avoid a shutdown this week, I ask all
23 senators to keep their schedules flexible, so we can work to ensure a pointless and harmful lapse
24 in funding doesn't occur." https://www.nytimes.com/2024/02/25/us/politics/spending-impasse-
25 partial-shutdown.html?searchResultPosition=1 (last visited Feb. 26, 2024.) and a true copy of
26 this article is attached as **Exhibit M**.

27     33.    Because the federal officials responsible for processing retailers' applications to
28 participate in SNAP and conducting necessary inspections will be furloughed under FNS's

1  contingency plan, food retailers whose authorization to accept SNAP benefits expire during any

2  government shutdown will cease to be able to accept SNAP benefits. No readily available

3  public list identifies such retailers, but their sudden departure from the program could seriously

4  interfere with recipient households' ability to purchase food with their SNAP benefits. USDA

5  and other research shows that SNAP already is plagued by "food deserts" where few or no food

6  stores accept SNAP benefits as well as areas where the only stores that do are high-priced

7  convenience stores. See Congressional Research Service ,

8  https://crsreports.congress.gov/product/pdf/IF/IF11841, discussing this research. The sudden

9  exit of authorized retailers would exacerbate this problem. Some recipients finding themselves

10  suddenly unable to spend their benefits at familiar stores are likely to mistakenly believe that

11  the entire program has shut down and not attempt to travel to other stores where they can

12  purchase food with SNAP benefits.

13  **The Vulnerabilities of SNAP Recipients**

14    34.    The most detailed reports about the characteristics of households that receive

15  SNAP are in USDA's *Characteristics of SNAP Households*. Because data collection was

16  suspended during the COVID-19 pandemic, the most recent of these reports that is available

17  covers most of Fiscal Year 2020. It is available at https://fns-

18  prod.azureedge.us/sites/default/files/resource-files/Characteristics2020.pdf (last visited

19  February 24, 2024). A true copy of Table A.1.a of this report is attached as **Exhibit N**.

20    35.    Table A.1.a of the 2020 Characteristics Report shows that 7.258 million SNAP

21  recipients live in households with at least one non-elderly person with a disability. A partially

22  overlapping group of 6.521 million SNAP recipients live in household with at least one elderly

23  person. SNAP's statutory definition of disability is based primarily on that relied upon in the

24  Social Security Disability Insurance and Supplemental Security Income programs, which

25  generally require severe impairments. A significant fraction of these people with disabilities, as

26  well as some of the elderly, have mental health conditions that could be adversely affected by

27  doubt and uncertainty if they will have access to food in the next month. Some others have

28  physical impairments that could be adversely affected if their diets are reduced or involuntarily

changed due to a lack of resources to purchase food and may be made anxious by that prospect.

36.    Table A.1.a also shows that 36.3% of all SNAP households, or 11.599 million households, are certified to receive the maximum SNAP benefit. These are households determined not to have any cash available to purchase food under the formula Congress established under the Food and Nutrition Act of 2008. These households depend on the efficient and effective expenditure of their SNAP benefits to obtain enough food to eat.

37.    Communications with homeless households could be especially problematic. Throughout the history of the Food Stamp Program and SNAP, a persistent challenge has been how best to serve homeless people, including those on the street, those in shelters, and those "couch-surfing" between highly temporary accommodations in the homes of friends and relatives. The first piece of legislation I worked on when I came to Washington involved improving access for the homeless, and I have worked on numerous statutory, regulatory, sub-regulatory, research, and litigation initiatives to improve access for homeless people since. A report from the Government Accountability Office (GAO) addressing some of the challenges of serving the homeless is *Homelessness: Barriers to Using Mainstream Programs* (Letter Report, July 6, 2000, GAO/RCED-00-184), https://www.govinfo.gov/content/pkg/GAOREPORTS-RCED-00-184/html/GAOREPORTS-RCED-00-184.htm.

38.    SNAP agencies have difficulty communicating with homeless people because of their lack of reliable mailing addresses and the very limited minutes most have on their cell phones. This leaves homeless people vulnerable to misinformation about the program, its rules, and its actions that affect them. This means that they may misunderstand any actual or threatened interruption of benefits due to a government shutdown because the state or local SNAP agency cannot send them corrective information.

39.    Homeless people also have difficulty using program benefits to full advantage. The Thrifty Food Plan, on which the program's benefit levels are based, assumes that households will have substantial facilities for storing and preparing food and that they will buy in bulk. Homeless people typically lack those facilities and must purchase more expensive prepared foods and without any bulk discounts. Homeless people therefore typically exhaust

their benefits well before the end of the month. Homeless people also may have difficulty

accessing food pantries and other emergency programs designed to meet needs that SNAP

cannot. Those programs often provide several bags of food at one time but then bar recipients

for an extended period thereafter. As a result, homeless people are especially susceptible to any

interruption in their benefits. Because their existence is already so marginal, they may

experience especially severe stress should they hear reports that SNAP benefits may be cut off.

I hereby declare under penalty of perjury under the laws of under the laws of the United

States of America that the foregoing is true and correct.

Executed on February 27, 2024, in Washington, D.C.

David A. Super

# EXHIBIT A

**Employment and Training**

**Q. The letter in part states "For other functions, including Employment and Training, FNS encourages States to delay further obligations until appropriations legislation is enacted."  What do the words "further obligations" mean?   Does this mean we should stop all E & T services immediately as we do not have a signed contract for FFY 2014 or does it mean that we continue to operate E & T services as the FFY 2014 funds are considered obligated by virtue of the letter sent notifying us of our funding?**

A.  FNS does not expect any new FY 2014 funding will be available for E&T during the lapse; approval of the FY 2014 plan does not obligate funds that have not been appropriated. While FNS encourages States to delay additional obligations until appropriations legislation is enacted, we recognize that States will need to make appropriate and reasonable decisions related to ongoing staff commitments.   Additionally, E&T services which were contracted for in FY 2013 with a performance period which extends into FY 2014 may continue.

Finally, it is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

**Q. Since we have our mandatory ABAWD provisions going into effect today, I am wondering about the funding as the paragraph encourages states to limit the funding on SNAP E & T. Your thoughts?**

A.  FNS does not expect any new FY 2014 funding will be available for E&T during the lapse. While FNS encourages States to delay additional obligations until appropriations legislation is enacted, we recognize that States will need to make appropriate and reasonable decisions related to ongoing staff commitments and core activities.  We encourage States to consider the continuity of operations that support uninterrupted eligibility and benefit issuance for ongoing recipients.  Additionally, E&T services which were contracted for in FY 2013 with a performance period which extends into FY 2014 may continue.

Finally, it is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

## Outreach

**Q. Can you please advise how we handle outreach activities?  Should we stop activities with our partners?   Although we have not been approved yet, we anticipate that we will be soon.**

A. Because SAE funds are limited in availability through the SNAP contingency funds, FNS expects States to focus on eligibility and issuance processes, integrity, oversight and system maintenance in order to ensure that benefits will reach those in need.  For other functions, such as outreach and E&T, FNS encourages States to delay further obligations until appropriations legislation is enacted.

It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

## November

**Q. As I read it - SNAP benefits to clients would be available through October and there are contingency funds available that would support State administrative expenditures through October as well.  However, if a shut down were to last longer than October - there would be no funding for SNAP or SAE beyond October.  Can I clarify that means issuance?  As you know some clients will still have benefits available on their EBT cards that may not be expended prior to the end of October... will these already issued benefits still be reimbursed to the vendor - or will the state be responsible for any unexpended issuance?**

A. We understand that States may be concerned about future operations and whether benefits will be paid and redeemed in November.   Questions such as this are appreciated as we consider available options, seek legal determinations, and make a final decision about a course of action closer to that time. We appreciate your patience as we work to serve SNAP participants during this potential continuing lapse in funding.

**Q's.  (Various and related)**
- **A State makes clear that they feel compelled to alert partners no later than the 12th or 13th that there may not be November benefits. A State advises they are flooded with calls about October benefits and wants to give folks a heads up as soon as we know for November, including partners such as food pantries.**
- **Our understanding is that, absent a budget agreement, a continuing resolution that extends the 2008 Farm Bill or a reauthorization of the Farm Bill, that there is no authority to extend the issuance of SNAP benefits into November.  Does USDA have a timeline for getting information to the States on the consequences of a failure of**

**Congress to act?  The sooner we can begin to disseminate that information, the better.  We believe that if the impasse is not resolved by the 15th of the month, it will be critical to get that information out to the States by the 17th.**

A.  We appreciate States' concern about future operations and the status of November benefits.  We are hopeful that Congress will provide an appropriation prior to the end of October.  USDA will evaluate available options, seek legal determinations and make a final decision about a course of action closer to that time.  We appreciate your patience, as well as your partners' patience.  The information provided in these questions, including State concern for timeframe constraints, is helpful to us as we continue to consider the issue of an extended lapse in funding beyond October.

**Q.  How is FNS handling messages to the public…regarding the possibility of November benefits being delayed… due to the shutdown**

A.  We are hopeful that Congress will provide an appropriation prior to the end of October.  We continue to monitor the situation closely and will stay in close coordination with our State partners with respect to program operations in October and beyond.

**Qs. (Various and related)**

- **7 CFR 273.2 (g)(2) indicates that SNAP households who apply after the 15th of the month and are determined eligible for the initial month and subsequent months may be issued a combined allotment at the State agency option for the month of application and benefits for the first full month of participation.   Our computer system is programmed to issue the combined allotment for eligible households who apply after the 15th of the month.  This means anyone who applies October 16 or later that is certified and  would receive October and November benefits as a single issuance, potentially in the month of October. How should we proceed?**
- **Application taken after the 15th of October will incorporated November benefits…should this be paid out of October allotment?**
- **If a household applies after the 15th of the month and is found eligible during the month of application, they receive a combined issuance that includes a pro-rated issuance for the month of application and a full issuance for the following month.  Our understanding is that, for applications filed between October 15th and October 31st, we would treat them as usual and issue the combined benefit for October and November.  Please confirm that our understanding is correct.**

A.  Program issuances made under this provision are proper obligations of October 2013.  As such, they are provided for in currently available program funding.

**Q.** **In planning for a contingency plan based on the Food Stamp Program/benefits ending October 31, 2013.**

- **What type of notice if any has to be sent to each active FS household regarding the program ending?**
- **If our computer system allows, should active cases be closed or suspended?**
- **Should we stop taking applications for Food Stamps and when?**

A.  We appreciate States' concern about future operations and the status of November benefits.  The questions posed here are extremely helpful to us in understanding the concerns and issues of States that need to be considered as a part of any next steps. USDA will evaluate available options, seek legal determinations and make a final decision about a course of action closer to that time.

**Funding/Appropriation**

**Q. How quick does money start flowing once the appropriation is signed?**

A. Funding for benefit issuance would be made available within 24 hours.  Funding for State administrative and other activities would follow shortly thereafter.

**Q. The Federal Contingency and Reconstitution Plan states that SNAP benefits for October 2013 will not be affected by the shutdown.   I just want to confirm that the contingency funds for October 2013 SNAP benefits is able to cover costs in the event there is a large increase in SNAP participation for the month of October 2013?**

A. To be clear, SNAP October benefits were provided through the authority from Section 101 of the American Recovery and Reinvestment Act of 2009 (ARRA) through which Congress provided "such sums as are necessary" to finance the SNAP benefits at the level specified in ARRA.

In addition, SAE funds are available through the SNAP contingency funds.  FNS expects States to focus on eligibility and issuance processes, integrity, oversight and system maintenance in order to ensure that benefits will reach those in need.  It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

**Q.  What does it mean to delay further obligations?**

A.  Because SAE funds are limited in availability through the SNAP contingency funds, FNS expects States to focus on eligibility and issuance processes, integrity, oversight and system maintenance in order to ensure that benefits will reach those in need.  For other functions, such as outreach and E&T, FNS encourages States to delay further—additional—obligations until appropriations legislation is enacted.   It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

**Furloughed federal employees**

**Various and related**
**Q. How do we handle Federal workers who are coming in with documents saying they are furloughed for 30 day…how should they be handled…what are the parameters?  Would furloughed federal employees be treated any differently than a laid-off employee for Food Stamp eligibility?  What should states tell Federal employees from any agency that are on furlough and say they cannot be sure of any income for October?**

A. Furloughed federal employees applying for SNAP benefits should be treated the same as other applicants in similar circumstances—they must meet the income and other non-financial requirements to be determined eligible for benefits.  In accordance with the Food and Nutrition Act, households shall have their incomes calculated on a prospective basis in order to determine eligibility.  If a participating household's income later exceeds 130% of poverty, the household is required to report such changes in circumstances to the State Agency.  When assigning a reporting system, the State Agency should consider what is the most appropriate for these households.

**Q. Furloughed federal employees have started applying for FS.  The work number shows their last check date as 10/03/13.  Furlough federal employees are stating it was 9/28/13.  Which date should be used for eligibility?**

A. Different federal agencies use different payroll services so dates can vary.  States should ask for verification from the applicant when information is questionable.

### Miscellaneous

**Q. Will states be absolved of QC errors if Federal data match sources are not available to confirm information provided by applicants?**

A. Due to the lapse in appropriation, FNS is evaluating our authority and options to address QC errors caused by the shutdown where the error is directly and only attributable to the inability to comply with federal regulatory matching requirements due to the inaccessibility of federal systems.

**Q. Will an array of Federal benefits ( SS, Veterans benefits) continue to be paid in October?**

A. FNS is able to respond to the affect of the lapse in funding on the federal nutrition programs under their jurisdiction.  The availability of other federal benefits would be better addressed by the cognizant agency.

**Q. If states cover expenses with state funds now, will they be reimbursed later when/if Federal funds are available?**

A. It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

**Q. Will TOP continue during the furlough period?**

A. States may continue to submit their TOP files.  However, files will not be processed during the lapse.

# EXHIBIT B

**Quality Control**

**Q. Is there any possibility that we will have access to SNAP QCS?**

A.  SNAPQCS is disabled for the length of the lapse in appropriation.  Once government operations resume, SNAPQCS will be brought back online per the FNCS Contingency and Reconstitution Plan.

**Q. Just to follow up our phone conversation about the Quality Control Sample for May 2013. The deadline to submit the sample into the SNAP-QCS State System was 9/23/2013.  The state has 10 days to make changes after submission.  We had several cases that needed to have some changes made by today in order to meet the deadline.  However, when our statistician went to update the SNAP-QCS system, he received an error message that the website is not available due to the lapse in federal funding.  I just want to ensure that we are held harmless and will be able to make updates once the system is reinstated.**

A. Once an appropriation is signed and when government operations resume, FNS will work with our SNAPQCS contractor to determine the most effective method to allow States to initiate adjustments for the May 2013 Sample.

**Communications**

**Q. Our adverse action date for October is 10/17, also the debt ceiling deadline coincidentally enough.  We are assuming we'd need to pivot on a dime if benefits are not authorized for November and stop payment for Nov early the week of 10/21, which we can do technically…but not in keeping with 10 day notice requirements.  Is there a hold harmless provision for such circumstances?  Also affects timeliness standards, not to mention expedited benefits.  Anyway, that's the burning question of the day.**

A.  SNAP requirements provide that the sunset of the ARRA stimulus is considered a mass change. States should handle the noticing as mass changes, which may be publicized via news media, posters in certification offices, issuance locations, or other sites frequented by certified households, or general notices mailed to households. Many States choose to go beyond the minimum requirements and issue notices directly to households in order to minimize confusion and provide good customer service, however, this is not subject to the 10 day notice requirements.  For those States sending a separate notice, they may want to consider delaying the release of the notification in order to avoid client confusion.

Also, please see response to questions associated with QC above.

**Q. Will USDA be sending or have you already sent anything to retailers notifying them that benefits are going out for October and they can transact business as usual?**

A. All of the retailer associations (National and State) received the FNS contingency plan.   We have made contact with the national associations and they report no confusion over the October SNAP benefits.  Additionally, we have a message recorded for all those calling the Retailer Service Center.  The message tells retailers that October benefits have been issued and that if they are already authorized, they can continue to accept SNAP benefits through normal EBT channels.  The message also makes clear that we are not accepting new applications during the lapse in appropriations.

**Q. As recently as yesterday, a State/local agency was hearing anecdotally that some merchants have refused to accept EBT cards for SNAP, erroneously believing that funding is not available for them because of the shutdown.   Recall during Superstorm Sandy that USDA was able to send out a blast e-mail to authorized retailers to let them know about the hot/prepared food waiver.  Would it be possible for USDA to send out a blast e-mail to let authorized retailers know that they should continue to accept SNAP EBT?**

A. During this lapse in funding, we are limited to the mechanisms we have used - notifying all State and National trade associations and providing the recorded message on the Retailer Service Center.  As of now, we do not have the capacity to use the automated systems that would provide for the email blast used during disasters.  We must count on media who has covered extensively the continuance of October benefits and word of mouth and our retailer trade associations whose membership is extensive, but not complete.  We appreciate the issue being brought to our attention--we will use all contacts available associated with smaller stores that may not be members of trade associations to see what they can do to help us get the word out that October benefits are available.  Our partners are our lifeline on this as we continue to be limited by the lapse in funding.  Referring retailers to the Retailer Service Center to hear the message officially from USDA that October benefits are available is probably a good strategy as well.  We understand and appreciate that State and local agencies are also using hotlines and other resources to get this message out.

**November**

**Q. Suppose Congress comes to an agreement and passes a Farm Bill prior to ending the government shutdown. Does that allow SNAP-Ed programs to then operate with the knowledge they do not have to rely on carry-over funds? Or are the two actions (shutdown and lack of an appropriation) co-dependent?**

A.  A FY 2014 appropriation is needed to fund SNAP-Ed programs beyond the FY 2013 funding that has been made available to States.  SNAP-Ed funding is available for two years and thus any 2013 funding can be used to continue SNAP-Ed activities in 2014.

**Q. If there is no authorization of SNAP benefits for November, will clients still be able to use their EBT cards to expend previously issued benefits?**

A.  We understand that States may be concerned about future operations and whether benefits will be paid and redeemed in November.   Questions such as this are appreciated as we consider available options, seek legal determinations, and make a final decision about a course of action closer to that time. We appreciate your patience as we work to serve SNAP participants during this potential continuing lapse in funding.

**Q.  May States temporarily relax the SSN rules for refugee (and newborn) applicants who can't apply for an SSN due to the federal government shutdown?**

A.  States may use good cause as provided for in the SNAP regulations, 7CFR 273.6(d).

**Q. Some States do not have an approved E&T plan yet.  Will FNS fund those states that do not have an approved plan?**

A.  Without an approved E&T plan for 2014, States can continue activities under their 2013 plan that are included in the 2014 plan; new activities will need to be approved once FNS is back (after a 2014 appropriation).

# EXHIBIT C



OCT 11 2013

**United States Department of Agriculture**

Food and Nutrition Service

3101 Park Center Drive

Alexandria, VA 22302-1500

SUBJECT:    Update on Food and Nutrition Service Operations
Supplemental Nutrition Assistance Program (SNAP) Lapse in Funding

TO:    SNAP State Agency Directors
All States

The Food and Nutrition Service (FNS) wants to extend our appreciation to States for their work in maintaining continuing service and benefits to Supplemental Nutrition Assistance Program (SNAP) participants and applicants in accordance with the FNS Contingency Plan issued October 1, 2013.

FNS understands that States are concerned about future operations stemming from the continuing lapse in Federal funding and have appreciated the information you provided us recently regarding your issuance and notice timelines.

According to the information we have received, several States provide the next month's issuance files as early as the 15th of the month. With that in mind, understanding the operational issues and constraints that States face, and in the interest of preserving maximum flexibility, we are directing States to hold their November issuance files and delay transmission to State electronic benefit transfer (EBT) vendors until further notice.

FNS will continue to work with our States and appreciates your continued support in responding to information requests that will assist in the ultimate course of action. If you have any questions, please contact your Regional Administrator or Jessica Shahin, Associate Administrator for the Supplemental Nutrition Assistance Program (SNAP), at jessica.shahin@fns.usda.gov.

Sincerely,

Audrey Rowe
FNS Administrator

cc:    Regional Directors
Supplemental Nutrition Assistance Program
All Regions

- By Oct. 25
- 191,000 people in Hawaii on program.
- 24.7 M per month

AN EQUAL OPPORTUNITY EMPLOYER

# EXHIBIT D



September 18, 2015

**United States**
**Department of**
**Agriculture**

Food and
Nutrition
Service

3101 Park
Center Drive

Alexandria, VA
22302-1500

SUBJECT:    Supplemental Nutrition Assistance Program (SNAP)
            State Issuance Files for October, 2015

TO:         SNAP State Agency Directors
            All States

The Food and Nutrition Service (FNS) wants to extend our appreciation to States for their work to serve those eligible for Supplemental Nutrition Assistance Program (SNAP) benefits. While we expect that we will soon have information regarding federal appropriations for fiscal year (FY) 2016 beginning October 1, 2015, we believe it is prudent to establish appropriate contingency plans related to the timing of the appropriation for FY 2016.

FNS appreciates and understands that States have questions regarding operation of the program, and has begun the process of fact finding and information gathering to be prepared in case a contingency plan must be implemented. With that in mind, we understand that several States will begin sending October benefit issuance files to their EBT vendors soon. Considering the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility, we are directing States to hold their October issuance files and delay transmission to State electronic benefit transfer (EBT) vendors until further notice.

We appreciate the partnership with States that administer this critical nutrition assistance program and will continue to keep you apprised with information as we exercise due diligence in our prudent oversight of the program.

Sincerely,

Audrey Rowe
FNS Administrator

Cc:    Regional Directors
       Supplemental Nutrition Assistance Program
       All Regions

# EXHIBIT E

**USDA**

**United States Department of Agriculture**

Food and
Nutrition
Service

Park Office
Center

3101 Park
Center Drive
Alexandria
VA 22302

SUBJECT:    Supplemental Nutrition Assistance Program (SNAP)
            State Issuance Files for October, 2015

DATE:       SEP 2 3 2015

TO:         SNAP State Agency Directors
            All States

The United States Department of Agriculture's (USDA) Food and Nutrition
Service (FNS) wants to extend our continued appreciation to States for their work
to serve those eligible for Supplemental Nutrition Assistance Program (SNAP)
benefits. We appreciate the immediate attention States gave to FNS'
communication of September 18, 2015, to hold October 2015 issuance files until
further notice. This communication is in follow up and provides additional
direction relating to October 2015 issuance files.

The Administration strongly believes that a lapse in appropriations should not
occur and there is enough time for Congress to prevent it. FNS is directing States
to send their issuance files to their Electronic Benefit Transfer (EBT) vendors
without further delay. This is to ensure that October benefits can be issued on a
timely basis. If Congress passes a funding bill, and does not cause a lapse in
appropriations then October benefits will be issued in full to all recipients, as per
standard operating procedure.

However, should Congress fail to act, USDA would have limited resources to
finance October SNAP benefits and would be required by law to ensure that
USDA does not incur obligations for which funding is not available. This would
require USDA to take steps, including the de-authorization of retailers in the first
several days of the month to prevent SNAP benefits from being redeemed during
an appropriations lapse.

I want to personally thank you for your efforts on behalf of low-income
Americans by administering this critical nutrition assistance program. My staff
and I will continue to keep you apprised of the situation.

Sincerely,

Audrey Rowe
Administrator
Food and Nutrition Services

An Equal Opportunity Provider and Employer

# EXHIBIT F



Home

## Q&A for SNAP Recipients in the Event of a Government Shutdown

**How likely is it that the government will shut down?**
The Obama Administration strongly believes that a lapse in funding should not occur. There is enough time for Congress to prevent it. However, without funding from Congress, USDA is required by law to ensure that it does not spend money it doesn't have. USDA is doing everything it can to notify participants of what those impacts might be.

**Will my EBT card stop working if there is a government shutdown?**
If we do not have funding from Congress, USDA will have limited funding for SNAP benefits in October and will be forced to stop providing benefits within the first few days of October. Once that occurs, families won't be able to use these benefits at grocery stores to buy the food their families need.

**Can I still use left-over benefits from September in October?**
No, once retailers are blocked from accepting SNAP EBT benefits, previously issued benefits will not be accessible. Those benefits will become available once retailers are able to accept SNAP benefits again.

**Why didn't the government prevent this?**
Without funding from Congress, USDA is required by law to ensure that it does not spend money it doesn't have. The Obama Administration strongly believes that a lapse in funding should not occur. There is enough time for Congress to prevent it.

**Why can't USDA pay for benefits using contingency funds?**
If Congress does not act to provide funding, USDA can use its limited contingency funds to provide some October SNAP benefits. However, USDA would be required by law to ensure that it does not incur obligations beyond the available funding. To avoid this, USDA would need to take steps to prevent retailers from accepting SNAP EBT benefits during the lapse.

**Should I use SNAP benefits I have now to stock up on food before the system goes down?**
SNAP benefits are currently available and will remain so through at least the first couple of days in October. Households may use those benefits to stock up on food now so they are prepared if SNAP benefits become inaccessible after the first couple of days in October.

However, some foods cannot be stored safely for long periods of time, while others can be stored safely, and households should take safe storage into consideration when making purchases to prepare for a period when they may not be able to use SNAP benefits. If households use up their benefits and the food goes bad because it wasn't properly stored, they won't have SNAP benefits available when the shutdown ends and the access to benefits is restored. More information about food safety and storing food is available at **Foodsafety.gov**.

**If Congress passes a budget after October 1, how long will it take for my benefits to return?**
Just as it will take a few days to block retailers from accepting SNAP EBT cards, it will take a few days to bring retailers back online so they can begin accepting SNAP EBT cards again. USDA will provide ongoing updates so that households, retailers, and states have information they need.

**Will my card stop working if Congress passes a last-minute budget?**
No. As long as there is no lapse in funding, retailers will continue to be able to accept SNAP benefits without interruption.

**Will my cash assistance/TANF/Unemployment/other benefits on my EBT card stop working as well?**
Some states provide other benefits, such as cash assistance through TANF, on the same EBT card used for SNAP. If Congress does not pass a budget and USDA must block retailers from accepting SNAP EBT benefits, these other benefits will **not** be affected. Families will be able to use cash benefits at stores and retrieve funds from ATM machines as they normally do.  WIC benefits will also continue to be available for use in stores.

Case 4:23-cv-04678-JST    Document 51-2    Filed 02/29/24    Page 33 of 65

**How do I check the balance for my SNAP benefits to know how much I have?**

Different states offer different ways to check your balance. However, a couple of easy ways are:

- Check the SNAP balance on your last grocery receipt.
- If your state provides information for your SNAP account on-line, sign in and check your balance on-line.
- Call your **state's EBT customer service number** (**http://www.fns.usda.gov/snap/ebt/pdfs/state-lines.pdf**). Customer service numbers for clients are located in the left column of the chart.
- Call the toll-free number on the back of your EBT card.

**What should I do if I need food right away?**

Contact your **regional food bank** (**http://feedingamerica.org/foodbank-results.aspx**) and ask for the nearest food distribution site. Or call your **state's information line** (**http://www.fns.usda.gov/snap/contact_info/hotlines.htm**) and ask for the nearest food pantry or food distribution site.

**I am a retailer. Should I expect an increase in SNAP customers at the end of September?**

Yes. As we approach the end of September and as the threat of a lapse in funding becomes more imminent, it is very likely that you will need additional stock to serve customers who are using up their September benefits to be prepared in the event of a shutdown. In addition, if Congress fails to provide funding, you may have a large increase in business from SNAP recipients for the first few days of October as customers will anticipate that their cards will soon not work.

**As a retailer, if the card readers stop working, can I process the transaction as I would during a routine outage?**

No. If USDA has to prevent retailers from using the SNAP EBT system, it means that funds are not available for SNAP purchases; you should not process any SNAP transactions until the system is back up and accepting and approving SNAP transactions.

##

*Last Modified: 09/25/2015*

# EXHIBIT G

**Quality Control**

**Q.  The system selected the October sample month cases for Federal review over the weekend.  Should States pull those cases for FNS review or will a new sample be selected later?**

A. States may pull those cases for review; FNS will not be able to review until the lapse in funding has been settled and the workforce has returned.

**Q. QC is working to finish June reviews that would normally be due for transmission 10/23, and also reviews for subsequent months. We are having difficulty finishing some reviews that require verification of federal benefits. Will we have extra time to try to obtain this verification when the shutdown ends before transmission is required, or should we be making likely conclusions on those amounts, with a hold harmless period for federal re-reviews?**

A. Once an appropriation is signed and when government operations resume, FNS will work with our SNAPQCS contractor to determine the most effective method to allow States to initiate adjustments regarding the transmission due dates.

**Furloughed Federal Employees**

**Q. Will furloughed federal employees receive retroactive pay back to October 1st?   If so, how do we view this for SNAP applications – will there be potential overpayments or would the normal reporting procedures be allowed to play out?**

A. It is unknown at this time if federal employees will receive retroactive pay back to October 1, 2013.   However, furloughed federal employees applying for SNAP benefits should be treated the same as other applicants in similar circumstances—they must meet the income and other non-financial requirements to be determined eligible for benefits.  In accordance with the Food and Nutrition Act, households shall have their incomes calculated on a prospective basis in order to determine eligibility.  If a participating household's income later exceeds 130% of poverty, the household is required to report such changes in circumstances to the State Agency.  When assigning a reporting system, the State Agency should consider what is the most appropriate for these households.   If it was determined at that a furloughed federal employee received SNAP benefits for which they were ineligible, States should establish a claim to recoup the overissuance of benefits in accordance with SNAP regulations.

**Employment & Training**

**Q. Last page and last question on Q&A volume 3… re E&T – Will there be, for an approved E&T plan with new activities, retroactive funding back to October 1st?**

A. It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and E&T funding will be made available to the States.

**Q.  States have continued to request available administrative funding for of SNAP E&T. Please see response below regarding a limited amount of SNAP contingency funds that will be provided to State agencies for 50% matching E&T during the lapse.**

A.

- The purpose of the SNAP E&T Program is to assist SNAP recipients in obtaining employment through a range of components and service delivery methods.  SNAP E&T is particularly critical for Able Bodied Adults Without Dependents (ABAWDS) and other required work registrants to ensure and maintain eligibility for benefits and move toward self-sufficiency.

- Because SNAP E&T is directly related to individuals' eligibility for benefits, FNS is making a limited amount of SNAP contingency funds available to State agencies for 50% matching E&T during the lapse.  Allocations will be provided based on a State's pro rata share (i.e., 31 days worth) of approved E&T plan targets for FY 2014.

- FNS recognizes that State E&T programs are complex and highly integrated activities, and that it would be difficult, if not impossible, to mandate the State agencies use funds only for specific E&T activities. However, given the limited contingency funds available, FNS encourages States to focus available funding to ensure those who rely on employment and training programs are able to maintain SNAP eligibility.   This supports the goal of providing uninterrupted eligibility and benefit issuance for these recipients to the extent possible during the lapse.

- For those States without an approved E&T plan for 2014, States can continue activities under their 2013 plan that are included in the 2014 plan; new activities will need to be approved once the lapse ends and FNS staff are back (once Congress passes an appropriation).

- It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE funding, including 50% matching funds for SNAP E&T, will be made available to the States.

**November**

**Q. Do the rules at 271.7 (d), allotment reduction procedures, apply if November benefits are not authorized? Highlighted citation of note is:**

**§ 271.7   Allotment reduction procedures.**

**(d)**

**(2)** *Suspensions and cancellations.* **(i) If a decision is made to suspend or cancel the distribution of SNAP benefits in a given month, FNS shall notify State agencies of the date the suspension or cancellation is to take effect. In the event of a suspension or cancellation of benefits, the provision for the minimum benefit for households with one or two members only shall be disregarded and all households shall have their benefits suspended or cancelled. Upon receiving notification that an upcoming month's issuance is to be suspended or cancelled, State agencies shall take immediate action to effect the suspension or cancellation. This action would involve making necessary computer adjustments, and notifying issuance agents and personnel.**

**(ii) Upon being notified by FNS that a suspension of benefits is over, State agencies shall act immediately to resume issuing benefits to certified households and shall resume benefit issuance as soon as practicable.**

**(4)** *Notification of eligible households.* **Reductions, suspensions and cancellations of allotments shall be considered to be Federal adjustments to allotments. As such, State agencies shall notify households of reductions, suspensions and cancellations of allotments in accordance with the notice provisions of § 273.12(e)(1), except that State agencies shall not provide notices of adverse action to households affected by reductions, suspensions or cancellations of allotments.**

**The suspension and cancellation of benefits contemplated under 7 CFR 271.7 appear to apply during a period when the Act and the program are in force but a reduction, suspension or cancellation of benefits becomes necessary because cost will exceed appropriation. However, the Act has not been extended either by continuing resolution or passage of a Farm Bill.   In other words, on what basis would either federal statute or regulation remain in force without any continuing resolution or Farm Bill authorizing extension of the program?**

A. The question assumes that the FNA is not operative; however, the FNA doesn't require extension other than its authorization for appropriation.  The FNA continues to be fully in force.

**Q. Given the previous Q & A document, we want to make sure we are understanding the response related to notification of November benefits correctly.  If legislation is not passed to authorize a November issuance and states have to take action to terminate/close benefits, FNS will consider it a mass change not an adverse action correct?**

A. This would be considered a mass change as provided under 7 CFR 271.7(d)(4).   Therefore, States should handle the noticing as mass changes, which may be publicized via news media, posters in certification offices, issuance locations, or other sites frequented by certified households, or general notices mailed to households.

**Q. In Q&A VOLUME 3 – "For those States sending a separate notice, they may want to consider delaying the release of the notification in order to avoid client confusion" – what does the reference to delaying the release mean – delay until when?**

A.  FNS wants to ensure that States know they have flexibility during this time of uncertainty regarding the lapse in federal funding. For example, States choosing to send a separate notice regarding the November decrease in benefits due to the expiration of ARRA may want to delay the notice until such time as the lapse in funding has been resolved or there is more clarity regarding available appropriations.

We appreciate States' concern about future operations and the status of November benefits. We are hopeful that Congress will provide an appropriation prior to the end of October.  USDA will evaluate available options, seek legal determinations and make a final decision about a course of action closer to that time.  In fact, the information you are currently providing regarding your issuance and notice timelines and contingency plans will help us with this decision.

**Q. Two states asked whether benefits loaded onto cards by October 31 would be available for draw in November if there are no new benefits loaded for November.**

A. Program issuances made under 7CFR 273.2(g)(2) (sometimes referred to as combined allotments) are proper obligations of October 2013.  As such, they are provided for in currently available program funding.

# EXHIBIT H



OCT 11 2013

**United States Department of Agriculture**

Food and Nutrition Service

3101 Park Center Drive

Alexandria, VA 22302-1500

SUBJECT:    Update on Food and Nutrition Service Operations
Supplemental Nutrition Assistance Program (SNAP) Lapse in Funding

TO:    SNAP State Agency Directors
All States

The Food and Nutrition Service (FNS) wants to extend our appreciation to States for their work in maintaining continuing service and benefits to Supplemental Nutrition Assistance Program (SNAP) participants and applicants in accordance with the FNS Contingency Plan issued October 1, 2013.

FNS understands that States are concerned about future operations stemming from the continuing lapse in Federal funding and have appreciated the information you provided us recently regarding your issuance and notice timelines.

According to the information we have received, several States provide the next month's issuance files as early as the 15th of the month. With that in mind, understanding the operational issues and constraints that States face, and in the interest of preserving maximum flexibility, we are directing States to hold their November issuance files and delay transmission to State electronic benefit transfer (EBT) vendors until further notice.

FNS will continue to work with our States and appreciates your continued support in responding to information requests that will assist in the ultimate course of action. If you have any questions, please contact your Regional Administrator or Jessica Shahin, Associate Administrator for the Supplemental Nutrition Assistance Program (SNAP), at jessica.shahin@fns.usda.gov.

Sincerely,

Audrey Rowe
FNS Administrator

cc:    Regional Directors
Supplemental Nutrition Assistance Program
All Regions

- By Oct. 25
- 191,000 people in Hawaii on program.
- 24.7 M per month

<u>November</u>

Q. Is it possible for a State to step in to cover the cost of SNAP benefits once SNAP funding runs out at the end of the month? Is there any precedent for a State taking over the federal government's costs for the program? Has FNS issued any guidance on how a state would be able to do so (including technical questions of loading the benefits on EBT cards). Have any State agencies reached out to FNS on this question?

A. FNS is hopeful that the current lapse in appropriations for SNAP will be resolved in time to permit normal, timely issuance of November benefits. If November benefits should be suspended due to the absence of funding, States may elect to continue issuance with State funds by working directly through their EBT contractors. However, FNS's ability to subsequently reimburse States for any such issuance and the associated administrative expenses is unclear. Significant legal and financial considerations would need to be addressed before any reimbursement could occur. If a State were to undertake this course of action, it would need to do so at its own risk and with no assurance of Federal reimbursement.

Q. If a state were to provide a week's cash benefit to help the neediest food stamp recipients pay for food in November, for the reason that logistically making a State issued food stamp payment through EBT is too complicated, then would that cash benefit be FNS reimbursable when government opens up again and retroactive payments to states are authorized?

A. FNS is hopeful that the current lapse in appropriations for SNAP will be resolved in time to permit normal timely issuance of November benefits. SNAP is a food benefit and is provided with limitations associated with the purchase of eligible foods. If a State issued a cash benefit to help SNAP participants pay for food in November, this would be done at the State's option and decision; there is no vehicle, barring specific Congressional action, that would provide for Federal reimbursement of a cash benefit.

Q. Vermont is considering using state funds to pay the 3SquaresVT benefit to our Cash Out recipients. They would like to know if it is OK to pay just those folks, about 17,000, and not pay the rest of our 3SquaresVT beneficiaries. If it is OK to do this can we get a reimbursement from FNS to cover this expense once the shutdown has been resolved?

A. Vermont would need to discuss the legal implications to the State for providing funds to some SNAP recipients and not others with their own general counsel. If Vermont were to undertake this course of action, it would do so at its own risk and with no assurance of Federal reimbursement.

Q. The following question was raised outside of State inquiries, but FNS thought it would be of interest to States: As Vice Chair for the State Forum of the Electronic Government Payments Council, I have been asked to send something out to the states regarding the Next Generation Conference in November 2013. We are hoping that we can tell them something positive so that people will continue to plan to attend. Any suggestions you have would be helpful.

A. Without a FY 2014 appropriation, FNS is unable to provide state exchange funds for conference attendance.  When a full FY 2014 appropriation becomes available, barring Congressional action, FNS would hope to reimburse 1 SNAP attendee per State, as we have in the past.

**Q.  Several States have indicated that their governments are starting to look at the possibility of furloughs for staff who have federal funding attached to their salaries.  What advice do you have for States considering furloughs of staff with federal funding attached to their salaries?**

A. It is anticipated that once an appropriation is enacted, barring other Congressional action, normal FY 2014 SAE and other allowable reimbursements will be made available to the States.  Employees continuing normal SNAP activities would presumably be considered allowable reimbursements.  FNS expects States to continue to conduct eligibility and issuance processes, integrity, oversight and system maintenance in order to ensure that benefits will reach those in need.

**Q.  Would we be required to provide some sort of adverse action notice for November benefits? We would prefer to send a letter or communication as opposed to a system generated notice if needed or required. However, a mailing would certainly not be without a substantial cost to the State.**

A.  States should handle the noticing as mass changes, which may be publicized via news media, posters in certification offices, issuance locations, or other sites frequented by certified households, or general notices mailed to households.  Many States choose to go beyond the minimum requirements and issue notices directly to households in order to minimize confusion and provide good customer service; however, this is not subject to the 10 day notice requirements.  For those States sending a separate notice, they may want to consider delaying the release of the notification until there is more certainty regarding November funding in order to avoid client confusion.

**Q.  If there is no legislation signed and November benefits are not issued, will that be considered a mass change?**

A.  Yes.

**Q.  Bottom line is that not knowing how to proceed for November monthly benefits is not the bigger issue as we can make that call very late and not affect timely issuance (October 30).  The much greater concern is not knowing how to handle daily expedited files.  Should we assume based on the guidance yesterday that we should continue processing those daily files all the way through the end of October as well even though they obligate funding into November?**

A.  Yes. While an expedited issuance in the latter half of October will reflect a pro-rata share of the October allotment and the full November allotment, it is considered an October issuance.

# EXHIBIT I

| | |
|---|---|
| **From:** | Shahin, Jessica - FNS |
| **Sent:** | Monday, January 14, 2019 3:32 PM |
| **To:** | FNS Regions |
| **Subject:** | Q&A document, Volume 2 |
| **Attachments:** | Early Issuance QA #2_FINAL_1.14.19.docx |

Please find attached the second set of Q&As to distribute to States related to the administration of SNAP during the lapse in funding.

Please let us know if you have any questions.


Thanks,

*Jessica*

Jessica Shahin
Associate Administrator
Supplemental Nutrition Assistance Program (SNAP)
Food and Nutrition Service
U.S. Department of Agriculture

1

**Early Issuance of February 2019 SNAP Benefits – Questions & Answers #2**

1. **Can you please provide clarification regarding the answer to #10 in the 1/10/2019 Q&A relating to pending recertifications? Should recertifications (expiring in January) that are still pending at the time the early issuance file is sent be included in the early issuance file, or should they be sent after all case actions are complete (interview, eligibility authorization)? Can you confirm that the contingency reserve is available to provide benefits for these cases in February?**

*Recertification issuance files should only be sent to the EBT processor after all actions are complete. FNS can confirm that limited funding is available from the contingency that can be used to provide benefits for February. This reserve is being used to fund recertifications and new applications through February.*

2. **Will benefits available by January 31st still be available for use after the 31st?**

*Yes.*

3. **For applications with a date of application prior to February but not approved until February— are we to issue the prior months benefits? If a supplement or restoration needs to be issued after January 20th for a previous month of benefits, can these benefits be issued to the customer?**

*Yes, States should handle these situations according to normal procedures.*

4. **Is there any possibility that we will have access to SNAP QCS?**

*SNAPQCS is currently operational. States should continue submitting files to QCS as they normally would. FNS will notify States should the status of QCS change.*

*Note: The information provided on the 1/11/19 Conference Call that the SNAPQCS was shut down was incorrect.*

5. **How should States handle new applications that are determined eligible for February benefits if they will not receive a combined allotment in January?**

*Limited funding within the SNAP contingency reserve is available for these cases; it is for this reason that it is so critical that States issue their regular ongoing benefits by January 20th. States should handle new applications for February benefits according to normal procedures.*

1

**6.   What are the specific notice requirements for early issuance of February benefits?**

*As indicated in FNS' 1/9/2019, Q&A, States should treat the early issuance as they would a mass change for the purpose of noticing SNAP households.  States should refer to 273.12(e)(1) regarding notice requirements.*

*Clear communication will be key to ensuring the early issuance process goes smoothly.  State agencies must engage in appropriate outreach and communication strategies to ensure that SNAP households understand that benefits are being issued earlier, rather than in addition to, their normal allotment, so participants can properly budget and plan.*

7.   **Will FNS provide more detail on a "hold harmless" for Quality Control purposes**?

*Not at this time.*

**8.   The blanket waiver for the early issuance does not include a waiver of the 40-day limit between issuances?  Would FNS approve such a waiver due to the extraordinary circumstances?**

*FNS appreciates the challenges the early issuance is presenting to States and recognizes that it will require effective communication and strategic budgeting in order for SNAP households to continue meeting their food needs while receiving their benefits outside of the normal issuance cycle.  Once the early issuance is completed, FNS expects to work closely with our State agency partners to mitigate these challenges and develop solutions that balance effective program administration with meeting the needs of the households we serve.*

**9.   If the shutdown is resolved and the Federal government reopens prior to the early issuance date, does FNS expect States to change course and issue February benefits on their normal schedule?**

*No.  Given the short timeframe before the early issuance files are due to the processors, it is critical that States continue working toward the deadlines provided to ensure eligible households receive benefits for February.  If the status of appropriations changes in the coming days, FNS expects that States will likely move forward with the early issuance; States would not be required to make changes to their plans.*

# EXHIBIT J

**(https://www.merkley.senate.gov)**



# MERKLEY: A GOVERNMENT SHUTDOWN WOULD SHUT DOWN FOOD STAMPS

HOME (HTTPS://WWW.MERKLEY.SENATE.GOV/) / NEWS
(HTTPS://WWW.MERKLEY.SENATE.GOV/NEWS/) / **MERKLEY: A GOVERNMENT SHUTDOWN WOULD SHUT DOWN FOOD STAMPS**

🇺🇸 **English**



Merkley: A Government shutdown would shut down food stamps

September 22, 2015: Oregon's Senator Jeff Merkley, the Ranking Member of the U.S. Senate Agriculture Appropriations Subcommittee, discusses the potential loss or delay of food assistance for millions of Americans if the government shuts down

🇺🇸 **English**



🇺🇸 **English**

# ABOUT

Meet Jeff

Legislative Priorities

Oregon Stories

# NEWS

Press Releases

In The News

Videos

# HELPING YOU

Help With A Federal Agency

Email Jeff

Visit Washington D.C.

# CONNECT

Town Halls

Get Jeff's Updates

Follow Jeff



(https://www.facebook.com
(https://www.instagram.com
(https://www.youtube.com/channel/UC
(https://twitter.com/Se

English

# EXHIBIT K





**SHERROD BROWN**
U.S. SENATOR FOR OHIO

SEPTEMBER 23, 2015

## WITH 1.7 MILLION OHIOANS DEPENDING ON FOOD ASSISTANCE, BROWN CALLS FOR ACTION TO PREVENT A GOVERNMENT SHUTDOWN

Unlike 2013 Shutdown Which Utilized Leftover Recovery Act Funds, a 2015 Shutdown Could Result in Loss of Food Stamps for Some of the 45 Million Americans Who Rely on SNAP to Put Food on the Table

  

WASHINGTON, D.C. – With more than 1.7 million Ohioans depending on food stamps through the SNAP program in 2014 – more than 60 percent of whom are children, the elderly, or Americans with disabilities – U.S. Sen. Sherrod Brown (D-OH) today called on his Republican colleagues to pass a clean spending bill. Brown was joined by Ohio Association of Foodbanks Executive Director Lisa Hamler-Fugitt.

"Another shutdown would hurt all Americans, but would be particularly hard on those that need the help the most: children, older Americans, and those with disabilities," Brown said. "It's time to stop the partisan stunts, and pass a clean continuing resolution, so that these Ohio families don't have to worry about where their next meal is coming from."

While the United States Department of Agriculture (USDA) was able to use remaining *Recovery Act* funds to continue Supplemental Nutrition Assistance Program (SNAP) benefits in 2013, there are no contingency funds to cover the cost of SNAP benefits if the government shuts down on Oct. 1, 2015. This could result in the loss or interruption of food assistance for nearly 45 million Americans. In 2014, 1.75 million Ohioans utilized SNAP to put food on the table.

###

## RELATED ISSUES

Agriculture & Rural Communities ›
Promoting Equal Rights & Opportunity ›

← PREVIOUS                                    NEXT →

# EXHIBIT L

**(https://www.merkley.senate.gov)**



# MERKLEY WARNS SNAP BENEFITS COULD RUN OUT, CALLS FOR ROBUST FUNDING IN CURRENT AND UPCOMING FISCAL YEAR

August 12, 2020

WASHINGTON, D.C. — Oregon's Senator Jeff Merkley, who serves as the top Democrat on the Senate Appropriations subcommittee that oversees funding for the U.S. Department of Agriculture, released the following statement today warning that troubling USDA data highlights the possibility that the Supplemental Nutrition Assistance Program (SNAP) could run out of funds before the end of this fiscal year:

🇺🇸 **English**

"Even before the coronavirus hit, keeping food on the table and in kids' lunchboxes was a daily struggle for hundreds of thousands of Oregonians and millions of Americans across the country. For the 43 million Americans who receive SNAP benefits, this program is the difference between going to bed with a full or an empty belly. But now, without more funding for SNAP, we run the very real risk that this lifeline will not be there for them by the time the fiscal year ends.

"The Department's projected $2 billion surplus at the end of September assumes that SNAP participation is unchanged over the rest of the fiscal year. That assumption is dangerously flawed.

"From March to April of this year alone, 6 million people became newly-eligible for SNAP. Since the virus is still not contained in America, unlike in countries that have managed the pandemic response more competently, that participation number is expected to continue to climb as the health and economic consequences of the coronavirus crisis deepen. Because the Senate Republicans and President Trump have chosen to cut unemployment insurance in the middle of this economic crisis, still more Americans are going to have to turn to SNAP as their incomes fall. Moreover, SNAP participation goes up in the wake of natural disasters. A bad hurricane year, as 2020 is forecast to be, can itself add $2 billion to the SNAP bill. Taken together, these factors point to a grave risk that SNAP will run out of funding before September 30.

"In the richest country in the world, no person should go hungry. Congress must ensure that SNAP doesn't run out of resources, and that the program receives the funding it needs in both the current and upcoming fiscal year to meet the unique challenges of this turbulent time. The White House and Senate Republicans felt that the Trump pandemic and recession warranted negotiating $160 billion in tax breaks for wealthy real estate and hedge fund investors into the CARES Act. Surely they will agree that supplemental funding for SNAP to ensure children don't go hungry is at least as important a priority."

Senator Merkley's statement comes as the Oregon Department of Health and Human Services reports that, largely due to the expiration of the $600 weekly unemployment benefit, SNAP applications increased by 37% during the first week of August. Applications had already risen 40-fold since the onset of the coronavirus crisis.

Merkley has long championed SNAP by advocating for necessary funding and fighting to strengthen benefits. Throughout the pandemic, he has worked to help vulnerable families limit their exposure to the virus by leading a group of colleagues in calling on Amazon and Walmart to waive delivery fees and minimum order requirements for SNAP participants, and teaming up with his colleagues to call on the USDA to immediately work to ensure that Americans who receive SNAP can receive home food delivery and curbside pickup. He has also led the effort to increase SNAP benefits to help families make it through the pandemic and the related economic fallout.

###

🇺🇸 **English**



 **English**

(https://www.facebook.com

(https://www.instagram.com

(https://www.youtube.com/channel/UCRo

(https://twitter.com/Se

🇺🇸 English

# EXHIBIT M

**The New York Times**

https://www.nytimes.com/2024/02/25/us/politics/spending-impasse-partial-shutdown.html

# *Spending Impasse Persists Amid G.O.P. Resistance as Partial Shutdown Looms*

With Republicans insisting on adding right-wing policy measures to spending bills, lawmakers are running out of time to strike a deal to avert a partial government shutdown before a deadline of Friday at midnight.



**By Catie Edmondson**
Reporting from Washington

Feb. 25, 2024

Congressional leaders have failed to reach a deal on legislation to keep federal funding going past Friday, with Republicans insisting on adding right-wing policy dictates to the spending bills, pushing the government to the brink of a partial shutdown within days.

Senator Chuck Schumer, Democrat of New York and the majority leader, said on Sunday that despite "intense discussions" that were continuing among top lawmakers to break the impasse, Republican recalcitrance was raising the prospect of a "disruptive shutdown" at midnight on Friday.

"While we had hoped to have legislation ready this weekend that would give ample time for members to review the text, it is clear now that House Republicans need more time to sort themselves out," Mr. Schumer said in a letter to Democratic senators. "With the uncertainty of how the House will pass the appropriations bills and avoid a shutdown this week, I ask all senators to keep their schedules flexible, so we can work to ensure a pointless and harmful lapse in funding doesn't occur."

With no sign of a breakthrough, President Biden summoned congressional leaders to the White House on Tuesday to discuss the spending legislation, as well as the $95 billion foreign aid package for Ukraine and Israel that the Senate passed

2/28/24, 11:13 AM
Case 4:23-cv-04678-JST  Document 51-2  Filed 02/28/24  Page 61 of 65
Spending Impasse Pushes Congress to Resistance the Partial Shutdown Looms - The New York Times

earlier this month, which Speaker Mike Johnson has refused to take up.

But the more immediate task was to keep government spending from lapsing this week.

Three consecutive times over the last six months, Congress has relied on short-term, stopgap spending bills passed by a bipartisan coalition of lawmakers to keep government spending flowing, essentially punting on a longer-term agreement for several weeks at a time. Each time, the Republican speaker — first Kevin McCarthy, then Mr. Johnson — has promised hard-right lawmakers that they would try to win more spending cuts and conservative policy conditions on how federal money could be spent during the next round of negotiations.

Now, with patience wearing thin among ultraconservatives, pressure is mounting on Mr. Johnson, whose members want him to secure major cuts and policy changes that have no chance of enactment with Democrats in control of the Senate and White House. Lawmakers in the House, which has been out of session for the past week, are set to return to Washington on Wednesday, just two days before a deadline on Friday to fund military construction, agriculture, transportation and housing programs.

Funding for all other agencies, including the Pentagon, is set to lapse at midnight on March 8.

In a statement on Sunday, Mr. Johnson said he had been laboring to reach a compromise.

"Despite the counterproductive rhetoric in Leader Schumer's letter, the House has worked nonstop, and is continuing to work in good faith, to reach agreement with the Senate on compromise government funding bills in advance of deadlines," Mr. Johnson said, adding: "This is not a time for petty politics."

Negotiators have continued to haggle over a series of partisan policy mandates that House Republicans had loaded into their spending bills, such as measures to restrict abortion access, that mainstream Republicans from competitive districts have refused to support.

Mr. Johnson in his statement on Sunday accused Senate Democrats of "attempting at this late stage to spend on priorities that are farther left than what their chamber agreed upon."

Several House Republicans conceded weeks ago that they expected Mr. Johnson to have little success winning significant policy concessions. Mr. Johnson told Republicans on Friday during a conference call that they should not expect the inclusion of many of their major policy priorities, though he said he expected to secure a number of more minor victories, according to people familiar with the private discussion who described it on the condition of anonymity. Part of the reason they would have to settle for less, he explained, was that hard-right lawmakers had routinely blocked consideration of spending legislation, sapping the House's leverage in talks with the Senate.

Instead, members of the ultraconservative Freedom Caucus have begun lobbying Mr. Johnson to instead pass a spending bill that would impose across-the-board cuts.

"If we are not going to secure significant policy changes or even keep spending below the caps adopted by bipartisan majorities less than one year ago, why would we proceed when we could instead pass a yearlong funding resolution that would save Americans $100 billion in year one?" they wrote in a letter to Mr. Johnson last week.

They were referring to a provision of the fiscal agreement made by Mr. McCarthy and Mr. Biden in May that would cut federal spending 1 percent across the board on April 30 if Congress could not reach a governmentwide spending deal before then.

But senators in both parties are determined to avoid that scenario because the cuts would particularly affect Pentagon spending.

**Catie Edmondson** covers Congress for The Times. More about Catie Edmondson

A version of this article appears in print on , Section A, Page 20 of the New York edition with the headline: No Deal Seen In Congress On Spending, Schumer Says

# EXHIBIT N



**United States Department of Agriculture**

# *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2020*

Supplemental Nutrition Assistance Program
Nutrition Assistance Program Report Series
Office of Policy Support

Report No. SNAP-21-CHAR

**Table A.1.a. Distribution of participating households, individuals, and benefits by household characteristic, pre-pandemic period**

| Household characteristic | SNAP households Number (000) | Percent | Participants in households with household characteristic Number (000) | Percent | Monthly SNAP benefits Number (000) | Percent |
|---|---|---|---|---|---|---|
| **Total** | 18,657 | 100.0 | 36,363 | 100.0 | 4,283,434 | 100.0 |
| **Household composition** | | | | | | |
| Children | 7,108 | 38.1 | 23,512 | 64.7 | 2,725,295 | 63.6 |
| School-age | 5,786 | 31.0 | 20,185 | 55.5 | 2,283,003 | 53.3 |
| Preschool-age | 3,396 | 18.2 | 12,184 | 33.5 | 1,446,577 | 33.8 |
| No children | 11,549 | 61.9 | 12,852 | 35.3 | 1,558,139 | 36.4 |
| Elderly individuals | 5,330 | 28.6 | 6,521 | 17.9 | 630,432 | 14.7 |
| No elderly individuals | 13,327 | 71.4 | 29,843 | 82.1 | 3,653,002 | 85.3 |
| Non-elderly individuals with disabilities | 4,071 | 21.8 | 7,258 | 20.0 | 724,010 | 16.9 |
| Non-elderly individuals with no disabilities | 14,586 | 78.2 | 29,106 | 80.0 | 3,559,425 | 83.1 |
| Adults age 18–49 without disabilities in childless households[a] | 2,492 | 13.4 | 2,987 | 8.2 | 465,988 | 10.9 |
| No adults age 18–49 without disabilities in childless households | 16,164 | 86.6 | 33,377 | 91.8 | 3,817,447 | 89.1 |
| Noncitizens | 945 | 5.1 | 2,050 | 5.6 | 235,612 | 5.5 |
| No noncitizens | 17,711 | 94.9 | 34,313 | 94.4 | 4,047,822 | 94.5 |
| **Locality** | | | | | | |
| Metropolitan | 15,332 | 82.2 | 29,756 | 81.8 | 3,529,218 | 82.4 |
| Micropolitan[b] | 1,841 | 9.9 | 3,687 | 10.1 | 422,433 | 9.9 |
| Rural | 1,091 | 5.8 | 2,202 | 6.1 | 246,149 | 5.7 |
| Unknown locality | 393 | 2.1 | 718 | 2.0 | 85,634 | 2.0 |
| **Countable Income Source** | | | | | | |
| Gross income | 15,199 | 81.5 | 30,823 | 84.8 | 3,301,231 | 77.1 |
| No gross income | 3,458 | 18.5 | 5,541 | 15.2 | 982,204 | 22.9 |
| Net income | 11,580 | 62.1 | 24,478 | 67.3 | 2,199,518 | 51.3 |
| No net income | 6,506 | 34.9 | 11,285 | 31.0 | 2,001,228 | 46.7 |
| Not applicable[c] | 570 | 3.1 | 600 | 1.6 | 82,689 | 1.9 |
| Earned income | 5,174 | 27.7 | 14,730 | 40.5 | 1,470,672 | 34.3 |
| No earned income | 13,483 | 72.3 | 21,634 | 59.5 | 2,812,763 | 65.7 |
| Unearned income | 11,768 | 63.1 | 21,437 | 59.0 | 2,298,372 | 53.7 |
| No unearned income | 6,889 | 36.9 | 14,926 | 41.0 | 1,985,063 | 46.3 |
| TANF | 674 | 3.6 | 2,158 | 5.9 | 252,276 | 5.9 |
| No TANF | 17,983 | 96.4 | 34,205 | 94.1 | 4,031,158 | 94.1 |
| GA | 768 | 4.1 | 1,432 | 3.9 | 179,855 | 4.2 |
| No GA | 17,888 | 95.9 | 34,931 | 96.1 | 4,103,579 | 95.8 |
| SSI | 4,667 | 25.0 | 7,637 | 21.0 | 806,237 | 18.8 |
| No SSI | 13,990 | 75.0 | 28,726 | 79.0 | 3,477,197 | 81.2 |
| Social Security | 5,933 | 31.8 | 8,388 | 23.1 | 750,871 | 17.5 |
| No Social Security | 12,724 | 68.2 | 27,975 | 76.9 | 3,532,564 | 82.5 |
| **Gross countable income as a percentage of poverty guidelines** | | | | | | |
| No gross income | 3,458 | 18.5 | 5,541 | 15.2 | 982,204 | 22.9 |
| 25 percent or less[d] | 1,349 | 7.2 | 3,253 | 8.9 | 544,283 | 12.7 |
| 26 to 50 percent | 1,850 | 9.9 | 5,119 | 14.1 | 769,358 | 18.0 |
| 51 to 75 percent | 3,391 | 18.2 | 6,903 | 19.0 | 836,956 | 19.5 |
| 76 to 100 percent | 5,084 | 27.2 | 8,687 | 23.9 | 824,364 | 19.2 |
| 101 to 130 percent | 2,291 | 12.3 | 4,745 | 13.0 | 262,742 | 6.1 |
| 131 percent or greater | 1,235 | 6.6 | 2,116 | 5.8 | 63,527 | 1.5 |
| **SNAP benefit** | | | | | | |
| Minimum benefit | 2,065 | 11.1 | 2,488 | 6.8 | 33,075 | 0.8 |
| Maximum benefit | 6,780 | 36.3 | 11,559 | 31.8 | 2,054,398 | 48.0 |

Source:    October 2019 through February 2020 data from the fiscal year 2020 SNAP QC sample.